**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |
| RED RIVER TALC LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 24-03194 (CML) |
| THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000, | **(Emergency Hearing Requested)** |
| Defendants. | |

**DEBTOR'S <u>EMERGENCY</u> MOTION FOR (I) AN ORDER (A) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS OR (B) PRELIMINARILY ENJOINING SUCH ACTIONS AND (II) A TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING**

**Emergency relief has been requested. Relief is requested not later than 2:30 p.m. (prevailing Central Time) on September 23, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on September 23, 2024 at 2:30 p.m. (prevailing Central Time) in Courtroom 401, 4th Floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference**

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

room number.  Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.

# TABLE OF CONTENTS

**Page**

NATURE OF PROCEEDING ...................................................................................... 1

JURISDICTION AND VENUE ................................................................................... 4

PRELIMINARY STATEMENT ................................................................................. 4

FACTUAL BACKGROUND ....................................................................................... 7

I.      BACKGROUND REGARDING TALC LITIGATION AGAINST THE
DEBTOR AND THE PROTECTED PARTIES ...................................................... 7

      A.      GENERAL BACKGROUND ..................................................................... 7

      B.      THE PENDING ACTIONS ......................................................................... 8

              (I)      THE MDL ........................................................................ 8

              (II)      THE MCL ........................................................................ 9

              (III)      INDIVIDUAL OVARIAN/GYNECOLOGICAL CANCER
ACTIONS ..................................................................... 10

              (IV)      THE FRAUDULENT TRANSFER ACTION ............................ 10

              (V)      THE MEDICAL MONITORING ACTION ............................. 11

II.     THE DEBTOR'S ULTIMATE RESPONSIBILITY FOR ALL DEBTOR TALC
CLAIMS ............................................................................................................. 12

      A.      J&J ADOPTS DECENTRALIZATION POLICY ............................................. 12

      B.      OLD JJCI'S RESPONSIBILITY FOR ALL LIABILITIES
ASSOCIATED WITH JOHNSON'S BABY POWDER ................................... 13

      C.      OLD JJCI'S RESPONSIBILITY FOR ALL LIABILITIES
ASSOCIATED WITH SHOWER TO SHOWER ............................................ 16

      D.      HEALTH AND MEDICAL SAFETY DECISIONS WERE MADE BY
OLD JJCI .......................................................................................... 18

      E.      FINANCIAL COURSE OF PERFORMANCE FOR PAYMENT OF
TALC LIABILITIES .............................................................................. 19

      F.      THE DEBTOR TALC CLAIMS ASSERTED AGAINST THE DEBTOR
AND J&J ARE THE SAME ...................................................................... 20

      G.      THE DEBTOR'S INSURANCE COVERAGE ............................................... 21

      H.      THE DEBTOR'S RETAILERS AND OTHER INDEMNIFIED PARTIES ...... 25

III.    THE 2021 CORPORATE RESTRUCTURING AND THE PRIOR CHAPTER 11
CASES ................................................................................................................ 28

      A.      THE 2021 CORPORATE RESTRUCTURING ................................................. 28

      B.      LTL'S CHAPTER 11 CASES ................................................................... 29

**TABLE OF CONTENTS**
(continued)

<b>Page</b>

    C.     NEW JJCI/OLD HOLDCO ................................................................ 30

IV.    THE PREPACKAGED PLAN AND 2024 CORPORATE RESTRUCTURING........... 31

    A.     THE 2024 CORPORATE RESTRUCTURING.................................................. 31

    B.     THE NEW FUNDING ARRANGEMENTS........................................................ 33

ARGUMENT ...................................................................................................................... 34

I.    THE COURT HAS SUBJECT MATTER JURISDICTION........................................... 34

    A.     THIS COURT HAS "ARISING UNDER" JURISDICTION TO APPLY
          AND EXTEND THE AUTOMATIC STAY......................................................... 35

    B.     THIS COURT HAS "ARISING IN" JURISDICTION TO GRANT
          RELIEF THAT WOULD HAVE NO EXISTENCE OUTSIDE OF
          BANKRUPTCY. ................................................................................................... 36

    C.     THIS COURT HAS "RELATED TO" JURISDICTION TO ENJOIN THE
          PROSECUTION OF THE DEBTOR TALC CLAIMS AGAINST THE
          PROTECTED PARTIES. ....................................................................................... 37

II.    THE AUTOMATIC STAY APPLIES OR EXTENDS TO PROHIBIT
    PROSECUTION OF THE DEBTOR TALC CLAIMS AGAINST THE
    PROTECTED PARTIES. ............................................................................................. 41

    A.     AN IDENTITY OF INTERESTS EXISTS BETWEEN THE DEBTOR
          AND THE PROTECTED PARTIES. ................................................................... 43

    B.     UNUSUAL CIRCUMSTANCES REQUIRE STAY PROTECTION TO
          PRESERVE THE DEBTOR'S REORGANIZATION EFFORTS..................... 47

          (I)     LIQUIDATION OF DEBTOR TALC CLAIMS OUTSIDE
                 THIS CHAPTER 11 CASE ....................................................... 47

          (II)    RISKS OF RES JUDICATA, COLLATERAL ESTOPPEL
                 AND EVIDENTIARY PREJUDICE............................................ 49

          (III)   POTENTIAL DIVERSION OF RESOURCES AND
                 DISRUPTION OF FUNDING..................................................... 52

    C.     ANY ACTION THAT COULD DEPLETE INSURANCE POLICIES IS
          AUTOMATICALLY STAYED BY SECTION 362(A)(3). .............................. 54

    D.     THE FRAUDULENT TRANSFER ACTION AND ANY OTHER
          ACTION SEEKING TO HOLD PROTECTED PARTIES LIABLE FOR
          THE DEBTOR TALC CLAIMS BASED ON DERIVATIVE
          LIABILITY, ALTER EGO, FRAUDULENT TRANSFER OR SIMILAR
          THEORIES ARE AUTOMATICALLY STAYED BY
          SECTION 362(A)(3). ........................................................................................... 55

**TABLE OF CONTENTS**
(continued)

Page

III.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(A) TO ENJOIN THE CONTINUATION OR COMMENCEMENT OF THE DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES. ........................ 60

    A.    THE COURT HAS AUTHORITY TO ENJOIN THE PURSUIT OF THE DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES. ........................................................................................... 60

    B.    THE PRELIMINARY INJUNCTION FACTORS ALL SUPPORT ENJOINING THE PURSUIT OF DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES. ........................................................... 63

        (I)    THERE IS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS. ...................................................... 64

        (II)    FAILURE TO ENJOIN LITIGATION OF DEBTOR TALC CLAIMS WOULD IRREPARABLY HARM THE DEBTOR ................................................................................. 66

        (III)    THE IRREPARABLE HARM THAT THE DEBTOR WOULD SUFFER IN THE ABSENCE OF AN INJUNCTION SUBSTANTIALLY OUTWEIGHS ANY PREJUDICE TO THE DEFENDANTS. ..................................... 67

        (IV)    INJUNCTIVE RELIEF WILL FURTHER THE PUBLIC INTEREST BY ENSURING THE DEBTOR'S SUCCESSFUL REORGANIZATION AND EQUITABLE TREATMENT OF DEFENDANTS. ........................................... 69

IV.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER TO EFFECTUATE THE RELIEF SOUGHT BY THE DEBTOR PENDING A FINAL HEARING. ........................................................................ 71

CONCLUSION ................................................................................. 74

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

<u>A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.)</u>,
    788 F.2d 994 (4th Cir. 1986) ................................................................. passim

<u>Alberto v. Diversified Group, Inc.</u>,
    55 F.3d 201 (5th Cir. 1995) ...........................................................................57

<u>Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to</u>
    <u>Complaint (In re Aldrich Pump)</u>,
    2021 WL 3729335 (Bankr. W.D.N.C. Aug. 20, 2021)........................39, 42, 62, 66

<u>Am. Can Co. v. Mansukhani</u>,
    742 F.2d 314 (7th Cir. 1984) .........................................................................73

<u>Arnold v. Garlock, Inc.</u>,
    278 F.3d 426 (5th Cir. 2001) .........................................................................37

<u>ASARCO LLC v. AMS Mining. Corp.</u>,
    382 B.R. 49 (S.D. Tex. 2007) .........................................................................57

<u>Atlanta Int'l Ins. Co. (as Successor in Interest to Drake Ins. Co.) v. Johnson &</u>
    <u>Johnson</u>,
    No. MID-L-003563-19, Superior Court of Middlesex County,................................24

<u>Baillie Lumber Co. v. Thompson (In re Icarus Holding, LLC)</u>,
    391 F.3d 1315 (11th Cir. 2004) .......................................................................56

<u>Berg v. Johnson & Johnson</u>,
    940 F.Supp.2d 983 (D.S.D. 2013) .....................................................................7

<u>Bergstrom v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co.)</u>,
    86 F.3d 364 (4th Cir. 1996) ...........................................................................37

<u>Bynum v. LLT Management LLC</u>,
    No. 3:24-cv-07065-MAS-RLS (D.N.J June 17, 2024)....................................11, 12

<u>Celotex Corp. v. Edwards</u>,
    514 U.S. 300 ...............................................................................................37

Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs.,
  138 B.R. 144 (S.D.N.Y. 1992) ................................................................................36

DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP),
  2021 WL 3552350 (Bankr. W.D.N.C. 2021) ................................................... passim

Edwards v. McElliotts Trucking, LLC,
  2017 WL 5559921 (S.D. W. Va. Nov. 17, 2017) ...................................................45

FDIC v. Hirsch (In re Colonial Realty Co.),
  980 F.2d 125 (2d Cir. 1992) ............................................................................42, 43

Fire Eagle, L.L.C. v. Bischoff (In re Spillman Dev. Grp., Ltd.),
  710 F.3d 299 (5th Cir. 2013) ...........................................................................38, 39

Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.,
  479 N.E.2d 1386 (Mass. 1985) .............................................................................26

First Tech. Safety Sys., Inc. v. Depinet,
  11 F.3d 641 (6th Cir. 1993) ...................................................................................73

FPSDA II, LLC v. Larin (In re FPSDA I, LLC),
  2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ...........................................36

FTC v. Garvey,
  383 F.3d 891 (9th Cir. 2004) .................................................................................49

Hood, et al. v. Acme et al.,
  No. 2020-CP10-03946 ...........................................................................................21

Hoover v. Morales,
  164 F.3d 221 (5th Cir. 1998) .................................................................................63

In re A.H. Robins Co. Inc. (A.H. Robins Co. v. Aetna),
  828 F.2d 1023 (4th Cir. 1987) ..............................................................................44

In re ACandS, Inc.,
  No. 02-12687 (PJW), Adv Pro. No. 02-5581 (PJW) (Bankr. D. Del. Sept. 27,
  2002) [Dkt. 16] ......................................................................................................62

In re Aearo Techs. LLC,
  642 B.R. 891 (Bankr. S.D. Ind. 2022) ..................................................................62

In re Aldrich Pump LLC,
   No. 20-30608 (JCW), Adv. Pro.No. 20-3041 (JCW) (Bankr. W.D.N.C. June
   25, 2020) [Dkt. 26].............................................................................................73

In re Am. Film Techs., Inc.,
   175 B.R. 847 (Bankr. D. Del. 1994) ............................................................. passim

In re Babcock & Wilcox Co.,
   2001 WL 536305 (E.D. La. 2001) ........................................................................64

In re Barretts Minerals Inc.,
   No. 23-90794, Adv. Pro. No. 23-03225 (Bankr. S.D. Tex. 2024) [Dkt. 92] ..........................35

In re Bass,
   171 F.3d 1016 (5th Cir. 1999) ..............................................................................38

In re Bestwall,
   606 B.R. 253 (Bankr. W.D.N.C. 2019)........................................................... passim

In re Bestwall LLC,
   71 F.4th 168 (4th Cir. 2023) ...................................................................35, 39, 40

In re Bestwall LLC,
   No. 17-31795 (LTB), Adv. Pro. No. 17-03105 (LTB) (Bankr. W.D.N.C. Nov.
   8, 2017) [Dkt. 18]...............................................................................................73

In re Boy Scouts of Am. and Del. BSA, LLC,
   650 B.R. 87 (D. Del. 2023)...................................................................................54

In re Brier Creek Corp. Ctr. Assocs. Ltd.,
   486 B.R. 681 (Bankr. E.D.N.C. 2013)...................................................................36

In re Caesers Ent. Operating Co., Inc.,
   561 B.R. 441 (Bankr. N.D. Ill. 2016) ....................................................................69

In re Calpine Corp.,
   365 B.R. 401 (S.D.N.Y. 2007)..............................................................................61

In re Canion,
   196 F.3d 579 (5th Cir. 1999) ................................................................................38

In re Cantu,
   784 F.3d 253 (5th Cir. 2015) ................................................................................56

*In re Caspri Corp.*,
    2010 WL 743914 (Bankr. W.D. Tex. 2010) ...........................................................57

*In re CDP Corp., Inc.*,
    462 B.R.615 (Bankr. S.D. Miss. 2011) ..................................................................63

*In re Combustion Eng'g, Inc.*,
    No. 03-10495 (JKF), Adv. Pro. No. 03-50839 (JKF) (Bankr. D. Del. Mar. 7,
    2003) [Dkt. 19]......................................................................................................62

*In re Davis*,
    730 F.2d 176 (5th Cir. 1984) ................................................................................37

*In re DBMP LLC*,
    No. 20-30080 (JCW), Adv. Pro. No. 20-3004 (JCW) (Bankr. W.D.N.C. Jan.
    29, 2020) [Dkt. 21]................................................................................................73

*In re DePuy Orthopaedics, Inc.*,
    888 F.3d 753 (5th Cir. 2018) ................................................................................59

*In re Divine Ripe, L.L.C.*,
    538 B.R. 300 (Bankr. S.D. Tex. 2015) .............................................................37, 43

*In re Dow Corning Corp.*,
    211 B.R. 545 (Bankr. E.D. Mich. 1997)................................................................70

*In re Eagle-Picher Indus., Inc.*,
    963 F.2d 855 (6th Cir. 1992) ................................................................................64

*In re Emoral Inc.*,
    740 F.3d 875 (3d Cir. 2014)..................................................................................59

*In re Family Health Servs., Inc.*,
    105 B.R. 937 (Bankr. C.D. Cal. 1989)..............................................................39, 61

*In re Federal-Mogul Glob., Inc.*,
    684 F.3d 355 (3d Cir. 2012)..............................................................................65, 68

*In re FiberTower Network Servs. Corp.*,
    482 B.R. 169 (Bankr. N.D. Tex. 2012)..................................................................64

*In re Fuel Oil Supply and Terminaling, Inc.*,
    30 B.R. 360 (Bankr. N.D. Tex. 1983)....................................................................35

In re G-I Holdings, Inc.,
No. 01-30135 (RG) ........................................................................................63, 73

In re Gander Partners LLC,
432 B.R 781 (Bankr. N.D. Ill. 2010) ..............................................................69

In re Garlock Sealing Techs. LLC,
No. 10-31607, Adv. Pro. No. 10-03145 (Bankr. W.D.N.C. June 21, 2010)
[Dkt. 14] .......................................................................................................35, 62

In re Harbison-Walker Refractories Co.,
No. 02-21627 (JKF), Adv. Pro. No. 02-02080 (Bankr. W.D. Pa. Feb. 14,
2002) [Dkt. 9] ...................................................................................................63

In re The Heritage Org., L.L.C.,
413 B.R. 438 (Bankr. N.D. Tex. 2009) ............................................................57

In re Heron, Burchette, Ruckert & Rothwell,
148 B.R. 660 (Bankr. D.D.C. 1992) .................................................................61

In re Honx, Inc.,
2022 WL 17984313 (Bankr. S.D. Tex. 2022) ............................................64, 70

In re HONX, Inc.,
No. 22-90035, Adv. Pro. No. 22-3129 (Bankr. S.D. Tex. Apr. 28, 2022)..............39

In re Houston Regional Sports Network, L.P.,
2014 WL 2159534 (Bankr. S.D. Tex. 2014).....................................................39

In re Hunt,
93 B.R. 484 (N.D. Tex. 1988).........................................................................63

In re Johns-Manville Corp.,
26 B.R. 420 (Bankr. S.D.N.Y. 1983) aff'd 40 B.R. 219 (S.D.N.Y. 1984), and
appeal allowed, decision vacated in part on other grounds, 41 B.R. 926
(S.D.N.Y. 1984) ......................................................................................51, 60, 69

In re Johns-Manville Corp.,
40 B.R. 219 ...................................................................................................51

In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and
Products Litig.,
No. 3:16-md-02738 (MAS) (RLS) (D.N.J.) ..........................................................6

In re Kaiser Gypsum Co., Inc.,
   No. 16-31602 (JCW), Adv. Pro. No. 16-03313 (JCW) (Bankr. W.D.N.C. Nov.
   4, 2016) [Dkt. 18]...................................................................................................62

In re Lazarus Burman Assocs.,
   161 B.R. 891 (Bankr. E.D.N.Y. 1993)................................................................61, 67

In re Leslie Controls, Inc.,
   No. 10-12199 (CSS), Adv. Pro. No. 10-51394(CSS) (Bankr. D. Del. July 14,
   2010) [Dkt. 46]...................................................................................................62, 73

In re LTL Mgmt. LLC,
   58 F.4th 738 (3d Cir. 2023) .....................................................................................29

In re LTL Mgmt. LLC,
   637 B.R. 396 (Bankr. D.N.J. 2022) rev'd and remanded by In re LTL Mgmt.
   LLC, 58 F.4th 738 (3d. Cir. 2023).............................................................................29

In re LTL Mgmt. LLC,
   No. 21-30589 (Bankr. D.N.J. Dec. 1-29, 2021)....................................................29, 49

In re LTL Mgmt. LLC,
   No. 22-2003 (3d. Cir. Mar. 31, 2003) [Dkt. 180] ....................................................30

In re LTL Mgmt. LLC,
   No. 23-12825 (Bankr. D.N.J. Apr. 24-May 10, 2023)..............................................30

In re Lyondell Chem. Co.,
   402 B.R. 571 (Bankr. S.D.N.Y. 2009) .....................................................................61

In re Mid Valley, Inc.,
   No. 03-35592 (JKF), Adv. Pro. No. 03-3296 (JKF) (Bankr. W.D. Pa. Dec. 17,
   2003) [Dkt. 7].........................................................................................................62

In re MortgageAmerica Corp.,
   714 F.2d 1266 (5th Cir. 1983) ............................................................................56, 58

In re Ms. Kipps, Inc.,
   34 B.R. 91 (Bankr. S.D.N.Y. 1983) .........................................................................46

In re Myerson & Kuhn,
   121 B.R. 145 (Bankr. S.D.N.Y. 1990)..................................................................39, 62

In re N. Am. Refractories Co.,
  No. 02-20198 (JKF), Adv. Pro. No. 02-2004 (JKF) (Bankr. W.D. Pa. Jan. 4,
  2002) [Dkt. 5] (TRO) ................................................................................................63

In re Philadelphia Newspapers, LLC,
  423 B.R. 98 (E.D. Pa. 2010) .....................................................................................45

In re Pittsburgh Corning Corp.,
  No. 00-22876 (JKF), Adv. Pro. No. 00-2161 (JKF) (Bankr. W.D. Pa. Apr. 16,
  2000) [Dkt. 6]............................................................................................................63

In re PTI Holding Corp.,
  346 B.R. 820 (Bankr. D. Nev. 2006) .........................................................................67

In re Purdue Pharms L.P.,
  No. 19-23649, Adv. Pro. No. 19-08289 [Dkt. 82] (Bankr. S.D.N.Y. Oct. 11,
  2019) aff'd 619 B.R. 38 (S.D.N.Y. 2020)..................................................................61

In re Quigley Co., Inc.,
  No. 04-15739, Adv. Pro. No. 04-04262 (Bankr. S.D.N.Y. Dec. 17, 2004) [Dkt.
  122] ............................................................................................................................53

In re Specialty Prods. Holding Corp.,
  No. 10-11780, Adv. Pro. No. 10-51085 (Bankr. D. Del. Oct. 13, 2010) [Dkt.
  72] ..................................................................................................................35, 62, 73

In re Sudbury,
  140 B.R. 461 (Bankr. N.D. Ohio 1992).................................................................51, 69

In re SunEdison, Inc.,
  576 B.R. 453 (Bankr. S.D.N.Y. 2017).......................................................................38

In re Talc Based Powder Products Litigation,
  Dkt. No. ATL-L-2648-15, Case No. 300 ...............................................................9, 10

In re TK Holdings Inc.,
  No. 17-50880, Adv. Pro. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017) [Dkt.
  63] ..............................................................................................................................61

In re Tronox, Inc.,
  855 F.3d 84 (2d Cir. 2017).........................................................................................59

In re TXNB Internal Case,
    483 F.3d 292 (5th Cir. 2007) ................................................38

In re United Health Care Org.,
    210 B.R. 228 (S.D.N.Y. 1997)................................................67

In re USA Gymnastics,
    No. 18-09108, Adv. Pro. No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019) [Dkt.
    71] ................................................61

In re W.R. Grace & Co.,
    115 F. App'x 565 (3d Cir. 2004) ................................................45, 52, 66

In re W.R. Grace & Co.,
    2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ................................................45, 46

In re W.R. Grace & Co.,
    475 B.R. 34 (D. Del. 2012)................................................61

In re W.R. Grace & Co.,
    No. 01-01139 (KJC), Adv. Pro. No. 01-00771 (KJC) (Bankr. D. Del. May 3,
    2001) [Dkt. 32]................................................63

Ingham v. Johnson & Johnson,
    No. 1522-CC10417, Circuit Court of the City of St. Louis,................................................19

Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,
    458 F.3d 244 (3d Cir. 2006)................................................50

Kocher v. Dow Chem. Co.,
    132 F.3d 1225 (8th Cir. 1997) ................................................39

Labarbera v. United Crane & Rigging Servs, Inc.,
    2011 WL 1303146 (E.D.N.Y. March 2, 2011) ................................................59

Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn.
    (In re Dow Corning Corp.),
    86 F.3d 482 (6th Cir. 1996), as amended on denial of reh'g and reh'g en banc
    (June 3, 1996)................................................38, 41

Love, D.D.S. v. LLT Mgmt. LLC,
    No. 3:24-cv-06320-MAS-RLS (D.N.J. May 22, 2024) ................................................10

Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC),
    No. 20-408, 2021 WL 523625 (D. Del. Feb. 11, 2021)....................................................38, 46

Matter of Edgeworth,
    993 F.2d 51 (5th Cir. 1993) .......................................................................................54

Matter of S.I. Acquisition, Inc.,
    817 F.2d 1142 (5th Cir. 1987) ........................................................................... passim

Matter of Zale Corp.,
    62 F.3d 746 (5th Cir. 1995) ....................................................................35, 39, 43, 47

McCartney v. Integra Nat'l. Bank N.,
    106 F.3d 506 (3d Cir. 1997)...............................................................................41, 43, 44

Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.,
    187 F.3d 439 (4th Cir. 1999) .....................................................................................59

Nat'l Oilwell Varco, L.P. v. Mud King Products, Inc.,
    2013 WL 1948766 (S.D. Tex. 2013) ........................................................................45

Pacor, Inc. v. Higgins,
    743 F.2d 984 (3d Cir. 1984)......................................................................................38

Parklane Hosiery Co. v. Shore,
    439 U.S. 322 (1979).................................................................................................50

Pfizer Inc. v. Angelos (In re Quigley Co., Inc.),
    676 F.3d 45 (2d Cir. 2012)........................................................................................55

Promaulayko v. Johns Manville Sales Corp.,
    562 A.2d 202 (N.J. 1989)..........................................................................................26

Purdue Pharm. L.P. v. Mass. (In re Purdue Pharm. L.P.),
    No. 19-23649 (Bankr. S.D.N.Y. Oct. 11, 2019) [Dkt. 87].......................................46

Queenie v. Nygard Int'l,
    321 F.3d 282 (2d Cir. 2003)......................................................................................43

Reliant Energy Services, Inc. v. Enron Canada Corp.,
    349 F.3d 816 (5th Cir. 2003) .....................................................................................43

Renate Nixdorf GmbH & Co. KG v. TRA Midland Properties, LLC,
　　No. 05-17-00577-CV, 2019 Tex. App. LEXIS 26, 2019 WL 92038 (Tex.
　　App.—Dallas Jan. 3, 2019, pet. denied) (mem. op.)...............................................59

Ritchie Cap. Mgmt., L.L.C. v. Jeffries,
　　653 F.3d 755 (8th Cir. 2011) ..................................................................................43

Russell v. SunAmerica Sec., Inc.,
　　962 F.2d 1169 (5th Cir. 1992) ................................................................................49

Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.),
　　922 F.2d 984 (2d Cir. 1990)....................................................................................41

Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.),
　　2000 WL 33716976 (Bankr. S.D.N.Y. Nov. 3, 2000) ...........................................45

Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.),
　　502 F.3d 1086 (9th Cir. 2007) ................................................................................64

Steyr-Daimler-Puch of Am. Corp. v. Pappas,
　　852 F.2d 132 (4th Cir. 1988) ..................................................................................57

Terrell v. DeConna,
　　877 F.2d 1267 (5th Cir. 1989) ................................................................................50

Test Masters Educ. Servs., Inc. v. Singh,
　　428 F.3d 559 (5th Cir. 2005) .............................................................................49, 50

Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs. by Jamie, Inc.),
　　230 B.R. 36 (Bankr. D.N.J. 1998) ..........................................................................58

Union Tr. Phila., LLC v. Singer Equip. Co. (In re Union Tr. Phila., LLC),
　　460 B.R. 644 (E.D. Pa. 2011) .................................................................................52

United States v. Whiting Pools, Inc.,
　　462 U.S. 198 (1983)................................................................................................69

W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC,
　　437 S.W.3d 917 (Tex. App.—Dallas Aug. 5, 2014)..............................................59

W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),
　　386 B.R. 17 (Bankr. D. Del. 2008) ................................................................. passim

<u>Wood v. Wood (In re Wood)</u>,
    825 F.2d 90 (5th Cir. 1987) ...........................................................................35, 37

**STATUTES**

11 U.S.C.
    § 105............................................................................................................ passim
    § 362............................................................................................................ passim
    § 524............................................................................................................ passim
    § 541.............................................................................................................54, 56
    § 544.............................................................................................................56, 58
    § 548..................................................................................................................35
    § 549..................................................................................................................35

28 U.S.C.
    § 157....................................................................................................................4
    § 1334...........................................................................................................4, 34
    § 1409..................................................................................................................4

Ariz. Rev. Stat. Ann.
    § 12-684.............................................................................................................26

Ark. Code Ann.
    § 16-116-207.....................................................................................................26

Iowa Code Ann.
    § 613.18.............................................................................................................26

Tex. Civ. Prac. & Rem. Code Ann.
    § 82.002.............................................................................................................26

Texas Fraudulent Transfers Act...........................................................................58

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 7001....................................................................................1, 4

Fed. R. Bankr. P. 7008.........................................................................................4

Fed. R. Bankr. P. 7065......................................................................1, 4, 53, 71

Fed. R. Civ. P. 65.........................................................................................71, 74

FRE 702................................................................................................................9

FRE 1006 .................................................................................................................22, 23, 40

13 Moore's Federal Practice § 65.36 (2019) .........................................................71

*Order Granting in Part and Denying in Part Debtors' Mot. for Prelim. Inj.*, In re
  TK Holdings Inc., No. 17-50880-BLS.......................................................39

*Order Granting Preliminary Injunction*, In re The Babcock & Wilcox Co., No.
  00-10992 .............................................................................................39

*Order Regarding Debtor's Emergency Motion to Extend and Enforce the*
  *Automatic Stay*, In re Tehum Care Services, Inc., No. 23-90086 (Bankr. S.D.
  Tex. March 3, 2023) [Dkt. 43]..............................................................39

Restatement (Second) of Torts § 886B .................................................................26

Restatement (Third) of Torts § 22 .......................................................................26

S. Elizabeth Gibson, Judicial Management of Mass Tort Bankruptcy Cases,
  Federal Judicial Center, at 1 (2005),
  https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf ......................................65

## NATURE OF PROCEEDING

1.     On September 20, 2024 (the "Petition Date"), Plaintiff Red River Talc LLC (the "Debtor"), a Texas limited liability company, commenced the above-captioned chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Thereafter, to preserve the effectiveness and integrity of the automatic stay of section 362 of the Bankruptcy Code in place as a result of the commencement of the Chapter 11 Case, the Debtor has commenced the above-captioned adversary proceeding and filed this motion (the "Motion").

2.     Pursuant to sections 362 and 105(a) of the Bankruptcy Code and Rules 7001(7), 7001(9) and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtor seeks an order (the "Proposed Order") declaring that the automatic stay applies or extends to prohibit (a) the continued prosecution of the actions identified in Appendix A to the Complaint[1] (collectively, the "Pending Actions"), (b) the filing of any actions (collectively with the Pending Actions, the "Covered Actions") asserting Debtor Talc Claims (as defined below) against certain non-debtor parties (collectively, the "Protected Parties") while the Chapter 11 Case remains pending and (c) the expansion of any Pending Action to name as a party any Protected Party not named as of the Petition Date.  The Debtor further requests a preliminary injunction, to the extent necessary, enjoining the prosecution of the Covered Actions outside of the Chapter 11 Case while the Chapter 11 Case remains pending. In addition, the Debtor seeks a temporary restraining order (the "Temporary Restraining Order"),

---

[1]     Capitalized terms used but not defined herein have the meanings given to them in the Plan (as defined below).

entered on limited notice, to effectuate the requested declaratory or injunctive relief pending a final hearing on this Motion.

3.      The defendants in this adversary proceeding (collectively, the "Defendants") are the named plaintiffs identified on Appendix A to the Complaint, as well as John and Jane Does 1-1000.[2]  The Protected Parties are identified on Appendix B to the Complaint and consist of:[3]

(a)     former Johnson & Johnson Consumer Inc. ("Old JJCI"), former Johnson & Johnson Holdco (NA) Inc. ("Old Holdco") (f/k/a Johnson & Johnson Consumer Inc. ("New JJCI")) and former LLT Management LLC ("LLT") (f/k/a LTL Management LLC ("LTL")), which are entities that no longer exist and certain of whose talc-related claims were allocated to the Debtor;

(b)     the Debtor's non-debtor affiliates set forth on Appendix B to the Complaint (collectively, the "Non-Debtor Affiliates") including, without limitation, Johnson & Johnson ("J&J"), Johnson & Johnson Holdco (NA) Inc. ("New Holdco") (f/k/a/ J&J Intermediate Holding Corp.), Pecos River Talc LLC ("Pecos River") and Kenvue, Inc. ("Kenvue");

(c)     third-party retailers who sold Old JJCI's talc-containing products (the "Retailers") and other third parties whom the Debtor has indemnified contractually (the "Indemnified Parties"), set forth on Appendix B to the Complaint; and

(d)     insurance entities set forth on Appendix B to the Complaint, which have issued insurance policies that the Debtor has access to for coverage for talc-related liabilities (the "Insurers").

4.      As used herein, "Debtor Talc Claims" means, collectively, any talc-related claim against the Debtor, including all claims relating in any way to talc or talc-containing

---

[2]      Appendix A identifies the civil action number (where available) for each lawsuit and the law firms representing each of the Defendants on account of their talc claims.  The Debtor reserves the right to supplement, amend or otherwise modify Appendix A.  For the avoidance of doubt, the inclusion of a talc-related claim on Appendix A is not an admission that such Defendant holds a currently pending claim against either the Debtor or any Protected Party.

[3]      The Debtor reserves the right to seek to supplement, amend or otherwise modify the list of Protected Parties, including, in particular, to request that additional parties be included as Protected Parties.

products or materials that formerly were asserted against (or that could have been asserted

against) LLT on any theory of liability (whether direct, derivative, joint and several, successor

liability or vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or

otherwise).  Notwithstanding the foregoing, Debtor Talc Claims do not include:  (a) any claim or

demand that (i) alleges that the relevant injured or deceased individual was exposed to talc or the

product or material containing talc, as applicable, in Canada or resided in Canada at the time

such claim is filed or (ii) was brought, threatened, or pursued in any court in Canada; (b) any

claim or demand asserted or assertable by or on behalf of any governmental unit under any

federal, state, international, or foreign consumer or employee protection rule, statute, or

regulation; and (c) any claim or demand that alleges that the relevant injured or deceased

individual developed Mesothelioma or Lung Cancer in connection with such individual's use of

talc or a product or material containing talc.

   5. Contemporaneously herewith in further support of this Motion, the Debtor

has filed:  (a) the *Debtor's Complaint for Declaratory and Injunctive Relief (I) Declaring That

the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining

Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing*

(the "Complaint") that initiated this adversary proceeding; (b) the *Declaration of John K. Kim in

Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motion*

(the "Kim Declaration"); (c) the *Declaration of Adam Lisman in Support of Debtor's Complaint

for Declaratory and Injunctive Relief and Related Motion* (the "Lisman Declaration"); and

(d) the *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day

Pleadings* (the "First Day Declaration"), filed in the Chapter 11 Case.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this adversary proceeding
and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding
pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the
Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), the Debtor
consents to the entry of final orders or a final judgment by this Court in this adversary
proceeding.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

7.      The statutory bases for the requested relief are sections 362(a)
and 105(a) of the Bankruptcy Code and Bankruptcy Rules 7001(7), 7001(9) and 7065.

## PRELIMINARY STATEMENT

8.      After extensive negotiations with law firms representing the majority of
claimants asserting ovarian cancer-related talc claims, as well as Ms. Randi S. Ellis, the proposed
representative for future claimants (the "FCR"), LLT, Old Holdco and J&J (collectively,
the "Company") formulated and successfully solicited acceptance of a prepackaged plan of
reorganization (the "Plan") to finally and comprehensively resolve all current and future
ovarian-cancer and other gynecological-cancer claims related to JOHNSON'S® Baby Powder
("Johnson's Baby Powder") and Shower to Shower products.  The Plan was subsequently
amended (the "Amended Plan") to improve the treatment of talc claimants as a result of a
memorandum of understanding (the "Memorandum of Understanding")[4] reached with The Smith
Law Firm.[5]

---

[4]      A copy of the Memorandum of Understanding is attached to the First Day Declaration as Annex A.

[5]      On the Petition Date, the Debtor filed the Amended Plan and a redline marked to show the changes made to
the Plan.

9.     The Debtor intends to promptly seek Court approval of the adequacy of the Disclosure Statement and the prepetition solicitation procedures in respect of the Plan. The Debtor also intends to seek confirmation of the Amended Plan as soon as practicable, likely in January, 2025.

10.     The Amended Plan proposes to establish a trust (the "Talc Personal Injury Trust") to process and pay "Channeled Talc Personal Injury Claims," which generally include all claims and demands asserted against the Debtor, J&J or any other Protected Party alleging injury from ovarian cancer and other gynecological cancers.[6]  Under the Amended Plan, the Talc Personal Injury Trust will be funded by a stream of payments in the aggregate amount of approximately $9 billion payable over 25 years.  This proposed level of funding for the Amended Plan constitutes one of the largest settlements ever reached in a mass tort product liability case, including cases where, unlike here, the alleged liability was undisputed.  As a result, the Amended Plan will provide qualifying holders of Channeled Talc Personal Injury Claims with substantial recoveries and eliminate the uncertainty of litigation in the tort system.

11.     The Debtor's recent plan solicitation demonstrated that the overwhelming majority of claimants (over 83%) are in favor of resolving their asbestos-based talc claims through the Amended Plan notwithstanding the multi-front attack launched by a limited number of economically conflicted plaintiff firms led by the Beasley Allen Law Firm ("Beasley Allen") to subvert the vote and thwart any consensual bankruptcy resolution.  Despite the unrelenting actions by these few plaintiff firms, including the submission by Beasley Allen (through a master

---

[6]     The Amended Plan does not resolve and will not affect:  (a) claims and demands alleging injury from mesothelioma or lung cancer; (b) claims and demands of governmental entities; and (c) Canadian claims and demands.  All holders of claims against the Debtor other than Channeled Talc Personal Injury Claims will be unimpaired by the Amended Plan because the Amended Plan does not modify their legal, equitable, or contractual rights, other than by curing defaults and reinstating maturities.

ballot) of thousands of "no" votes premised on a false certification that Beasley Allen had

obtained the claimants' "informed consent" to vote "no," the Debtor has secured the requisite

support of the current claimants (over 75%).  The FCR continues to support the Amended Plan,

with the understanding that the FCR has not approved the Memorandum of Understanding.

The holdouts are led primarily by a minority of plaintiff firms that have a vested interest in

maintaining the Pending Actions, and particularly the intractable multidistrict litigation pending

in the United States District Court for the District of New Jersey (the "New Jersey District

Court"), styled In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and

Products Litig., No. 3:16-md-02738 (MAS) (RLS) (D.N.J.) (the "MDL"), in which the

Channeled Talc Personal Injury Claims of tens of thousands of claimants have been languishing

since 2016.

12.     At bottom, whether asserted against the Debtor or any Protected Party—

and however characterized in the creative pleadings of plaintiff firms—any Debtor Talc Claim

asserts the same claim and arises from the same product and the same alleged injury as the

claims against the Debtor that are the subject of this Chapter 11 Case.  A stay and injunction with

respect to all Covered Actions is therefore critical to (a) give proper effect to the automatic stay

of section 362 of the Bankruptcy Code, (b) avoid irreparable harm to the Debtor's reorganization

efforts and (c) lay the foundation for a successful and expeditious resolution of this Chapter 11

Case.

# FACTUAL BACKGROUND

## I.    BACKGROUND REGARDING TALC LITIGATION AGAINST THE DEBTOR AND THE PROTECTED PARTIES

### A.    General Background

13.    Cosmetic talc litigation against the Debtor, its predecessors and the other Protected Parties has focused primarily on Johnson's Baby Powder as a purported cause of ovarian cancer.  Kim Decl. ¶ 5.  Plaintiffs historically assert two types of claims:  (a) claims alleging ovarian cancer arising as a result of talc exposure, i.e., ovarian cancer claims, and (b) claims alleging respiratory cancers or other asbestos-related diseases arising as a result of talc exposure, i.e., mesothelioma claims.  Id.  For over 125 years, Johnson's Baby Powder has been used by hundreds of millions of consumers worldwide.  Id.  On May 19, 2020, the Company announced that it would permanently discontinue its line of talc-based Johnson's Baby Powder in the United States and Canada.[7]  Id.  Additionally, on August 11, 2022, the Company announced that talc-based Johnson's Baby Powder would be discontinued globally in 2023 in a transition to a cornstarch-based product.  Id.  Those decisions were based on business considerations, including lack of sales due to misinformation about the safety of Old JJCI's talc-based Johnson's Baby Powder.  Id.

14.    Prior to 2010, there were only a small number of isolated lawsuits alleging claims related to Johnson's Baby Powder or Shower to Shower.  Id. ¶ 6.  Claims started to increase after the jury in a 2013 talc-related ovarian cancer case, Berg,[8] found for the plaintiff but

---

[7]    Upon information and belief, Shower to Shower products sold in the U.S. and Canada no longer include talc.  Kim Decl. ¶ 5, n. 3.  Like Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and Canada no longer contained talc as of 2020.  Id.

[8]    Berg v. Johnson & Johnson, 940 F.Supp.2d 983, 993 (D.S.D. 2013).

awarded no damages.  Id.  In 2014, Old JJCI was served with 46 ovarian cancer complaints.  Id.
In 2017, Old JJCI received nearly 5,000 complaints.  Id.

15.     In the years that followed the Berg verdict, tens of thousands of cases were
filed all over the country, resulting in the MDL (further described below) in New Jersey and
multiple state consolidations.  Id. ¶ 7.  As of the Petition Date, there are more than
60,000 plaintiffs asserting ovarian or other gynecological cancer claims against the Debtor in
jurisdictions across the country, including more than 57,000 plaintiffs with claims pending in the
MDL, more than 2,800 plaintiffs with claims pending in the MCL (defined and discussed below)
and more than 2,200 with claims pending in individual actions around the United States.  Id.

16.     Particularly with respect to allegations of ovarian cancer caused by
asbestos exposure, ovarian-cancer related talc litigation against the Debtor is anticipated to
continue for decades more, as are the extraordinary costs of defending and resolving the tens of
thousands of expected claims.  Id. ¶ 8.  As a result, although Old JJCI stopped selling its
talc-based Johnson's Baby Powder in North America in 2020 and globally in 2023, individuals
who develop ovarian cancers for years into the future could sue the Debtor.  Id.

B.     The Pending Actions

(i)     The MDL

17.     On October 4, 2016, the United States Judicial Panel on Multidistrict
Litigation ordered that pending and future personal injury or wrongful death actions in federal
courts alleging that plaintiffs or their decedents developed ovarian cancer from the use of
Johnson's Baby Powder and Shower to Shower body powder be transferred and centralized in
the New Jersey District Court.  Kim Decl. ¶ 9.  In addition to individual actions pending in
federal district courts around the country, two consumer class actions alleging that Johnson's

Baby Powder and Shower to Shower body powder products were marketed for use without disclosure of talc's allegedly carcinogenic properties were included in the MDL.  Id.

18.     The MDL cases were consolidated in part to prevent inconsistent rulings on Daubert motion practice.  Id. ¶ 10.  During the pendency of the LTL's 2021 chapter 11 case (the "2021 Chapter 11 Case"), the New Jersey District Court reviewed briefing in the MDL and decided a threshold Daubert issue of whether reliable and sufficient scientific and medical evidence exists on the issue of causation.  Id.  As a result of that review, the New Jersey District Court granted in part J&J's motion to exclude opinions of plaintiffs' five witnesses and denied plaintiffs' motion to exclude the opinions of J&J's three experts.  Id.

19.     Since that decision, on March 27, 2024, over objection from the MDL Plaintiffs' Steering Committee (the "PSC"), the New Jersey District Court has ruled that, given the emergence of new and highly relevant science, recent changes to Rule 702 of the Federal Rules of Evidence, and certain limitations of the previous Daubert order, the court would hear new, full-scale Daubert expert challenges.  Id. ¶ 11.  The Debtor filed six separate Daubert motions in the MDL that implicate every expert witness put forward by the PSC on multiple grounds.  Id.  Briefing on the Daubert issues was completed on August 22, 2024.  Id.

### (ii)     The MCL

20.     On May 19, 2015, the defendants in the talcum powder products cases currently pending in Atlantic and Bergen counties in New Jersey submitted an application for centralized management of the cases.  Kim Decl. ¶ 12.  At the time of the application, there were 103 pending cases in New Jersey involving claims of more than 156 plaintiffs.  Id.  The Supreme Court of New Jersey entered an order dated October 20, 2015 designating the cases as part of a multicounty litigation in Atlantic County, styled In re Talc Based Powder Products Litigation, Dkt. No. ATL-L-2648-15, Case No. 300 (the "MCL"), for centralized case management

purposes.  Id.  Similar to the MDL, broad scale factual discovery and other motions practice has

been underway.  Id.  Currently, the claims of over 2,800 plaintiffs are pending in the MCL.  Id.

### (iii)    Individual Ovarian/Gynecological Cancer Actions

21.    In addition to the MDL and MCL, the Pending Actions include the claims

of over 2,200 claimants, which are pending in other actions around the United States against one

or more of the Protected Parties alleging Debtor Talc Claims arising from ovarian or other

gynecological cancers.  Kim Decl. ¶ 13.  Each of these actions is identified on Appendix A to the

Complaint.

### (iv)    The Fraudulent Transfer Action

22.    On May 22, 2024, five plaintiffs, both individually and on behalf of a

proposed class, commenced a putative class action, styled Love, D.D.S. v. LLT Mgmt. LLC,

No. 3:24-cv-06320-MAS-RLS (D.N.J. May 22, 2024) (the "Fraudulent Transfer Action"),

against, among others, LLT, J&J, Old Holdco and certain of their officers and directors in the

New Jersey District Court.  See Kim Decl. ¶ 14.  The Fraudulent Transfer Action was allocated

to the Debtor in the 2024 Corporate Restructuring.  Id.  The complaint in the Fraudulent Transfer

Action alleges ten causes of action that generally seek to avoid (a) the 2021 Corporate

Restructuring, (b) the termination of the 2021 Funding Agreement (as defined below), and (c) the

separation of the Consumer Division (as defined below) into Kenvue on the basis that the

transactions were actual fraudulent transfers.  Id.; see also Ex. 1[9] (Fraudulent Transfer Action

Complaint) at ¶¶ 11-12.  The proposed class includes all persons who, as of August 11, 2023,

either had a pending lawsuit alleging an ovarian cancer or mesothelioma personal injury claim

caused by asbestos or other constituents in J&J talcum powder products or had executed a

---

[9]    Except as otherwise stated, any reference in this Motion to an exhibit signifies the applicable exhibit to the
Kim Declaration.

retainer agreement with a lawyer or law firm to pursue such a claim.  See Kim Decl. ¶ 14.
The tort claimants are represented by the following law firms, each of which submitted a master
ballot asserting that all or substantially all of their clients voted against the Plan:  (a) Golomb
Legal; (b) Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr, Mougey, P.A.;
(c) Bailey Glasser LLP; (d) Beasley Allen; (e) Ashcraft & Gerel, LLP; and (f) Burns
Charest LLP.  See id. at ¶ 14.

23.      LLT disputed, and the Debtor, J&J and the other defendants dispute, the
allegations in the Fraudulent Transfer Action and have moved for dismissal of the complaint.
See Kim Decl. ¶ 15.  The New Jersey District Court has not yet ruled on the motion to dismiss.
Id.

### (v)      The Medical Monitoring Action

24.      On June 17, 2024, three individuals, both individually and on behalf of a
proposed class, commenced a putative class action, styled Bynum v. LLT Management LLC,
No. 3:24-cv-07065-MAS-RLS (D.N.J June 17, 2024) (the "Medical Monitoring Action"),
against LLT, J&J, Old Holdco and certain of their affiliates and other entities in the New Jersey
District Court.  Kim Decl. ¶ 16.  The Medical Monitoring Action was allocated to the Debtor in
the 2024 Corporate Restructuring.  Id.  The Medical Monitoring Action seeks damages on behalf
of a subclass of future claimants who used cosmetic talc products but have not been diagnosed
with cancer.  The plaintiffs also seek to recover the costs of medical monitoring for potential
future claimants.  Id.; see also Ex. 2 (Medical Monitoring Action complaint) at ¶ 40(a).
The plaintiffs are represented by the following law firms, four of which represent plaintiffs in the
Fraudulent Transfer Action matter:  (a) Anapol Weiss; (b) Levin, Papantonio, Rafferty, Proctor,
Buchanan, O'Brien, Barr, Mougey, P.A.; (c) Levin Sedran & Berman; (d) Beasley Allen;
(e) Aschraft & Gerel, LLP; and (f) Burns Charest LLP.  See id.  The Debtor, J&J and the other

defendants dispute the allegations in the Medical Monitoring Action complaint and, on August 21, 2024, moved to dismiss the complaint.[10]  Id.  As of the Petition Date, the plaintiffs are required to file a response to the defendants' motion to dismiss or an amended complaint by September 26, 2024.[11]  Id.

## II.    THE DEBTOR'S ULTIMATE RESPONSIBILITY FOR ALL DEBTOR TALC CLAIMS

25.    The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly owned subsidiary of J&J.  Kim Decl. ¶ 17.  J&J, a New Jersey company incorporated in 1887, first began selling Johnson's Baby Powder in 1894, launching its baby care line of products.  Id.  In 1972, J&J established a formal operating division for its baby products business, which included Johnson's Baby Powder.  Id.

### A.    J&J Adopts Decentralization Policy

26.    In the 1970s, J&J adopted a policy to decentralize its operations as a part of a growth and innovation strategy.  See Kim Decl. ¶ 18.  As a part of this decentralization policy, J&J converted into a holding company, and certain J&J subsidiaries accepted all assets and operational responsibilities, and assumed all liabilities associated with, designated operating divisions of J&J.  Id.  The purpose of the decentralization policy was to drive creativity and productivity by giving each company autonomy to make decisions without unnecessary constraints.  Id.; see also Ex. 3 (1981 Annual Report) at 401, 404.  J&J's contemporaneous public U.S. Securities and Exchange Commission ("SEC") disclosures, and board meeting

---

[10]    See *Defs.' Mem. of Law in Supp. of Mots. to Strike Pls.' Class Allegations and Dismiss Medical Monitoring Claims*, Bynum v. LLT Management LLC, No. 3:24-cv-07065-MAS-RLS (D.N.J Aug. 21, 2024) [Dkt. 11].

[11]    See *Stipulation to Extend Time to Respond to Mot. to Dismiss*, Bynum v. LLT Management LLC, No. 3:24-cv-07065-MAS-RLS (D.N.J Aug. 30, 2024) [Dkt. 13].

minutes, emphasize the importance of J&J's decentralization strategy and philosophy to its businesses.  Kim Decl. ¶ 18; see also Ex. 4 (Board of Directors Meeting Minutes, dated Dec. 12, 1978) at 6-7.

**B.      Old JJCI's Responsibility for All Liabilities Associated with Johnson's Baby Powder**

27.      Consistent with J&J's policy of decentralizing its businesses, on December 12, 1978, J&J's Board of Directors approved the transfer of all assets and liabilities of the Baby Products division, including those associated with Johnson's Baby Powder, to J&J Baby Products.  Kim Decl. ¶ 19.  This was part of a larger restructuring of J&J that included the transfer of assets and liabilities of seven principal operating divisions to wholly owned subsidiaries.  Id.  Contemporaneous board minutes confirm that:

> **[T]he incorporation of seven principal operating divisions of Johnson & Johnson effective January 1, 1979 as wholly-owned subsidiaries** . . . will be accomplished by a transfer of assets from the divisions to the corporations respectively which **will also assume the liabilities of the divisions** respectively . . . In keeping with Johnson & Johnson's long standing policy of decentralization of corporate business, and in light of substantial potential state tax savings, as well as additional legal considerations, the matter has been approved by the Executive Committee in June 1978 and reported to the Board on July 1978.

Ex. 4 (Dec. 12, 1978 Board of Directors Meeting Minutes) at 6-7 (emphasis added).

28.      Subsequently, to effectuate the transaction, J&J and J&J Baby Products entered into an *Agreement for Transfer of Assets and Bill of Sale*, effective January 1, 1979 (the "1979 Agreement"), pursuant to which J&J transferred all assets and liabilities associated with the Baby Products division to J&J Baby Products.  Kim Decl. ¶ 20.

> WHEREAS, J&J has a number of operating divisions conducting various lines of business; and

> WHEREAS, one of these operating divisions is named the JOHNSON & JOHNSON BABY PRODUCTS COMPANY Division (sometimes hereinafter called the "BABY Division"); and
>
> WHEREAS, the Subsidiary corporation, is wholly-owned by J&J and J&J is desirous of **transferring to this Subsidiary all assets and liabilities** which are now allocated to the BABY Division on the books or records of Johnson & Johnson; . . .

Ex. 5 (1979 Agreement) at 1 (emphasis added); accord id. § 1 ("J&J . . . does grant, bargain, sell, assign, alien, remise, release, convey, transfer, set over and confirm, **unto the Subsidiary**, **its successors and assigns**, forever, all the **businesses**, franchises, properties and assets . . . which are now allocated on its books or records of J&J to its Baby Division . . .") (emphasis added).

29.     The 1979 Agreement provides that J&J Baby Products assumed all liabilities of every kind and description associated with the Baby Products division and indemnified J&J for such liabilities.  Kim Decl. ¶ 21.  In particular:

> . . . Subsidiary agrees to assume . . . **all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division** and the Subsidiary hereby covenants and agrees with J&J that the **Subsidiary will forever** . . . **indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed** . . . .
>
> . . .the covenants and agreements herein contained shall inure to the benefit of and shall bind the respective parties hereto and their respective successors and assigns.

Ex. 5 (1979 Agreement) at § 1 (emphasis added).  The assumed liabilities included contingent and future product liability claims.  Kim Decl. ¶ 21.  The 1979 Agreement also provided J&J Baby Products with an irrevocable power of attorney to substitute itself "**for J&J and in its [J&J's] name and stead** . . . **on behalf of and for the benefit of the Subsidiary**" to, among other things, "**defend and compromise any and all actions**, suits or proceedings in respect of

any said Properties" – defined as the Baby Products division's "businesses, franchises, properties and assets."  Ex. 5 (1979 Agreement) at § 2 (emphasis added).

30.     Following the 1979 Agreement, J&J no longer manufactured or sold baby products, including Johnson's Baby Powder.  Kim Decl. ¶ 22.  Thus, in 1979, J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc business that was being transferred.  Id.

31.     In 1981, J&J Baby Products transferred all of its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products.  Id. ¶ 23; see also Ex. 6 (Johnson & Johnson Baby Products Company Action Authorized by Unanimous Consent, dated July 21, 1981) at 2.  In turn, Omni assumed all liabilities of J&J Baby Products, except those liabilities related to its diaper program, and agreed to indemnify J&J Baby Products against all assumed liabilities.  Kim Decl. ¶ 23.  Immediately following the transaction, J&J Baby Products merged into Personal Products Company, another subsidiary of J&J, with J&J Baby Products as the surviving corporation but renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.  Id.  In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.  Id.

32.     In 1988, Johnson & Johnson Baby Products Company transferred all of its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of the liabilities of, and agreed to indemnify, Johnson & Johnson Baby Products Company and was renamed Johnson & Johnson Consumer Products, Inc.  Id. ¶ 24; see also Ex. 7 (Agreement for Transfer of Assets and Bill of Sale, dated Jan. 3, 1988).

33.     In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").  Kim Decl. ¶ 25; see also Ex. 8 (Certificate of Incorporation, dated June 19, 1997).  In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc.  Kim Decl. ¶ 25.  The resulting entity was renamed Johnson & Johnson Consumer Inc. (which, including all former names and historical forms, was Old JJCI).  Id.; see also Exs. 9, 10, 11 (Certificates of Merger, executed Nov. 28, 1998, June 23, 2015 and June 23, 2015, respectively).

34.     The timeline below reflects these intercompany transactions that resulted in Old JJCI becoming responsible for all claims alleging that Johnson's Baby Powder causes cancer or other diseases:



C.     **Old JJCI's Responsibility for All Liabilities Associated with Shower to Shower**

35.     Similar to Johnson's Baby Powder, Old JJCI became responsible for all claims alleging that Shower to Shower products, which contained talc, caused cancer or other diseases.  Kim Decl. ¶ 26.  Prior to the institution of the 1970s decentralization policy, Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic

Operating Company division.  Id.  Consistent with J&J's decentralization efforts and its

transition to a holding company, effective January 1, 1978, J&J transferred all assets and

liabilities related to Shower to Shower products to Personal Products Company, a wholly owned

subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility

for the Shower to Shower products.  Id.

> As we discussed, **Personal Products Company will take
> full responsibility for SHOWER TO SHOWER\*** on
> January 1, 1978.  During January, I will take the necessary
> steps to register with FDA and our Consumer Affairs
> Department will be taking over the complaint handling.

Ex. 12 (Oct. 31, 1977 internal Personal Products Company letter) (emphasis added).

Contemporaneous public filings by J&J confirm that Personal Products Company in fact took

responsibility for the Shower to Shower product line.[12]  Personal Products Company was

primarily focused on feminine hygiene products.  Kim Decl. ¶ 27.  In addition to Shower to

Shower brand body powder, Personal Products Company also controlled MODESS, Stayfree,

Sure & Natural brands of sanitary napkins, Carefree Panty Shields, and Coets brand cosmetic

squares.  Id.  Internal accounting records for year-end December 31, 1978, show that expenses

associated with the Shower to Shower product line were recorded on the books of Personal

Products Company.  See Ex. 16 (Personal Products Company 1978 financial statements).

     36.    The operational responsibilities, liabilities and assets related to Shower to

Shower products were transferred from Personal Products Company to Johnson & Johnson Baby

Products Company by early 1987.  Kim Decl. ¶ 28; compare Ex. 17 (excerpt from J&J 1985

Annual Report) (identifying Shower to Shower as a product of Personal Products Company) with

---

[12]    Compare Ex. 13 (J&J 10-K, for the FYE Jan. 2, 1977) (not identifying Shower to Shower as a product of
Personal Products Company) with Ex. 14 (J&J 10-K, for the FYE Jan. 1, 1978) (identifying Shower to
Shower as a product of Personal Products Company) and Ex. 15 (J&J 10-K, for the FYE Dec. 30, 1979)
(identifying Shower to Shower as a product of Personal Products Company).

Ex. 18 (excerpt from J&J 1986 Annual Report) (identifying Shower to Shower as a product of Johnson & Johnson Baby Product Company).

37.     In 2012, Old JJCI sold the assets and liabilities related to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("<u>Valeant</u>").  Kim Decl. ¶ 29.  Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc. ("<u>Bausch</u>")) entered into an indemnification agreement.  Ex. 19 (Valeant indemnification agreement).  Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use, or sale of Shower to Shower products, as set forth more fully in the agreement.  <u>Id.</u>

38.     At all times after 1978, all Shower to Shower liabilities—including costs for talc-related litigation claims—were ultimately charged to Personal Products Company, Johnson & Johnson Baby Products Company, or Old JJCI.  <u>Id.</u> ¶ 30.

**D.     Health and Medical Safety Decisions Were Made By Old JJCI**

39.     Old JJCI was responsible for the safety of Johnson's Baby Powder and Shower to Shower products.  Kim Decl. ¶ 31.  Old JJCI's former Chief Medical Officer, Dr. Edwin Kuffner, confirmed in the 2021 Chapter 11 Case that "I have ultimate responsibility for the safety of the products within [Old JJCI].  That lies with me."  Ex. 20 (excerpts of Kuffner testimony from <u>In re LTL Mgmt.</u>, Hr'g Tr., Nov. 5, 2021, at 374:13-376:8); Ex. 21 (J&J Medical Safety Standard, dated Jan. 1, 2014) at 1 ("Each sector within Johnson & Johnson … shall establish policies and process that adhere to the … Safety Standard").  This has been confirmed by the Chief Medical Officer of J&J, Dr. Joanne Waldstreicher, who has testified in the talc products liability litigation that decisions about the safety of talc products were made by the safety and medical officers at Old JJCI, not those at J&J.  <u>See</u> Ex. 22 (excerpts of Waldstreicher

testimony from <u>Ingham v. Johnson & Johnson</u>, No. 1522-CC10417, Circuit Court of the City of St. Louis, State of Missouri, Dep. Tr., April 19, 2017, at 14:15-15:9; 60:15-62:1; 92:5-94:7; 102:5-103:6; 168:2-168:17; 171:7-172:17; 182:6-182:18; 192:3-192:11; 212:21-213:11, and <u>Leavitt v. Johnson & Johnson</u>, RGI 7882401, Superior Court of California, County of Alameda, Dep. Tr., Sept. 14, 2018, at 131:8-133:9).  Dr. Waldstreicher further testified that Old JJCI's safety officers were responsible for reviewing and approving J&J's public statements about the safety of talc products before the statements were released to the public.  <u>Id.</u>  Likewise, the Chief Safety Officer of Old JJCI, Dr. Susan Nicholson, has testified that she was responsible for the medical oversight of the consumer products, including Johnson's Baby Powder, and that her team evaluated the safety of any product Old JJCI made.  <u>See</u> Ex. 23 (excerpts of Nicholson testimony from <u>Prudencio v. Johnson & Johnson</u>, RG20061303, Superior Court of the State of California, County of Alameda, Dep. Tr., 706:14-707:23, Jun. 4, 2021).

        **E.**    **Financial Course of Performance for Payment of Talc Liabilities**

        40.    Historically, except where insurance coverage has been available to pay talc-related costs, all costs associated with litigation concerning any talc products—including defense costs, settlements and any verdict amounts—have been borne by Old JJCI or LTL/LLT, as applicable.  Lisman Decl. ¶ 8.  These entities have used an integrated, centralized cash management system with J&J to collect, manage, and disburse funds.  <u>Id.</u>  Pursuant to company policy, cash collected by these entities has generally been swept to J&J's concentration account on a daily basis.  <u>Id.</u>  For administrative convenience and pursuant to company policy, J&J initially paid costs associated with litigation concerning talc products from its concentration account and then charged 100% of those costs to Old JJCI or LTL/LLT through intercompany charges.  <u>Id.</u>

41.     These intercompany charges have been reflected on Old JJCI's, LTL/LLT's and now the Debtor's general ledger.  Id. ¶ 9.  Since 2007, these entities have used SAP accounting software to maintain their general ledgers electronically.  Id.  Debit entries in these general ledgers from 2007 to the present confirm that these entities have been charged through intercompany payables all defense costs and any settlement or verdict amounts related to litigation concerning talc products.  Id.

42.     J&J reports its financial statements on a consolidated basis with all of its subsidiaries.  Id. ¶ 11.  J&J's consolidated financial statements reflected a reserve for defense and indemnity costs associated with personal injury claims related to talc.  Id.  Although the reserve is reported on a consolidated basis, it is allocated to J&J's General Corporate segment, which has included Old JJCI, LTL/LLT and now the Debtor, in accordance with generally accepted accounting principles ("GAAP") and SEC reporting requirements.  Id.

**F.     The Debtor Talc Claims Asserted Against the Debtor and J&J Are the Same**

43.     Even though J&J has not manufactured or sold talc-containing products for over 40 years, the Debtor Talc Claims are asserted in virtually every case against both the Debtor (as successor to Old JJCI and LTL/LLT) and J&J.  See Kim Decl. ¶ 32.  In many jurisdictions, the plaintiffs have sought to hold the Debtor and J&J jointly and severally liable for the Debtor Talc Claims.  The plaintiffs rarely, if ever, attempt to differentiate between talc-containing products sold by J&J and Old JJCI and have never alleged that only the talc sold by J&J (and not Old JJCI) caused a plaintiff's injury.  Id.

44.     The alleged claims against J&J and the Debtor in the MDL, for example, are all identical—based on the same products, same defect, and same alleged harm.  Id. ¶ 33. The allegations are asserted with respect to all talc products, defined collectively.  Id.; see also Ex. 24 (MDL complaint) at 18-19 ("Plaintiffs make the following allegations . . . regarding

-20-

Defendants' talcum powder-containing products known as Johnson's Baby Powder and Shower to Shower (hereinafter together or individually, '**the PRODUCTS**.').") (emphasis added).

45.     Neither do the MDL plaintiffs make any effort to differentiate between J&J and the Debtor (again, as successor to Old JJCI and LTL/LLT), referring instead throughout the MDL Complaint to the two separate entities collectively as the "Johnson & Johnson Defendants."  Kim Decl. ¶ 34; see Ex. 24 (MDL complaint) at 8 ("Hereinafter, . . . these two entities [J&J and Old JJCI] shall be referred to as the '**Johnson & Johnson Defendants**.'") (emphasis added).

46.     Courts presiding over Debtor Talc Claims have likewise treated both J&J and the Debtor's predecessors as the same for evidentiary purposes.  For example, before the preliminary injunction was issued during the 2021 Chapter 11 Case, a court in South Carolina ruled that the filing of the 2021 Chapter 11 Case did not impact in any way the evidence that could be presented at trial, holding that all evidence would be received regardless of whether it was against J&J or Old JJCI:

> I tell you one thing, . . ., if you think anybody in any of these cases is going to allow the stay against liability on behalf of [Old JJCI] to somehow affect the evidence that is going to be received, whether that evidence was from [J&J], [Old JJCI] or New Johnson, that is a very different kettle of fish, and I can tell you right now, that is not going to happen in this case as far as I'm concerned.

Ex. 25 (Hood, et al. v. Acme et al., No. 2020-CP10-03946, County of Charleston for the State of South Carolina, Hr'g Tr., 58, Oct. 28, 2021).

**G.     The Debtor's Insurance Coverage**

47.     The Debtor believes that it has insurance coverage for the Debtor Talc Claims.  Kim Decl. ¶ 36.  The Debtor and Pecos River, among other entities, have access to primary and excess liability insurance policies issued to J&J as the named insured that cover, for

example, defense or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[13]  See id.; Ex. 26 (FRE 1006 insurance coverage summary).  All of these insurance policies provide that J&J and all of its subsidiaries and affiliates are named insureds, and many also include Retailers as additional insureds.  See Kim Decl. ¶ 36; see also Exs. 27, 28, 29, 30 (various insurance policies).  In addition, the policies contain annual aggregate limits shared by all of the named insureds.  Id.

48.    Aetna Casualty and Surety Company ("Travelers")[14] issued primary general liability policies to J&J (which policies cover the Debtor) for the period from 1957 to 1980 (the "Travelers Policies").  Kim Decl. ¶ 37; see, e.g., Ex. 27 (Aetna Insurance Agreement, #38 AL 12880 SR(Y)_1-1-1967 to 1-1-1970).  The combined limits of the Travelers Policies (not accounting for deductibles or erosion/exhaustion of limits) total more than $214 million per occurrence and $263 million in the aggregate.  Kim Decl. ¶ 37; Ex. 26 (FRE 1006 insurance coverage summary).  The deductibles increase over time, starting at a minimal level and increasing to $5 million per occurrence by 1977.  Kim Decl. ¶ 37; see, e.g., Ex. 29 (Aetna Insurance Agreement, Aetna Primary 38 PK 15 SCA).

49.    The limits of the Travelers Policies before 1973 are not eroded by defense costs; under later policies, defense costs erode limits.  Kim Decl. ¶ 38; see, e.g., Ex. 30 (Aetna Insurance Agreement, #38 AL 12880 SR(Y)_1-1-1967 to 1-1-1970).  From 1957 to 1985, Travelers also provided excess liability coverage to J&J that covers the Debtor.  Kim Decl. ¶ 38; see, e.g., Ex. 27 (Aetna Insurance Agreement, 38 XN 07 SCA).  The combined aggregate limits

---

[13]    The policies cover the time period, which includes the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.  Kim Decl. ¶ 38, n. 5; see, e.g., Ex. 27 (Aetna Insurance Agreement 38 XN 07 SCA), at 9.

[14]    Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

of those policies total approximately $563 million.  Kim Decl. ¶ 38; see also Ex. 26 (FRE 1006 insurance coverage summary).

50.     From 1973 to 1985, a variety of other insurers issued excess policies that cover the Debtor.  Kim Decl. ¶ 39; see also Ex. 26 (FRE 1006 insurance coverage summary). Those insurers include subsidiaries or affiliates of the following companies:  American International Group, Allstate Insurance Company, The Hartford, Home Insurance Company, Nationwide Indemnity Company and North River Insurance Company.  Kim Decl. ¶ 39. The combined limits of those excess policies total more than $1.09 billion in the aggregate.  Id. Certain of the insurers that issued the above-described excess policies are insolvent (including, in particular, Home Insurance Company).  See id.

51.     From 1981 to 1985, American Motorists Insurance Company ("AMICO") issued primary and excess coverage that covers the Debtor (the "AMICO Policies").  Kim Decl. ¶ 40; see also Ex. 26 (FRE 1006 insurance coverage summary).  AMICO is insolvent, having been placed into liquidation in 2013.  Kim Decl. ¶ 40.  The Debtor currently believes that the applicable limits of the AMICO Polices were exhausted by payments made by AMICO on claims while it was still solvent.  Id.

52.     From 1973 through 1985, Middlesex Insurance Company ("Middlesex"), a captive insurance company that is a wholly owned subsidiary of J&J, issued policies that cover J&J, Pecos River and the Debtor.  Kim Decl. ¶ 41.  Those policies insured J&J and Old JJCI for large deductibles under the Travelers Policies and the AMICO Policies.  Id.  From 1977 to 1985, Middlesex also issued excess insurance policies that cover J&J and Old JJCI.  Id.  There is a dispute between J&J, the Debtor, Pecos River, and Middlesex, on the one hand, and the third-party insurers (i.e., insurers other than the Middlesex captive), on the other hand, regarding

the applicability, extent of coverage and limits of the Middlesex policies, in particular with respect to the post-1985 Middlesex policies.  Id.

53.     The currently available limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities total approximately $1.25 billion.  Id. ¶ 52.  The annual limits for these policies are aggregated.  Id.

54.     Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims to the third-party insurers.  Id. ¶ 45.  Since then, none of those insurers has acknowledged its coverage obligations, defended Old JJCI, LTL/LLT, the Debtor, Pecos River or J&J, paid the costs of defense, or indemnified any such entity for settlements or judgments.  Id.  Instead, the third-party insurers have asserted various coverage defenses.  Id.

55.     In May 2019, certain of the Debtor's third-party insurers filed a lawsuit against Old JJCI, J&J and Middlesex in New Jersey State Court, styled Atlanta Int'l Ins. Co. (as Successor in Interest to Drake Ins. Co.) v. Johnson & Johnson, No. MID-L-003563-19, Superior Court of Middlesex County, New Jersey (the "NJ Coverage Action"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies.  Kim Decl. ¶ 44.  The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020.  Id. On July 31, 2020, J&J, Old JJCI, and Middlesex filed answers to the Second Amended Complaint, and asserted counterclaims and cross-claims against certain defendants.  Id. Travelers and certain other insurers filed cross-claims against J&J, Old JJCI, and Middlesex to which J&J, Old JJCI, and Middlesex responded later in 2020.  Id.  In the 2021 Chapter 11 Case, certain insurers filed motions to lift the automatic stay to permit the NJ Coverage Action to proceed.  Id.  The United States Bankruptcy Court for the District of New Jersey (the "New

Jersey Bankruptcy Court") denied those motions but permitted certain third-party discovery to occur.  Id.

56.     After arms-length negotiations between certain of the third-party insurers, in May 2024 the parties entered into confidential settlement agreements and releases whereby certain insurers agreed to pay certain confidential amounts to J&J to purchase all of J&J's and LLT's right, title, and interest in and to the policies free and clear of any interest of any person. Id. ¶ 45.  Upon the receipt of the confidential amounts from those certain insurers as set forth in each of these settlement agreements, the applicable parties have agreed to release each other from and against all:  (a) liability for certain talc personal injury claims; (b) claims between them relating to the policies, including any claims arising from any of J&J's and the Debtor's actual or alleged obligations to actual or alleged indemnitees and distributors; and (c) extra-contractual claims between them.  Id.  One condition to certain of the settlement agreements is that the Amended Plan be consistent with their terms.  Id.  Further, within seven days after the effective date of the settlement agreements, the settling insurers and J&J will file a stipulation for the dismissal of their claims.  Id.  The NJ Coverage Action otherwise remains pending.  Id.

## H.     The Debtor's Retailers and Other Indemnified Parties

57.     Old JJCI and LTL/LLT had relationships with various Retailers who sold Old JJCI's talc-containing products.  See Kim Decl. ¶ 46.  Old JJCI agreed to indemnify the Retailers for claims related to the sale of talc-containing products, and those contractual indemnities were allocated to LTL in the 2021 Corporate Restructuring.  Id.; see, e.g., Ex. 31 (1989 Agreement with Safeway); Ex. 32 (2020 Agreement with HEB).  Following the 2021 Corporate Restructuring, LTL/LLT entered into its own indemnification agreements with various Retailers.  Kim Decl. ¶ 46; see also, e.g., Ex. 33 (2024 Agreement with Ralphs Grocery); Ex. 34 (2023 Agreement with Publix Super Markets).  In addition, to the extent a Retailer is held liable

for a claim arising out of the products manufactured and/or sold by Old JJCI, and not by independent actions of the Retailers (i.e., such that those claims are Debtor Talc Claims), certain state laws could require the Debtor to indemnify the Retailers.  Kim Decl. ¶ 46.[15]  Except as described below with respect to Tender Agreements (defined below), all of LLT's contractual indemnities with Retailers were allocated to the Debtor in the 2024 Corporate Restructuring.  Id. As part of the 2024 Corporate Restructuring, Pecos River agreed to indemnify the Debtor from and against any indemnification claims asserted against the Debtor in respect of liabilities allocated to Pecos River.  Id.

58.    Claims asserted against the Retailers for their sale of talc products are virtually identical to the claims asserted against Old JJCI, LTL/LLT and, to the extent in respect of talc-related liabilities that will be resolved by the Amended Plan (the "Debtor Talc Related Liabilities"), the Debtor.  Kim Decl. ¶ 47.  These claims against Retailers generally serve to defeat removal to federal court based on diversity jurisdiction, and the Retailers are often dismissed before trial without payment.  Id.

59.    Old JJCI and LTL/LLT would periodically accept from the Retailers tenders of talc-related claims related to the sale of its products.  Id. ¶ 48.  When Retailers have been sued on a Debtor Talc Claim, they have notified Old JJCI, LTL/LLT or the Debtor, as

---

[15]    See, e.g., Restatement (Second) of Torts § 886B (Am. Law Inst., 1979) (establishing obligation to indemnify party that is held vicariously liable for the conduct of the indemnitor); Restatement (Third) of Torts § 22 (Am. Law Inst., 2000) (same, and also expressly establishing a right to recover indemnity where indemnitee was held liable only as the seller of a product supplied to the indemnitee by the indemnitor); see also Promaulayko v. Johns Manville Sales Corp., 562 A.2d 202, 206 (N.J. 1989) (recognizing "claims for common-law indemnification [for asbestos-related tort claims] by one party in the chain of distribution against a party higher up the chain" in New Jersey and other states); Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A., 479 N.E.2d 1386, 1389 (Mass. 1985) ("[T]he retailer may recover in indemnity against the manufacturer."); Tex. Civ. Prac. & Rem. Code Ann. § 82.002 ("A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission…"); Ariz. Rev. Stat. Ann. § 12-684; Ark. Code Ann. § 16-116-207; Iowa Code Ann. § 613.18.

applicable, by submitting a tender request.  Id.  Old JJCI or LTL/LLT would then determine

whether to accept the Retailer's tender of its defense and indemnified the Retailer pursuant to a

tender agreement (each, a "Tender Agreement").  Id.  Since the commencement of the

talc-related litigation, Old JJCI, and LTL/LLT agreed to indemnify and assume the defense of

more than 1,180 talc-related claims against the Retailers pursuant to Tender Agreements.  Id.

Examples of two such Tender Agreements are attached as exhibits to the Kim Declaration.  See

Ex. 35 (Tender Agreement with Safeway for indemnification and defense of claims by Abbott,

Richard, dated May 13, 2019); Ex. 36 (Tender Agreement with Albertson's for indemnification

and defense of claims by Lane, Ardys, dated Oct. 8, 2018).  Tender Agreements in respect of

Debtor Talc Related Liabilities were allocated to the Debtor in the 2024 Corporate Restructuring

whereas Tender Agreements in respect of liabilities allocated to Pecos River were allocated to

Pecos River.  Id.

       60.     Old JJCI or LTL/LLT agreed to indemnify certain other transaction

counterparties for liability arising from Debtor Talc Claims.  Kim Decl. ¶ 49.  For example, in

2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc.

("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing

plant (where various products, including certain talc-containing products, were bottled) to PTI,

which continued to operate the facility and manufacture certain talc products until early 2020.

Id.; see Ex. 37 (Asset Purchase Agreement, dated Apr. 4, 2005).  In connection with the asset

sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was

subsequently amended and restated.  Kim Decl. ¶ 49.  Under the manufacturing and supply

agreement, Old JJCI agreed to indemnify, and has indemnified, PTI and its affiliates for certain

claims related to talc products.  Id.  The claims against PTI are generally identical to and based on the claims against Old JJCI.  Id.

61.     Further, pursuant to an indemnification agreement, Old JJCI agreed to indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. (f/k/a Valeant Pharmaceuticals International) and Bausch Health US, LLC (f/k/a Valeant Pharmaceuticals North America LLC)) for personal injury and products liability actions arising from alleged exposure to Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use or sale of Shower to Shower, as set forth more fully in the agreement.  Kim Decl. ¶ 50; Ex. 19 (Valeant indemnification agreement).  The claims against Valeant (now Bausch) are generally identical to the claims asserted against Old JJCI, LLT and to the extent in respect of Debtor Talc Related Liabilities, the Debtor.  See Kim Decl. ¶ 50.

62.     Like the contractual indemnities of retailers described above, these contractual indemnities of transaction counterparties also were allocated to the Debtor in the 2024 Corporate Restructuring, and Pecos River likewise agreed to indemnify the Debtor from and against any indemnification claims asserted against the Debtor in respect of liabilities allocated to Pecos River.  Id. ¶ 51.

III.    **THE 2021 CORPORATE RESTRUCTURING AND THE PRIOR CHAPTER 11 CASES**

A.      **The 2021 Corporate Restructuring**

63.     In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021.  Kim Decl. ¶ 52. The 2021 Corporate Restructuring was effectuated through a series of steps, including a divisional merger under the Texas Business Organizations Code.  Id.  As a result of the 2021 Corporate Restructuring, two new entities were created:  (a) New JJCI; and (b) LTL.  Id.  LTL

became solely responsible for Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws) and the defense of those claims.  Id.

64.     Among the assets allocated to LTL through the 2021 Corporate Restructuring were rights under a funding agreement between LTL, on the one hand, and J&J and New JJCI on the other (the "2021 Funding Agreement").  Id. ¶ 53.  The primary purpose of the 2021 Funding Agreement was to facilitate the resolution of talc-related claims through a chapter 11 filing by LTL.  Id.  The 2021 Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, for, among other things, (a) the administrative costs of LTL's chapter 11 case and (b) a trust that would satisfy current and future talc claims, in both situations to the extent that any cash distributions received by LTL from its subsidiary were insufficient to pay such costs and further, in the case of the funding of a trust, LTL's other assets were insufficient to provide that funding.  Id.

**B.     LTL's Chapter 11 Cases**

65.     On October 14, 2021, LTL commenced the 2021 Chapter 11 Case. Id. ¶ 54.  After transfer of the case to the New Jersey Bankruptcy Court, the official committee of talc claimants and two plaintiff law firms moved to dismiss the 2021 Chapter 11 Case.  Id.; see In re LTL Mgmt. LLC, No. 21-30589 (Bankr. D.N.J. Dec. 1-29, 2021) [Dkts. 632, 766, 1003]. The New Jersey Bankruptcy Court issued an opinion denying the motions to dismiss.  Kim Decl. ¶ 54; In re LTL Mgmt. LLC, 637 B.R. 396 (Bankr. D.N.J. 2022) rev'd and remanded by In re LTL Mgmt. LLC, 58 F.4th 738 (3d. Cir. 2023).  On appeal, a panel of the United States Court of Appeals for the Third Circuit (the "Third Circuit") issued an opinion reversing the New Jersey Bankruptcy Court's ruling and directing the New Jersey Bankruptcy Court to dismiss the 2021 Chapter 11 Case.  Kim Decl. ¶ 54; see In re LTL Mgmt. LLC, 58 F.4th 738 (3d Cir. 2023).

On March 31, 2023, the Third Circuit denied LTL's petition for stay pending appeal to the United States Supreme Court and issued its mandate directing the New Jersey Bankruptcy Court to dismiss the 2021 Chapter 11 Case.  Kim Decl. ¶ 54; see In re LTL Mgmt. LLC, No. 22-2003 (3d. Cir. Mar. 31, 2003) [Dkt. 180].

66.     After dismissal of the 2021 Chapter 11 Case on April 4, 2023, LTL commenced its second chapter 11 case (the "2023 Chapter 11 Case") in the New Jersey Bankruptcy Court.  Kim Decl. ¶ 55.  Before LTL commenced the 2023 Chapter 11 Case, the 2021 Funding Agreement was terminated and replaced with a new funding arrangement.  Id. The official committee of talc claimants and various other parties moved to dismiss the 2023 Chapter 11 Case.  Kim Decl. ¶ 55; see, e.g., In re LTL Mgmt. LLC, No. 23-12825 (Bankr. D.N.J. Apr. 24-May 10, 2023) [Dkts. 286, 335, 346, 350, 358, 379, 384, 480].  Following briefing and a four-day hearing on the dismissal motions, the New Jersey Bankruptcy Court entered an order dismissing the 2023 Chapter 11 Case, concluding that LTL lacked sufficient financial distress necessary to avail itself of bankruptcy relief at that time under the standard articulated by the Third Circuit.  Kim Decl. ¶ 55.  Thereafter, in December 2023, LTL changed its state of formation to Texas and its name to LLT Management LLC.  Id.

**C.     New JJCI/Old Holdco**

67.     New JJCI's business following the 2021 Corporate Restructuring included the manufacture and sale of a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter pharmaceutical products (collectively, the "Consumer Business").  Kim Decl. ¶ 56.  In November 2021, J&J announced its plans to accelerate innovation, serve patients and consumers and unlock value through the separation of the Consumer Business.  Id.; see Ex. 38 (Nov. 12, 2021 Press Release).  Thereafter, in December 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc. (i.e.,

Old Holdco), and in early January 2023, Old Holdco transferred its Consumer Business assets to its parent entity.  Kim Decl. ¶ 56.  Consistent with J&J's November 2021 announcement, in August 2023, J&J reported that the Consumer Business had been separated into Kenvue, a new company in which J&J retained a 9.5% interest.  Id.

## IV.     THE PREPACKAGED PLAN AND 2024 CORPORATE RESTRUCTURING

### A.     The 2024 Corporate Restructuring

68.     Following the dismissal of the 2023 Chapter 11 Case, after extensive negotiations with representatives of the majority of claimants asserting ovarian cancer-related talc claims, as well as the FCR, the Company formulated the Plan to finally and comprehensively resolve all current and future ovarian cancer and other gynecological cancer claims pertaining to Johnson's Baby Powder and Shower to Shower.  Kim Decl. ¶ 57.  LLT commenced solicitation of the Plan on behalf of the Debtor on June 3, 2024.  Id.  Following the successful solicitation, on August 19, 2024, a corporate restructuring (the "2024 Corporate Restructuring") was completed. Id.  The 2024 Corporate Restructuring consisted of a sequence of transactions more fully described in the First Day Declaration that resulted in the elimination of LLT and the formation of:  (a) the Debtor, Red River Talc LLC, which was allocated all Debtor Talc Related Liabilities and specified assets; (b) Pecos River, which was allocated certain other talc-related liabilities of LLT (including, among other things, claims and demands alleging injury from mesothelioma or lung cancer, claims and demands of governmental entities, and Canadian claims and demands), and certain other specified assets and liabilities; and (c) a new entity having the name Johnson & Johnson Holdco (NA) Inc. (i.e., New Holdco).  See First Day Decl. ¶¶ 36, 37.

69.     Upon the effectiveness of the 2024 Corporate Restructuring, the Debtor, Pecos River and New Holdco entered into an agreement whereby the parties committed to indemnify and hold harmless the other parties and their respective affiliates from and against any

and all losses related in any way to claims in respect to liabilities and assets allocated to such party in the 2024 Corporate Restructuring, among other things.  Id. ¶ 82.

70.     New Holdco is the direct parent of the Debtor, and the Debtor is the direct parent of Royalty A&M LLC ("Royalty A&M"), a Texas limited liability company.  Kim Decl. ¶ 59.  New Holdco is a holding company with ownership interests in various subsidiaries.  Id. The resulting structure of the Debtor and its key affiliates is depicted below.



71.     The Debtor's ultimate parent company, J&J, is a holding company that through its operating subsidiaries conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being.  Id. ¶ 60.  J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years.  Id.  That innovation includes novel oncology, immunology and vaccine products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing. Id.

72.     The Debtor is responsible for all Channeled Talc Personal Injury Claims and was formed to effectuate the terms of the Plan.  Id. ¶ 61.  The Debtor also oversees the operations of its wholly owned subsidiary, Royalty A&M, a Texas limited liability company.  Id.

Royalty A&M owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON®, ROGAINE®, and TENA® products as well as certain products marketed by CLOROX®, ECOLAB®, ESSITY®, and SPARTAN®.  Id.  This portfolio includes a synthetic royalty arrangement in Texas with Kiron Capital LLC, a private equity firm, through its indirect subsidiary Confidas Health System. Id.  Royalty A&M reviews profitable royalty opportunities in the healthcare industry and seeks to grow its business by reinvesting the income from existing royalty revenue streams into both the acquisition of additional external royalty revenue streams, financings to third parties secured by similar royalty streams, and synthetic royalty investments secured by similar future royalty streams.  Id.

       **B.**      **The New Funding Arrangements**

       73.     In connection with the 2024 Corporate Restructuring, the Debtor entered into an indemnity funding agreement (the "Indemnity Cost Funding Agreement") with New Holdco as payor and the Debtor as payee.  See Kim Decl. ¶ 62.  Pursuant to the Indemnity Cost Funding Agreement, which became effective upon the Petition Date, New Holdco became obligated to provide limited funding to the Debtor for use by the Debtor to fund the Talc Personal Injury Trust or, if the Plan does not become effective and the Chapter 11 Case is dismissed, certain other defined liabilities, all on the terms and subject to the conditions set forth therein.  Id.

       74.     In addition, New Holdco, as payor, and the Debtor, as payee, entered into a funding agreement for expenses (the "Expense Funding Agreement").  Id.  Pursuant to the Expense Funding Agreement, New Holdco is obligated to provide funding to the Debtor for use by the Debtor to pay any and all costs and expenses of the Debtor incurred during the pendency

of this Chapter 11 Case, among other things.[16] Id.  Funding is not available under the Expense Funding Agreement for the payment of Debtor Talc Related Liabilities contemplated to be funded under the Indemnity Cost Funding Agreement, and vice versa.  Id. ¶ 63.

## ARGUMENT

75.     To preserve the effectiveness and integrity of the automatic stay of section 362 of the Bankruptcy Code in place as a result of the commencement of the Chapter 11 Case and to protect the Debtor's ability to expeditiously confirm the Amended Plan and establish a trust pursuant to section 524(g) of the Bankruptcy Code, the Court should:  (a)(i) declare that the automatic stay of section 362 applies or extends to prohibit the commencement or continued prosecution of the Debtor Talc Claims against the Protected Parties, or, in the alternative, (ii) preliminarily enjoin the commencement or continued prosecution of the Debtor Talc Claims against the Protected Parties pursuant to sections 105 and 362 of the Bankruptcy Code during the pendency of this Chapter 11 Case; and (b) enter a temporary restraining order enjoining the commencement or continued prosecution of Debtor Talc Claim against the Protected Parties pending a final hearing.

## I.       THE COURT HAS SUBJECT MATTER JURISDICTION.

76.     Section 1334(b) of title 28 of the United States Code identifies three types of proceedings over which this Court has jurisdiction—those (a) "arising under title 11," (b) "arising in" a case under title 11 and (c) "related to" a case under title 11. 11 U.S.C. § 1334(b).  Proceedings "arising under" and "arising in" a chapter 11 case are

---

[16]     Additionally, pursuant to the Amended Plan, the Debtor would also be a party to the Cash Contributions Parent Guarantee (the "Parent Guarantee") with J&J and New Holdco (together, the "Guarantors"). The Parent Guarantee would be executed and delivered on the Effective Date of the Amended Plan.  Under the Parent Guarantee, the Guarantors would unconditionally guarantee the full and timely delivery of each Cash Contribution to the Talc Personal Injury Trust.

considered "core" proceedings, whereas proceedings "related to" a chapter 11 case are considered "non-core." Wood v. Wood (In re Wood), 825 F.2d 90, 97 (5th Cir. 1987). The Fifth Circuit has held that courts "need not identify which jurisdictional provision specifically applies because the provisions operate in conjunction." Matter of Zale Corp., 62 F.3d 746, 751 (5th Cir. 1995). And bankruptcy courts may have jurisdiction to enjoin third-party litigation, such as that at issue here, under *any one* of these three bases. Indeed, courts routinely grant preliminary injunctions relating to a debtor's mass tort liabilities,[17] finding that they have jurisdiction over such third-party claims.[18]

### A.    This Court has "Arising Under" Jurisdiction to Apply and Extend the Automatic Stay.

77.    "Arising under" jurisdiction "describe[s] those proceedings that involve a cause of action created or determined by a statutory provision of title 11." Wood, 825 F.2d at 96; see also In re Fuel Oil Supply and Terminaling, Inc., 30 B.R. 360, 362 (Bankr. N.D. Tex. 1983) ("As to the 'arising under' jurisdiction nothing needs to be said other than its claims arise under §§ 362, 548 and 549 of the Bankruptcy Code."). Here, the Debtor's request for declaratory relief aims to confirm or extend the scope of the automatic stay, which is a right

---

[17]    See, e.g., In re Bestwall, 606 B.R. 253, 254 (Bankr. W.D.N.C. 2019) ("Injunctions of the type requested by the Debtor have previously and uniformly been issued in numerous other asbestos-related cases").

[18]    See, e.g., In re Barretts Minerals Inc., No. 23-90794, Adv. Pro. No. 23-03225 at 2 (Bankr. S.D. Tex. 2024) [Dkt. 92]  (the "Barretts Minerals Stay Order") (order stating that the bankruptcy court had jurisdiction over a request for extension of the automatic stay and it was a core proceeding); In re Bestwall LLC, 71 F.4th 168, 178-79 (4th Cir. 2023) (rejecting challenges to the court's subject-matter jurisdiction and enjoining asbestos-related claims against non-debtor affiliates); DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP), 2021 WL 3552350, at *18-21 (Bankr. W.D.N.C. 2021) (same); In re Specialty Prods. Holding Corp., No. 10-11780, Adv. Pro. No. 10-51085, at 2 (Bankr. D. Del. Oct. 13, 2010) [Dkt. 72] (the bankruptcy court had jurisdiction to rule on the debtors' motion to clarify the scope of the injunction); W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.), 386 B.R. 17, 28-30 (Bankr. D. Del. 2008) (rejecting challenges to the court's subject-matter jurisdiction and extending the automatic stay to enjoin third-party actions); see also In re Garlock Sealing Techs. LLC, No. 10-31607, Adv. Pro. No. 10-03145, at 6  (Bankr. W.D.N.C. June 21, 2010) [Dkt. 14] (after debtor addressed jurisdiction, finding jurisdiction and granting a preliminary injunction).

created by the Bankruptcy Code.  "Arising under" jurisdiction thus exists.  See, e.g., FPSDA II, LLC v. Larin (In re FPSDA I, LLC), 2012 WL 6681794, at *5 (Bankr. E.D.N.Y. Dec. 21, 2012) ("[S]ince the Bankruptcy Code both imposes the automatic stay and provides the Debtors and the Court with the means to invoke it and to implement its protections, it is manifest that any proceeding to determine the scope and applicability of the automatic stay 'arises under' the Bankruptcy Code"); In re Brier Creek Corp. Ctr. Assocs. Ltd., 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013) ("arising under" jurisdiction existed over motion in which debtor sought declaratory relief or, in the alternative, a section 105(a) injunction, "in that it specifically requested an order confirming that the stay under § 362(a)(1) applies to" the third-party action against non-debtor guarantor).

78.     The Court also has "arising under" jurisdiction because the Debtor's request for a section 105(a) injunction is necessary to ensure and preserve the integrity of the automatic stay of section 362 of the Bankruptcy Code.  The Debtor Talc Claims against the Protected Parties "are really claims against the debtor and therefore impair the automatic stay." Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs., 138 B.R. 144, 147 (S.D.N.Y. 1992).  Given the close link between the injunction sought and the automatic stay, "common sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay," as it plainly does, "then it has jurisdiction over a related motion for preliminary injunctive relief," in the same proceeding.  FPSDA I, 2012 WL 6681794, at *5 (finding "arising under" and "related to" jurisdiction).

**B.     This Court Has "Arising In" Jurisdiction to Grant Relief that Would Have No Existence Outside of Bankruptcy.**

79.     This Court independently has "arising in" jurisdiction because the Debtor's request for an extension of the automatic stay of section 362(a) and injunctive relief

under section 105(a) is unique to bankruptcy. A proceeding "arising in" a bankruptcy case is "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." Wood, 825 F.2d at 97; Bergstrom v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co.), 86 F.3d 364, 372 (4th Cir. 1996); see also In re Divine Ripe, L.L.C., 538 B.R. 300, 306 (Bankr. S.D. Tex. 2015) (matters from a motion for extension of the automatic stay are matters "that can only arise in bankruptcy.").

80.     A claim for a stay and injunction, tied to and lasting only during a bankruptcy case, arises only in bankruptcy cases. The request for a section 105(a) injunction is necessary to ensure and preserve the integrity of the automatic stay. See In re Davis, 730 F.2d 176, 184 (5th Cir. 1984) (section 105(a) provides bankruptcy courts "the authority to enjoin litigants from pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate.").

**C.     This Court has "Related to" Jurisdiction to Enjoin the Prosecution of the Debtor Talc Claims Against the Protected Parties.**

81.     This Court, at a minimum, has "related to" jurisdiction to extend the automatic stay under section 362(a) and issue a related preliminary injunction under section 105(a).[19] The bar for "related to" jurisdiction is intentionally low. The Fifth Circuit has previously held that "the test for whether a proceeding properly invoked federal bankruptcy jurisdiction is the same as the Third Circuit's Pacor test, namely 'whether the outcome of that proceeding could **conceivably** have **any effect** on the estate being administered in bankruptcy.'"[20] As interpreted by this Circuit, the standard is intentionally broad; "[c]ertainty is

---

[19]     Celotex Corp. v. Edwards, 514 U.S. 300 at 309-311, 311 n.8 (overturning a Fifth Circuit ruling and finding that a section 105(a) injunction issued to augment the automatic stay was "at least a question 'related to' Celotex's bankruptcy").

[20]     Arnold v. Garlock, Inc., 278 F.3d 426, 434 (5th Cir. 2001) (emphasis added) ("Most of the federal circuits, including the Fifth Circuit, derive their 'related to' jurisprudence from Pacor, Inc. v. Higgins") (citing

unnecessary; an action is 'related to' bankruptcy if the outcome could alter, positively or

negatively, the debtor's rights to liabilities, options, or freedom of action or could influence the

administration of the bankruptcy estate." In re TXNB Internal Case, 483 F.3d 292, 298

(5th Cir. 2007); see also In re Bass, 171 F.3d 1016, 1022 (5th Cir. 1999) ("A proceeding is

'related to' a bankruptcy if 'the outcome of that proceeding could conceivably have any effect on

the estate being administered in bankruptcy.'" (quoting Walker v. Cadle Co., 51 F.3d 564, 569

(5th Cir. 1995)).

      82.    "[C]ourts have made clear that this standard [for "related to" jurisdiction]

applies whether any claims against a third party are alleged to be 'direct' or 'derivative.'"

Bestwall, 606 B.R. at 249 (citing Pfizer Inc. v. Angelos (In re Quigley Co., Inc.), 676 F.3d 45,

56-57 (2d Cir. 2012)).[21]   A proceeding "need not necessarily be against the debtor or against the

debtor's property" to confer jurisdiction.  Pacor, 743 F.2d at 994.  Rather, "[a]n action is related

to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of

action (either positively or negatively) and which **in any way impacts upon the handling and

administration of the bankrupt estate**."  Id. (emphasis added).[22]  And the Fifth Circuit has

---

Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)); In re Canion, 196 F.3d 579, 586 (5th Cir. 1999)
("[T]he law is well established in this Circuit, as in others, that, when testing 'related to' jurisdiction, an
effect is not required to a certainty.  Rather jurisdiction will attach on a finding of any *conceivable* effect.");
Fire Eagle, L.L.C. v. Bischoff (In re Spillman Dev. Grp., Ltd.), 710 F.3d 299, 304-305 (5th Cir. 2013)
("A 'conceivable effect' in this context is any that 'could alter the debtor's rights, liabilities, options, or
freedom of action (either positively or negatively) and which in any way impacts upon the handling and
administration of the bankrupt estate.'") (quoting FDIC v. Majestic Energy Corp. (In re Majestic Energy
Corp.), 835 F.2d 87, 90 (5th Cir. 1988)).

[21]   See Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC), No. 20-408, 2021 WL 523625, at *2-3 (D. Del.
Feb. 11, 2021) (holding that even if non-debtors had independent liability the court had "related to"
jurisdiction to issue preliminary injunction enjoining claims against them); In re SunEdison, Inc., 576 B.R.
453, 462 (Bankr. S.D.N.Y. 2017) ("Where a third-party claim may give rise to a potential indemnification
or contribution claim against the estate, the third-party claim will have a conceivable effect on the estate,
and accordingly, the [c]ourt has the jurisdiction to enjoin it.").

[22]   Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn. (In re Dow Corning Corp.),
86 F.3d 482, 491 (6th Cir. 1996), as amended on denial of reh'g and reh'g en banc (June 3, 1996)
("Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on 'the debtor's
rights, liabilities, options, or freedom of action' or the 'handling and administration of the bankrupt

noted that "hypothetical effects of third-party litigation can give rise to related-to bankruptcy jurisdiction." Spillman, 710 F.3d at 305. On this basis, bankruptcy courts regularly exercise broad authority over claims against non-debtor entities, including non-debtor affiliates, both in mass-tort[23] and non-mass-tort bankruptcies,[24] to fully effectuate the automatic stay's protections and maintain the integrity of the Debtor's estate. Under this standard, jurisdiction here is straightforward.

83.     Litigation of the Debtor Talc Claims against the Protected Parties outside of this Court would *at least* "conceivably have [an] effect" on the Debtor's estate and reorganization. The Debtor Talc Claims are the *exact same claims* the Debtor seeks to resolve through the Amended Plan in this Chapter 11 Case. As explained herein, in accordance with Texas law, any liability associated with those claims is the responsibility of the Debtor.

---

estate.'"); Kocher v. Dow Chem. Co., 132 F.3d 1225, 1231 (8th Cir. 1997) (holding that the district court had "related to" jurisdiction over plaintiff's product liability claims against debtor's non-debtor co-defendants because the co-defendants had potential indemnification claims against the debtor and therefore "it is at least arguable that [the plaintiff's] claims against [the co-defendants] conceivably could affect [the debtor's] bankruptcy estate"); In re Houston Regional Sports Network, L.P., 2014 WL 2159534, *4-6 (Bankr. S.D. Tex. 2014) ("Like most circuits, the Fifth Circuit derives its' related-to jurisprudence from Pacor v. Higgins. . . Despite the differing interpretations of the test for related-to jurisdiction is whether the outcome of those proceedings could conceivably have an effect on the estate being administered in bankruptcy. Certainty or even likelihood of such an effect is not required.")

23    See In re HONX, Inc., No. 22-90035, Adv. Pro. No. 22-3129 at 1 (Bankr. S.D. Tex. Apr. 28, 2022) (observing that any attempt to proceed with asbestos-related claims against "any entity that may have liability arising out of its dominion or control of the Debtor" would violate the automatic stay; see also, e.g., Barretts Minerals Stay Order; *Order Regarding Debtor's Emergency Motion to Extend and Enforce the Automatic Stay*, In re Tehum Care Services, Inc., No. 23-90086 (Bankr. S.D. Tex. March 3, 2023) [Dkt. 43] (the "Tehum Stay Order"); *Order Granting Preliminary Injunction*, In re The Babcock & Wilcox Co., No. 00-10992, Adv. Pro. No. 00-01029 (Bankr. E.D. La. Apr. 17, 2000) (the "Babcock & Wilcox Injunction Order"); accord Bestwall, 71 F.4th at 178-79; Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump), 2021 WL 3729335, at *23-24 (Bankr. W.D.N.C. Aug. 20, 2021); DBMP, 2021 WL 3552350, at *18-21; *Order Granting in Part and Denying in Part Debtors' Mot. for Prelim. Inj.*, In re TK Holdings Inc., No. 17-50880-BLS (Bankr. D. Del. Aug. 22, 2017) [Dkt. 63].

24    See, e.g., Zale, 62 F.3d at 760-61 (stating that an automatic stay or injunction may enjoin claims against non-debtor affiliates in unusual circumstances); In re Am. Film Techs., Inc., 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying claims against a debtor's directors); In re Family Health Servs., Inc., 105 B.R. 937, 942-943 (Bankr. C.D. Cal. 1989) (staying claims by certain health care providers against members and enrollees of a debtor HMO); In re Myerson & Kuhn, 121 B.R. 145, 160 (Bankr. S.D.N.Y. 1990) (enjoining suits against non-debtor partners).

Moreover, the Debtor has indemnification obligations to J&J, New Holdco, Pecos River, the Retailers and the Indemnified Parties.  And the Debtor shares insurance coverage with J&J, Pecos River and the Retailers, who are named as insureds under many of the policies.[25] Any party pursuing a Debtor Talc Claim against another entity is seeking to establish through third-party litigation a claim against the Debtor.  Third-party litigation involving these claims could at least "conceivably" affect the Debtor's estate (and, in fact, would materially and adversely impact this case).  See Bestwall, 71 F.4th at 179 ("And the possible effect on the Bestwall bankruptcy estate of litigating thousands of identical claims in state court is sufficient to confer 'related to' jurisdiction.").

84.    Moreover, continued litigation of the Debtor Talc Claims against non-debtor Protected Parties by holdout law firms also threatens to create an evidentiary record and potentially determine issues that could materially impact confirmation of the Amended Plan, which is supported by the substantial majority of claimants.  See, e.g., W.R. Grace, 386 B.R. at 35 (taking into account the "risks of collateral estoppel and record taint" in assessing potential impact on the debtor).  Thus, the continuation of the Debtor Talc Claims while the Chapter 11 Case is ongoing jeopardizes the Debtor's legal interests and rights in a way that impacts the administration and handling of its bankruptcy estate, including confirmation of the Amended Plan.  In assessing the potential impact on the Debtor, the *potential* harms to the Debtor of continued litigation against a non-debtor weigh in favor of finding that the Court has "related to"

---

[25]    All of the pre-1986 occurrence-based insurance policies provide insurance shared by the Debtor, Pecos River and J&J.  Ex. 26 (FRE 1006 insurance coverage summary).  In addition, the Retailers are identified as insureds in many of the pre-1986 insurance policies.  See, e.g., Ex. 30.  The relevant provisions generally provide coverage to vendors with respect to bodily injury arising out of the distribution or sale in the regular course of the vendor's business of the named insured's products, subject to certain exclusions.  See id.  The only relevant exclusion is where the vendor is alleged to repackage J&J or Old JJCI's products, or where the vendor made a physical or chemical change to the product.  Id.

jurisdiction to enjoin claims against non-debtors.  As detailed below, the adjudication of the claims against non-debtors *could conceivably* impact the resolution of the Debtor Talc Claims in the Debtor's bankruptcy case, and *at least raises the possibility* of collateral estoppel, res judicata and record-taint concerns.

85.     Finally, any judicial determination regarding issues that underlie the Debtor Talc Claims could impact the availability of insurance coverage to the Debtor and could also affect damage awards for which the Debtor is liable.  See, e.g., In re Dow Corning, 86 F.3d 482, 494 (6th Cir. 1996) (unfiled and contingent indemnification claims against the debtor arising from third-party litigation against non-debtors "unquestionably could ripen into fixed claims," which "suffices to establish a conceivable impact on the estate").  And the potential impact of continued prosecution of the Debtor Talc Claims would require the Debtor to monitor the cases, diverting resources and attention away from the Debtor's efforts to confirm the Amended Plan.  As a result, this Court clearly has "related to" jurisdiction.

## II.     THE AUTOMATIC STAY APPLIES OR EXTENDS TO PROHIBIT PROSECUTION OF THE DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES.

86.     The automatic stay allows "the bankruptcy court to centralize all disputes concerning property of the debtor's estate in bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas."  Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 989 (2d Cir. 1990); see also Matter of S.I. Acquisition, Inc., 817 F.2d 1142, 1146 (5th Cir. 1987) ("[T]he stay . . . prohibits the proliferation of numerous claims in different forums against the debtor."); McCartney v. Integra Nat'l Bank N., 106 F.3d 506, 511 (3d Cir. 1997) (one purpose of section 362 is "to centralize all prebankruptcy civil claims against a debtor in the bankruptcy court").

87.     Although the automatic stay typically applies only to debtors, Fifth Circuit precedent, as well as precedent in other circuits, recognizes that the automatic stay of section 362(a) may apply of its own force to prohibit the prosecution of the Debtor Talc Claims against the Protected Parties.  See Tehum Stay Order ¶ 1 ("[T]he automatic stay prohibits the commencement or continuation of any action by the Defendants to recover prepetition claims against [the non-debtor affiliates] . . ."); Barretts Minerals Stay Order ¶ 2 ("Any Talc Action in which a [debtor] Affiliate is named as a defendant is stayed as against such [debtor] Affiliate(s) . . ."); see also Aldrich Pump, 2021 WL 3729335, at *31-32 ("[T]he Debtors . . . are the real party defendants in any suit seeking to liquidate and recover on account of an Aldrich/Murray Asbestos Claim, even if directed at a Protected Party, and section 362(a)(1) applies to stay such actions."); DBMP, 2021 WL 3552350, at *27 (same).  As explained above, the Debtor is responsible for the Debtor Talc Claims, and these claims against the Protected Parties involve the same products, same time periods, same alleged injuries and same evidence as claims against the Debtor.  Thus, the commencement or continuation of the Debtor Talc Claims against the Debtor's predecessors, its affiliates and Retailers can have only one purpose:  the ultimate liquidation and recovery of claims against the Debtor.  As a result, any action against the Protected Parties to recover such claims is expressly enjoined by section 362(a)(1) because it constitutes an "action or proceeding against the debtor" to recover a prepetition claim.  See FDIC v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125, 131-32 (2d Cir. 1992) (actions "to recover a claim against the debtor" as provided in section 362(a)(1) "must encompass cases in which the debtor is not a defendant; it would otherwise be totally duplicative of the former category and pure surplusage").

88.     But even where the automatic stay does not apply of its own force, this Court can extend the stay to non-debtor defendants in "unusual circumstances," including "when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor" or "when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." Zale, 62 F.3d at 761; see also S.I. Acquisition, 817 F.2d  at 1147 ("Several courts . . . have reasoned that a nonbankruptcy codefendant may be protected by the automatic stay of section 362(a)(1) if extension of the stay contributes to the debtor's efforts of rehabilitation or the debtor and nonbankrupt are closely related.").

### A.     An Identity of Interests Exists Between the Debtor and the Protected Parties.

89.     An identify of interests arises "where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." Reliant Energy Services, Inc. v. Enron Canada Corp., 349 F.3d 816, 825 (5th Cir. 2003) (acknowledging that the Fifth Circuit has recognized the exception stated in A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.), 788 F.2d 994, 999 (4th Cir. 1986));[26] accord McCartney, 106 F.3d at 510-11 (concluding that the automatic stay extended to enjoin an action against a non-debtor third party where the debtor "was, in essence, the real party in interest" in the pursuit of a deficiency judgment against the third party).[27]

---

[26]     See In re Divine Ripe, L.L.C., 538 B.R. 300, 308 (Bankr. S.D. Tex. 2015) (finding that "[t]he Fifth Circuit has recognized the A.H. Robins Co.'s exception to the general rule [that the automatic stay is generally not extended beyond the debtor]").

[27]     See also Ritchie Cap. Mgmt., L.L.C. v. Jeffries, 653 F.3d 755, 762 (8th Cir. 2011) (acknowledging that bankruptcy courts can stay cases against non-debtors in unusual circumstances); Queenie v. Nygard Int'l, 321 F.3d 282, 288 (2d Cir. 2003) (automatic stay applied to non-debtor third-party corporation "because it is wholly owned by [debtor], and adjudication of a claim against the corporation will have an immediate adverse economic impact on [debtor]"); Colonial Realty, 980 F.2d at 131-32 (automatic stay applied to

90.     Here, the non-debtor Protected Parties and the Debtor enjoy such an identity of interests that a lawsuit asserting talc-related claims against the Protected Parties is a lawsuit against the Debtor.  As explained above, responsibility for all claims associated with Johnson's Baby Powder and Shower to Shower was assumed by Old JJCI before being allocated to LTL/LLT in the 2021 Corporate Restructuring.  See supra § III.A.  Then, pursuant to the 2024 Corporate Restructuring, responsibility for the portion of those claims that constitutes Debtor Talc Claims was allocated to the Debtor.  See id.  The pursuit of the Debtor Talc Claims against LTL/LLT and Old JJCI (both of which no longer exist) and J&J, therefore, is an effort to liquidate and recover prepetition claims for liabilities that were assumed by the Debtor's predecessors and are now liabilities of the Debtors.  See id.  Such litigation also creates risks of binding the Debtor through res judicata and collateral estoppel, and creating an evidentiary record that prejudices the Debtor.

91.     The Debtor's indemnification obligations also give rise to an identity of interests with the Retailers and Indemnified Parties, including the Debtor's affiliates, because the Debtor is ultimately responsible for those Debtor Talc Claims.  In Robins, the United States Court of Appeals for the Fourth Circuit (the "Fourth Circuit") described one situation that would give rise to an identity of interests as "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." Robins, 788 F.2d at 999.  Notably, the reference to "absolute indemnity" does not create a requirement that any indemnity obligation be automatic.  Rather, the prospect or potential for indemnification is sufficient to warrant application of the automatic stay.  See, e.g., In re A.H.

_____

non-debtor third party who was recipient of property that was allegedly fraudulent transferred from debtors).

Robins Co. Inc. (A.H. Robins Co. v. Aetna), 828 F.2d 1023, 1025 (4th Cir. 1987) (noting that the Fourth Circuit found in Robins that a stay was authorized because the defendant "**might** seek indemnification from Robins for any damages it had to pay, thus implicating the debtor's property.") (emphasis added); Nat'l Oilwell Varco, L.P. v. Mud King Products, Inc., 2013 WL 1948766, at *2-3 (S.D. Tex. 2013) (extending automatic stay to non-debtor defendants in order to allow the bankruptcy court to "sort out the scope, applicability, and overall enforceability of the indemnification duties" owed to the non-debtors).[28]  Indeed, the Fourth Circuit in Robins continued, "[t]o refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute."  Robins, 788 F.2d at 999.[29]

    92.    Moreover, courts have found that an identity of interest between a debtor and a non-debtor exists where the debtor's conduct or product was "at the core of the issues raised" in actions against the non-debtor.  See W.R. Grace, 386 B.R. at 30-31.[30]  So too here.

---

[28]    See also In re W.R. Grace & Co., 115 F. App'x 565, 568-69 (3d Cir. 2004) (refusing to modify injunction precluding state court action against non-debtor third parties because the "prospect of indemnification" warranted a stay); In re Philadelphia Newspapers, LLC, 423 B.R. 98 (E.D. Pa. 2010) (holding that unusual circumstances existed to justify extension of automatic stay where debtor owed potential indemnification obligation).

[29]    See also id. (quoting In re Metal Ctr., 31 B.R. 458, 462 (D. Conn. 1983) ("Clearly the debtor's protection must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate.")); S.I. Acquisition , 817 F.2d at 1147  (citing to Metal and noting that courts "have reasoned that a nonbankrupt codefendant may be protected by the automatic stay of section 362(a)(1) if the extension of the stay contributes to the debtor's efforts of rehabilitation or the debtor and nonbankrupt are closely related"); Edwards v. McElliotts Trucking, LLC, 2017 WL 5559921, at *3 (S.D. W. Va. Nov. 17, 2017) (finding that indemnification arrangement between the debtor and non-debtor defendants made actions against non-debtor defendants subject to the automatic stay imposed by section 362(a)(1)); In re W.R. Grace & Co., 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004) (applying the automatic stay to litigation between two non-debtor parties where one of the parties was entitled to contractual indemnity from the debtor on account of such claims and amending preliminary injunction order to include such action).

[30]    See also TK Holdings Inc., Adv. Pro. No. 17-50880 (Bankr. D. Del. July 13, 2017) [Dkt. 64] (the "Takata PI Ruling") (finding an identity of interest between the debtors and the non-debtors, even though plaintiffs alleged they asserted direct claims against the non-debtors, because the basis for all the claims was the "delivery and installation of a defective part manufactured by the debtors" and the debtors owed indemnification obligations to the non-debtors); Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.), 2000 WL 33716976, at *3 (Bankr. S.D.N.Y. Nov. 3, 2000) (finding that action against non-debtor defendant was inextricably intertwined with the debtors given that non-debtor was merely a distributor of the debtors and the core of the action was for patent infringement based on the debtors' product); Am. Film

At their core, all of the Debtor Talc Claims arise out of the alleged harm caused by Johnson's Baby Powder and other talc-containing products for which the Debtor is responsible.  And this is true regardless of whether the Protected Parties have independent liability.  The Debtor Talc Claims do not distinguish between the actions of the Debtor or the Protected Parties but instead seek recoveries for the same alleged conduct under the same or similar theories.  In that respect, this case is comparable to W.R. Grace, where the debtor's alleged conduct predominated the claims against the non-debtors, and the court found it appropriate to enjoin such claims based on an identity of interest.[31]  It is also consistent with other cases where courts have found that even allegedly direct claims against non-debtors do not cut off an identity of interests between the debtor and the non-debtors.[32]

93.    The identity of interests among the Debtor and the other Protected Parties is further evidenced by the identity of claims at issue.  Continued prosecution of the Debtor Talc Claims against the Protected Parties—even if such claims were allegedly for the Protected

---

Techs., 175 B.R. at 849-50 (finding identity of interest in part because counts against non-debtors and debtors necessarily involved the same subject matter and would involve facts identical to each other); In re Ms. Kipps, Inc., 34 B.R. 91, 93 (Bankr. S.D.N.Y. 1983) (finding that automatic stay extended to non-debtor principal of the debtor given that action against non-debtor was inextricably intertwined with claim against and liability of the debtor and was premised on "one wrong, one injury and one recovery").

[31]    See W.R. Grace, 386 B.R. at 30-36 (rejecting argument that the test for identity of interest could not be satisfied where the non-debtor was allegedly independently liable and preliminarily enjoining actions against non-debtor railroad company because the debtors' actions were alleged to be the proximate cause of the plaintiffs' injuries, i.e., the debtors' operations and conduct were at the "core of the issues" raised in the actions against the non-debtor, and the debtors were obligated to indemnify the non-debtor).

[32]    See, e.g., Mallinckrodt, 2021 WL 523625 at *3, 6 (stating that a holding that the non-debtors could have independent liability would not preclude or estop the bankruptcy court's conclusions that the claims are "inextricably intertwined" for purposes of issuing a preliminary injunction); Purdue Pharm. L.P. v. Mass. (In re Purdue Pharm. L.P.), No. 19-23649 (Bankr. S.D.N.Y. Oct. 11, 2019) [Dkt. 87]  (stating that even if "a claim against a third party is independent or not derivative of the debtors, it still may be enjoined under proper circumstances"); Takata PI Ruling, 15:5-16 (rejecting contention that non-debtors "inability to be indemnified for their own negligent or wrongful acts" vitiated the identity of interest created by contractual indemnity obligations of the debtors and finding that all the claims against the non-debtors revolved around the acts and omissions of the debtors); see also W.R. Grace, 2004 WL 954772 at *2-3 (finding that there was an identity of interest between the debtor and the non-debtor owner of property that was previously owned by the debtor in litigation between two non-debtors given entitlement to contractual indemnity).

Parties' independent conduct—would involve litigation of the same key facts:  the same products, time periods and alleged injuries, and would effectively seek to adjudicate the very same issues in this Chapter 11 Case.

      **B.**      **Unusual Circumstances Require Stay Protection to Preserve the Debtor's Reorganization Efforts.**

      94.      In addition to the existence of an identity of interest between the Debtor and the Protected Parties, allowing the Debtor Talc Claims to continue outside of this Chapter 11 Case would "adverse[ly] impact [] the debtor's ability to accomplish [a] reorganization," specifically confirmation of the Amended Plan.  See Zale, 62 F.3d at 761.  Stay protection is essential with respect to the Debtor Talc Claims to avoid liquidation of claims outside the Chapter 11 Case, the potential preclusive or prejudicial impact of such litigation, to avoid depleting the Debtor's resources to the detriment of its estate and to allow for the establishment of a trust pursuant to section 524(g) of the Bankruptcy Code.  In discussing the automatic stay in the context of a mass-tort asbestos case, courts in this District have recognized that section 524(g) establishes a special process in asbestos cases and that allowing plaintiffs to proceed against non-debtor co-defendants could "destroy the [section] 524(g) remedy that Congress created" and "result[] in extremely adverse consequences to the debtor's attempts to establish a 524(g) trust."  See Ex. 39 (Tr. of Apr. 29, 2022 Hr'g at 48:2-49:16, HONX, Inc. v. Those Parties Listed in Appendix A (In re HONX, Inc.), Adv. Pro. No. 22-03129, (Bankr. S.D. Tex.) [Dkt. 24]).

      *(i)*      *Liquidation of Debtor Talc Claims Outside this Chapter 11 Case*

      95.      Absent a stay of litigation, "uncontrollable" and "uncoordinated proceedings in different courts" will occur, Robins, 788 F.2d at 998, which eventually will lead to the liquidation of Debtor Talc Claims against the Protected Parties for which the Debtor

ultimately is liable.  Whether such claims are the responsibility of the Debtor directly—by virtue of the allocation of those claims to the Debtor from LLT—or indirectly through the Debtor's actual or alleged indemnification obligations, continued litigation against the Protected Parties would liquidate the claims against the Debtor outside of this Chapter 11 Case and potentially deplete available insurance coverage—frustrating the purpose of the automatic stay.

96.     Under the circumstances of this Chapter 11 Case, many facts establishing an identity of interests between the Debtor and the Protected Parties also illustrate the impact on the Debtor's estate that would be caused by continued litigation of the Debtor Talc Claims against the Protected Parties.  Because the talc claimants assert the same claims arising from the same products, same time periods, same alleged injuries and same evidence against the Protected Parties, the liquidation of any such claim against any Protected Party will affect the assertion of that same claim against the Debtor.  The Debtor's estate thus typically has dual interests in the outcome of the litigation of the Debtor Talc Claims against the Protected Parties:  because the same claim for the same liability is asserted against the Debtor, as successor to LLT; and because the Debtor, as indemnitor, may ultimately be liable for any judgment against the Protected Party.

97.     Permitting claimants to continue seeking to indirectly liquidate claims against the Debtor through actions against third parties with indemnity rights would also inhibit the Debtor's expeditious confirmation of the Amended Plan.  The successful outcome of this Chapter 11 Case depends upon the Debtor's ability to obtain confirmation of the Amended Plan to establish a trust that will resolve all current and future ovarian and gynecological talc claims against the Debtor.  The simultaneous effort by individual talc claimants or holdout law firms to fix Debtor Talc Claims in other forums against related parties would undermine (or defeat) this

goal and the ability of the Debtor and its large majority of supporting claimants to achieve
confirmation of a plan that treats all similarly situated talc claimants fairly and equitably.

### (ii)  Risks of Res Judicata, Collateral Estoppel and Evidentiary Prejudice

98.     Litigation of the Debtor Talc Claims outside of this Chapter 11 Case also
gives rise to the risk of res judicata, collateral estoppel and evidentiary prejudice.  The Debtor is
not required to establish definitively the preclusive or evidentiary harm it will suffer.  Rather,
"employ[ing] a broader view of the potential impact on the debtor," LTL Mgmt., 638 B.R.
at 314, "it suffices to acknowledge that there *exists a risk* that [such doctrines] could adversely
impact Debtor in future litigation."  Id. at 316 (emphasis in original) (citing W.R. Grace,
115 F. App'x at 565 (holding that risk of future preclusive consequences was enough to weigh in
favor of extending the stay)).  This burden is satisfied here.

99.     Res judicata bars relitigation in a subsequent action by the parties—or any
of their privies—of claims and defenses that were brought—or that could have been brought—in
the prior action.  See Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 571 (5th Cir. 2005)
(holding res judicata arises when "(1) the parties are identical or in privity; (2) the judgment in
the prior action was rendered by a court of competent jurisdiction; (3) the prior action was
concluded by a final judgment on the merits; and (4) the same claim or cause of action was
involved in both actions").  Any number of relationships may give rise to privity for purposes of
claim preclusion.  A risk of preclusion may exist, for example, between a corporation and its
successor, Russell v. SunAmerica Sec., Inc., 962 F.2d 1169, 1175-1176 (5th Cir. 1992), or
between an indemnitor and indemnitee, FTC v. Garvey, 383 F.3d 891, 898-899 (9th Cir. 2004).
As a result, unless Debtor Talc Claims are stayed, the risk exists that plaintiffs may attempt to
bar the Debtor from raising defenses to the Debtor Talc Claims that were not raised by the

Protected Parties in ongoing litigation outside of this Chapter 11 Case causing an obvious prejudicial impact to the Debtor.

100.    Collateral estoppel—or issue preclusion—bars the re-litigation of issues where "(1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action."  See Test Masters, 428 F.3d at 572. Importantly, nonmutual collateral estoppel has been applied offensively by litigants who were not parties to the prior litigation.  See, e.g., Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979) (allowing offensive use of collateral estoppel to prevent a corporation from defending against the stockholder class action of plaintiffs who were not parties to prior SEC litigation against the corporation); see also Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 248-49 (3d Cir. 2006) (discussing nonmutual offensive use of collateral estoppel); Terrell v. DeConna, 877 F.2d 1267, 1270 (5th Cir. 1989) (collateral estoppel may be used offensively "against a non-party by a party to the prior suit").  A clear risk therefore exists that talc claimants who have never before litigated their claims against the Debtor, or against the Protected Parties, could seek to bar the Debtor's defenses by pointing to a prior judgment on a Debtor Talc Claim against a Protected Party.

101.    Courts consistently have concluded that the risks of collateral estoppel and res judicata warrant a stay of third-party litigation that could undermine the purposes of the automatic stay.  See, e.g., Bestwall, 606 B.R. at 256 (determining that the risks posed by the doctrines of res judicata and collateral estoppel, among other factors, warrant a preliminary injunction of litigation against non-debtor affiliates); Am. Film Techs., 175 B.R. at 850-55 (staying claims against debtor's directors and holding that a potential finding of liability against

such directors would be based on acts undertaken by directors as agents of the debtor and therefore would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions); In re Sudbury, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); In re Johns-Manville Corp., 26 B.R. 420, 429 (Bankr. S.D.N.Y. 1983) aff'd 40 B.R. 219 (S.D.N.Y. 1984), and appeal allowed, decision vacated in part on other grounds, 41 B.R. 926 (S.D.N.Y. 1984) (concluding that the risk of collateral estoppel would irreparably injure the estate and, thus, issuance of a stay of claims against non-debtors was warranted).

102.    Beyond formal preclusion doctrines, litigation of the Debtor Talc Claims against the Protected Parties could allow parties to use statements, testimony and other evidence elicited or adduced in those proceedings to try to establish the Debtor's liability for Debtor Talc Claims—especially given the same nucleus of operative facts at issue.  As one court put it, "once a witness has testified to a fact, or what sounds like a fact, that witness may be confronted with his prior testimony under oath in a future proceeding" involving the debtor regardless of whether the debtor "was a party to the record on which the initial testimony was taken." In re Johns-Manville Corp., 40 B.R. 219, 225.  The same concern arises for other evidence: "Once an admission against interest is made, under oath or otherwise, by the agent of a party, that admission stands for all time."  Id.  Regardless of what the parties to the other proceeding might "stipulate, the thousands of other claimants and cross-claimants who are after [the debtor's] assets, would be entitled to use the product of such discovery."  Id.; see also Bestwall, 606 B.R. at 256 ("Litigation of the Bestwall Asbestos Claims against the Protected Parties will create the additional risk that statements, testimony, and other evidence generated in proceedings

against the Protected Parties will be used to try to establish Bestwall Asbestos Claims against the Debtor."); W.R. Grace, 386 B.R. at 34 (granting injunction based, among other things, on the possibility that "record taint" in actions against non-debtors would compel the debtors' participation and impair the reorganization effort); Union Tr. Phila., LLC v. Singer Equip. Co. (In re Union Tr. Phila., LLC), 460 B.R. 644, 657 (E.D. Pa. 2011) (in subsequent suits, debtor could be bound by "critical factual and legal issues" determined in the proceedings against non-debtor).

103.    Unless the litigation of the Debtor Talc Claims against the Protected Parties is stayed, the Debtor may be compelled to defend its interests in pending litigation against the Protected Parties to prevent such harm to its estate, thereby defeating the "breathing spell" intended by the automatic stay.  These are consequences that the Debtor should not be required to suffer or be compelled to protect against, and the extent of this risk should not be "tested at the debtor's peril."  W.R. Grace, 115 F. App'x at 570.

### (iii)    *Potential Diversion of Resources and Disruption of Funding*

104.    Courts routinely find that the potential diversion of estate resources to monitor or participate in external litigation justifies an extension of the automatic stay.  See W.R. Grace, 386 B.R. at 31-32 (finding that actions against non-debtor directly impacted the estate due to the overlap of issues, contractual indemnity and the implication of the debtors' insurance, which would all necessitate the debtors' involvement and divert resources to attend to the claims rather than the reorganization); Bestwall, 606 B.R. at 256-57 (finding that litigation of claims against certain non-debtors would "divert key personnel from the important tasks required to establish a section 524(g) trust"); Takata PI Ruling 19:5-23:5 (finding that continued prosecution of the state and individual actions against non-debtors would adversely impact the debtors' efforts to reorganize given need of all stakeholders to focus on reorganization process);

Phila. Newspapers, 407 B.R. at 616 (finding that the diversion of resources caused by action against non-debtors arising from a series of allegedly false and misleading newspaper and internet articles and certain non-debtors "bad acts" would impact the debtors' ability to engage in a timely and effective reorganization).

105.    If litigation of Debtor Talc Claims continues outside this Chapter 11 Case, the Debtor will be distracted from its efforts to confirm the Amended Plan by its need to monitor or participate in litigation because of the identity of claims being liquidated and issues being determined in the tort system, as well as the Debtor's indemnification obligations, the potential effects of res judicata, collateral estoppel or record taint.  Moreover, funds and resources necessary for the Debtor's reorganization efforts may be diverted by any judgments entered by depleting insurance proceeds available to the Debtor under shared insurance policies.  See, e.g., *Inj. Pursuant to §§ 105(a) and 362(a) and Fed. Rule of Bankruptcy Procedure 7065*, In re Quigley Co., Inc., No. 04-15739, Adv. Pro. No. 04-04262 (Bankr. S.D.N.Y. Dec. 17, 2004) [Dkt. 122] at 3-4 (the "Quigley Stay Order") (finding that continued prosecution of any and all asbestos claims against non-debtor parent, whether allegedly direct or derivative, would deplete shared insurance policies and funds in an insurance trust to the detriment of the debtor's estate).

106.    In sum, because the Debtor is the real-party defendant in any suit seeking to liquidate and recover on account of a Debtor Talc Claim and continuation of such suits would impair the Debtor's ability to expeditiously confirm the Amended Plan and establish a trust pursuant to section 524(g) for the benefit of claimants, "unusual circumstances" exist and, thus, section 362(a)(1) applies or extends to stay such actions.

C.    **Any Action That Could Deplete Insurance Policies Is Automatically Stayed by Section 362(a)(3).**

107.    Section 541 of the Bankruptcy Code establishes that the filing of a bankruptcy case creates an "estate."  11 U.S.C. § 541(a).  That estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" and "[a]ny interest in property that the estate acquires after the commencement of case," wherever located and by whomever held.  Id. § 541(a)(1), (7).  Section 362(a)(3) automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . ."  11 U.S.C. § 362(a)(3).

108.    Section 362(a)(3) bars plaintiffs from bringing suits against J&J, Pecos River or the Retailers that would deplete the Debtor's insurance on account of the Debtor Talc Claims because the right to insurance coverage is property of the estate.  See Matter of Edgeworth, 993 F.2d 51, 55 (5th Cir. 1993) ("[C]ourts are generally in agreement that an insurance policy will be considered property of the estate"); see also In re Boy Scouts of Am. and Del. BSA, LLC, 650 B.R. 87, 131 (D. Del. 2023) ("A dollar-for-dollar reduction of the Debtor's available insurance coverage—property of the estate under § 541 of the Bankruptcy Code—without the need for an intervening action is precisely the type of effect on the estate that can adversely affect the Debtor's reorganization."); Robins, 788 F.2d at 1001 (agreeing with "the weight of authority" that insurance contracts are property of the estate and that "[a]ccordingly actions 'related to' the bankruptcy proceedings against the insurer . . . are to be stayed under section 362(a)(3)").

109.    J&J, Pecos River and the Debtor (and, in many cases, the Retailers) are covered for talc-related claims under various shared insurance policies.  See supra § II.G.  The right to coverage under these insurance policies is property of the Debtor's estate, and

-54-

prosecution of a claim against J&J, Pecos River and/or the Retailers, as co-insured parties, would deplete proceeds available to the Debtor, thereby reducing assets available to the bankruptcy estate.  See, e.g., Quigley Co., 676 F.3d at 53-54, 58 ("[W]here litigation of the [lawsuits against non-debtor] would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of [debtor], the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate."); Robins, 788 F.2d at 1008 (sustaining injunction and transfer of claims against non-debtors in part because such claims, if successful, would reduce insurance funds available to debtor's estate).

110.    Here, insurance is potentially available to the Debtor, J&J, Pecos River and the Retailers under various insurance policies for talc-related claims.  If a Debtor Talc Claim is prosecuted against J&J, Pecos River or the Retailers, they may seek coverage under these shared insurance policies to satisfy any judgment, thereby reducing the coverage available to the Debtor's estate.  Such a depletion of an estate asset violates the automatic stay and, therefore, Debtor Talc Claims against such entities are stayed pursuant to section 362(a)(3).

**D.    The Fraudulent Transfer Action and Any Other Action Seeking to Hold Protected Parties Liable for the Debtor Talc Claims Based on Derivative Liability, Alter Ego, Fraudulent Transfer or Similar Theories Are Automatically Stayed by Section 362(a)(3).**

111.    State law affords an individual creditor the right in some circumstances to recover a claim against an entity from a third party based on derivative theories.  But once that primary entity files for bankruptcy, the creditor's pursuit of the claim against the third party is automatically stayed by section 362(a)(3) if it constitutes an act "to exercise control over" the same or similar claim that state law or the Bankruptcy Code affords to the debtor to assert generally on behalf of its creditors.

112.    "Causes of action that belong to the debtor 'at the time the case is commenced' or that are acquired after commencement but before conversion are therefore property belonging to the estate."  In re Cantu, 784 F.3d 253, 257-258 (5th Cir. 2015); Baillie Lumber Co. v. Thompson (In re Icarus Holding, LLC), 391 F.3d 1315, 1319 (11th Cir. 2004) (debtor's estate "includes legal causes of action the debtor had against others at the commencement of the bankruptcy case").  Further, section 544(b) of the Bankruptcy Code grants exclusive authority to the trustee (or debtor in possession), after the bankruptcy case is filed, to bring on behalf of the estate the same fraudulent conveyance actions that individual creditors could bring under state law prior to the filing of the bankruptcy case.  11 U.S.C. § 544(b).

113.    When claims against a non-debtor "are property of the estate under section 541(a), any similar extraneous lawsuits brought by individual creditors will be subject to the automatic stay provision of 11 U.S.C. § 362(a)(3)."  Baillie Lumber, 391 F.3d at 1319 (citing S.I. Acquisition, 817 F.2d at 1153); S.I. Acquisition, 817 F.2d at 1149 (holding that section 362(a)(3) extends to "'all legal or equitable interests of the debtor in property,'" which is "all-encompassing and includes rights of action as bestowed by either federal or state law").

114.    Importantly, the "scope of the automatic stay under section 362 depends upon how the Texas courts would characterize a cause of action. . . .  If an action under that theory belongs, under Texas law, to the corporation, then the action is 'property of the estate' and the creditor may not pursue it."  In re MortgageAmerica Corp., 714 F.2d 1266, 1276 (5th Cir. 1983).  In making this determination, the Fifth Circuit has instructed that courts are to keep "in mind the Bankruptcy Code's general policies of securing and preserving the debtor's property and of ensuring equal distribution of the debtor's assets to similarly-situated creditors."  SI Acquisition, 817 F.2d at 1150; see also MortgageAmerica Corp., 714 F.2d at 1273-78

(holding that certain actions for the benefit of all creditors are stayed by the automatic stay in furtherance of "the fundamental bankruptcy policy of equitable distribution among creditors" and to prevent races to win a judgment).  Pursuant to this analysis, courts within the Fifth Circuit have noted that "any alter ego type claims—a claim for an alter ego remedy, a fraudulent transfer claim, a denuding claim, a corporate fund claim—are property of the bankruptcy estate." In re Caspri Corp., 2010 WL 743914, at *4 (Bankr. W.D. Tex. 2010) (citing generally S.I. Acquisition).[33]

115.    In S.I. Acquisition, the Fifth Circuit found that, although an alter ego action is typically asserted by a debtor corporation's creditors, there is nothing in Texas law that prohibits a corporation from asserting the action itself.  See S.I. Acquisition, 817 F.2d at 1149-53 ("We, therefore, conclude that [creditor's] alter ego action is a right of action belonging to [the debtor]").  Because the debtor *could have* asserted an alter ego action itself, such an action was therefore an estate cause of action, "and, as such, is 'property of the estate' within the meaning of section 541(a)(1).  Accordingly, the automatic stay of section 362(a)(3) applie[d]."  Id.; see also Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132, 136 (4th Cir. 1988) (holding that a debtor corporation had the right under Virginia law to bring an alter ego claim against its principal and an affiliate, and that the claim became property of the estate when the corporation

---

[33]    To determine which state law is the "relevant state law" for this inquiry, bankruptcy courts "apply the choice of law rules of the forum in which they sit."  In re The Heritage Org., L.L.C., 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009).  Because it is the forum state here, Texas's choice-of-law rules determine which state law governs whether the Debtor had standing to assert derivative claims at the time the bankruptcy case was filed.

Texas applies the "internal affairs doctrine," which applies the law of the state in which the debtor is incorporated, with respect to veil piercing claims.  See Alberto v. Diversified Group, Inc., 55 F.3d 201 (5th Cir. 1995) (holding that the wholly-owned subsidiary's state of incorporation, not the parent company's state of incorporation, governed a veil piercing issue); ASARCO LLC v. AMS Mining. Corp., 382 B.R. 49, 65 (S.D. Tex. 2007) (holding that the law of the state of incorporation of the subsidiary controlled over the state of the parent-company's incorporation under Texas "internal affairs doctrine" law.).  Here, the Debtor is a Texas limited liability company.  Thus, Texas law governs whether it had standing at that time to pierce its own corporate veil.

filed its chapter 7 case); Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs. by Jamie, Inc.), 230 B.R. 36, 43 (Bankr. D.N.J. 1998) (corporation can sue alter ego under New Jersey law, noting "majority of courts in other jurisdictions that have addressed the issue of authority to pursue an alter ego action on behalf of a corporate debtor have also held that the trustee has standing" to assert such claim).

116.    Similarly, in MortgageAmerica, the Fifth Circuit found that fraudulent conveyance claims as well as corporate denuding claims were stayed upon the debtor's filing for bankruptcy as they were claims that sought to exercise control over the debtor's property, including because of "the fundamental bankruptcy policy of equitable distribution among creditors."  See MortgageAmerica Corp., 714 F.2d at 1275 (finding that "[t]he automatic stay under section 362(a) thus applies and prevents a creditor from continuing to pursue a cause of action under the Texas Fraudulent Transfers Act after a petition for bankruptcy has been filed"); id. at 1276 ("[Section 544(b)] allows the bankruptcy trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance acts for the benefit of all creditors, not just those who win a race to judgment."); id. at 1277 ("a cause of action under the Texas corporate trust fund (denuding) theory, even though usually brought by creditors, is an action in the right of the corporation, and which is brought for the benefit of all creditors and shareholders with an interest in the corporation.").

117.    The reasoning in these cases applies equally to any Debtor Talc Claims asserted against Protected Parties that are based on facts and legal theories "generally available" to other talc claimants arising out of the various corporate restructurings.  As a result, these facts and legal theories of liability are not "personal" or "unique" to a particular claimant, or even

involve the conduct that gave rise to the claimants' talc-related claim against the Debtor.[34]  And, if these claims were successful, the benefit would be to all creditors equally.  As a result, such claims are property of the estate and stayed by section 362(a) of the Bankruptcy Code.  See In re Emoral Inc., 740 F.3d 875, 879-81 (3d Cir. 2014) (finding claim was "appropriately classified" as a "generalized claim constituting property of the estate" because plaintiffs failed to demonstrate "how any of the factual allegations that would establish their cause of action . . . are unique to them as compared to other creditors of Emoral" and "how recovery on their successor liability cause of action would not benefit all creditors of Emoral"); In re Tronox, Inc., 855 F.3d 84, 103-07 (2d Cir. 2017) (agreeing with reasoning in Emoral and finding court below had "correctly classified the [tort claimants'] claims as generalized, derivative claims comprising estate property" because success on the claims "would serve to increase the pool of assets available to all creditors").[35]

118.    Consistent with this precedent and the policy underlying section 544, the claims asserted in the Fraudulent Transfer Action,[36] in addition to any other fraudulent transfer,

---

[34]    See Labarbera v. United Crane & Rigging Servs, Inc., 2011 WL 1303146, at *7 (E.D.N.Y. March 2, 2011) ("The case law demonstrates that an alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, only if the conduct that supports the claim is the same conduct that directly harmed the creditor in the underlying cause of action.").

[35]    See also Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc., 187 F.3d 439, 441 (4th Cir. 1999) (finding that sureties causes of action were "so similar in object and purpose to claims the trustee could bring in bankruptcy court that the Sureties lack[ed] standing to pursue [those] claims in district court" and that the "trustee should have the first crack at challenging the [debtor/transferee] transaction").

[36]    In addition to actual fraudulent transfer claims, the Fraudulent Transfer Action includes claims for aiding and abetting fraudulent transfers.  Any such claim is also stayed given that its underlying basis (i.e., the claim of a fraudulent transfer) is estate property.  See Renate Nixdorf GmbH & Co. KG v. TRA Midland Properties, LLC, No. 05-17-00577-CV, 2019 Tex. App. LEXIS 26, 2019 WL 92038, at *5 (Tex. App.—Dallas Jan. 3, 2019, pet. denied) (mem. op.) ("Aiding and abetting is a dependent claim premised on an underlying tort; there can be no aiding and abetting claim related to an underlying tort that fails."); W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC, 437 S.W.3d 917, 921 (Tex. App.—Dallas Aug. 5, 2014, no. pet. h.) ("[T]he supreme court has specifically dealt with aiding and abetting—as it has dealt with conspiracy—as a 'dependent' claim, which is 'premised on' an underlying tort.  Thus, when an underlying tort fails, there can be [no] aiding and abetting claim related to that failed tort." (citing Ernst & Young, L.L.P., 51 S.W.3d 573, 582-83 (Tex). 2001)); In re DePuy Orthopaedics, Inc., 888 F.3d 753, 782 (5th Cir.

alter ego or similar "derivative" claims that have been alleged or that might be alleged by the Defendants against the Debtor's non-debtor affiliates, are generalized claims that seek to exercise control over property of the Debtor's estate and are thus stayed by section 362(a)(3).

## III.   THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(a) TO ENJOIN THE CONTINUATION OR COMMENCEMENT OF THE DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES.

### A.   The Court Has Authority to Enjoin the Pursuit of the Debtor Talc Claims Against the Protected Parties.

119.   Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This includes "ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process" of a bankruptcy case. Johns-Manville, 26 B.R. at 425, 436 (citing 2 Collier on Bankruptcy § 362.05 (15th Ed.).

120.   Bankruptcy courts' authority to use section 105 to enforce the protections of and achieve the statutory objective behind the automatic stay in section 362 is broadly recognized. See, e.g., S.I. Acquisition, 817 F.2d at 1146 n.3 ("beyond the automatic stay provisions of section 362(a)(1) and (3), the bankruptcy court may affirmatively stay proceedings pursuant to its broad discretionary powers embodied in 11 U.S.C. § 105 . . . . Section 105 does empower the bankruptcy court to stay proceedings against nonbankrupt entities.") (citing to In re Otero Mills, Inc., 25 B.R. 1018, 1020 (D.N.M. 1982)).[37] An injunction as to third-party litigation is appropriate where, among other things, the "failure to enjoin would [a]ffect the bankruptcy estate and would adversely or detrimentally influence and pressure the debtor

---

2018) (stating that Johnson & Johnson was entitled to judgment as a matter of law on the plaintiffs' aiding and abetting claims "because no such claim exists in Texas.").

[37]   This authority is further supported by the inherent power of all courts "under their general equity powers and in the efficient management of the[ir] dockets to grant" appropriate injunctive relief. S.I. Acquisition, 817 F.2d at 1146 n.3 (internal quotation omitted).

through the third party." Robins, 788 F.2d at 1003 (internal citation omitted).[38]  In such cases, an

injunction allows the debtor to receive the intended benefits of the automatic stay imposed by

section 362 of the Bankruptcy Code, which aims to:

> protect the debtor from an uncontrollable scramble for its
> assets in a number of uncoordinated proceedings in different
> courts, to preclude one creditor from pursuing a remedy to
> the disadvantage of other creditors, and to provide the debtor
> and its executives with a reasonable respite from protracted
> litigation, during which they may have an opportunity to
> formulate a plan of reorganization for the debtor.

Robins, 788 F.2d at 998; see also In re W.R. Grace & Co., 475 B.R. 34, 147 (D. Del. 2012)

(quoting Robins).

      121.    Acting under the broad authority granted by section 105(a), courts have

consistently stayed claims against non-debtor entities, including a debtor's affiliates, both in

mass tort and non-mass tort bankruptcies, to maintain the integrity of the debtor's estate and fully

effectuate the protections of the automatic stay pursuant to section 362(a).  See Bestwall,

606 B.R. at 254 ("Injunctions of the type requested by the Debtor have previously and uniformly

been issued in numerous other asbestos-related cases, including in this jurisdiction.") (citing to,

among other things, the Babcock & Wilcox Injunction Order).[39]  In fact, to the Debtor's

---

[38]    See also In re Calpine Corp., 365 B.R. 401, 409 (S.D.N.Y. 2007) (holding that court may issue a
"preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens
the reorganization process") (internal quotation omitted); In re Lazarus Burman Assocs., 161 B.R. 891, 897
(Bankr. E.D.N.Y. 1993) ("When an action by a creditor of a debtor against a non-debtor third party
threatens a debtor's reorganization, the creditor's action may be enjoined pursuant to section 105(a).").

[39]    As to non-asbestos mass tort bankruptcies, see In re Purdue Pharms L.P., No. 19-23649,
Adv. Pro. No. 19-08289 [Dkt. 82] (Bankr. S.D.N.Y. Oct. 11, 2019) aff'd 619 B.R. 38 (S.D.N.Y. 2020);
In re USA Gymnastics, No. 18-09108, Adv. Pro. No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019) [Dkt. 71];
In re TK Holdings Inc., No. 17-50880, Adv. Pro. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017) [Dkt. 63];
In re Lyondell Chem. Co., 402 B.R. 571 (Bankr. S.D.N.Y. 2009); Robins, 788 F.2d at 999-1000.

As to non-mass tort bankruptcies, see Am. Film Techs., 175 B.R. at 855 (staying claims against a debtor's
directors); In re Family Health Servs., Inc., 105 B.R. 937, 942–43 (Bankr. C.D. Cal. 1989) (staying claims
by certain health care providers against members and enrollees of a debtor HMO); In re Heron, Burchette,
Ruckert & Rothwell, 148 B.R. 660, 690 (Bankr. D.D.C. 1992) (finding that injunction of suits against non-

knowledge, virtually every court that has addressed the issue in the context of mass tort claims of a debtor asserted against non-debtor affiliates has recognized that such claims threaten the debtor's prospects for reorganization and has implemented a section 105(a) injunction.[40]  These courts have recognized, in the context of mass tort chapter 11 cases, that claims asserted against non-debtor affiliates or insurers threaten the debtor's prospects for reorganization and have correspondingly implemented a section 105(a) injunction.  See, e.g., Aldrich Pump, 2021 WL 3729335 at *37 ("If there is to be a Chapter 11 Case, there can be no dispute that the preliminary injunction is necessary."); DBMP, 2021 WL 3552350 at *41 ("And the litigation of DBMP Asbestos Claims in the tort system while the Chapter 11 Case remains pending would undermine the purposes of chapter 11 and section 524(g) to resolve all such current and future claims in a fair and equitable manner though a chapter 11 plan").[41]  Such relief is critical for a

---

debtor partners should issue); In re Myerson & Kuhn, 121 B.R. 145, 160 (Bankr. S.D.N.Y. 1990) (enjoining suits against non-debtor partners).

[40]   A notable outlier is the decision of the United States Bankruptcy Court for the Southern District of Indiana in In re Aearo Techs. LLC, 642 B.R. 891 (Bankr. S.D. Ind. 2022).  But that case is highly distinguishable because it relies on interpretations of law in the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit") that are inapplicable here.  In particular, the court ruled that Seventh Circuit authority did not permit extensions of the automatic stay of section 362(a)(1), as expressly permitted by Fifth Circuit precedent and Robins.  Id. at 905.  Moreover, the court found that it lacked even related to subject matter jurisdiction with respect to the proceeding under the Seventh Circuit's "more constrained approach to 'related to' jurisdiction," which the bankruptcy court was required to interpret "narrowly."  Id. at 909

[41]   See also Barretts Minerals Stay Order at 2 (enjoining the continued prosecution of defined covered actions as against the debtor's affiliates); In re Kaiser Gypsum Co., Inc., No. 16-31602 (JCW), Adv. Pro. No. 16-03313 (JCW) (Bankr. W.D.N.C. Nov. 4, 2016) [Dkt. 18] at 3-4 (staying asbestos-related actions against debtors' third-party insurer and non-debtor affiliates); In re Garlock Sealing Techs. LLC, No. 10-31607 (JCW), Adv. Pro. No. 10-03145 (JCW) (Bankr. W.D.N.C. June 21, 2010) [Dkt. 14] at 2-3 (staying asbestos-related actions against non-debtor affiliates); In re Leslie Controls, Inc., No. 10-12199 (CSS), Adv. Pro. No. 10-51394(CSS) (Bankr. D. Del. July 14, 2010) [Dkt. 46] at 4-5 (staying asbestos-related actions against current and former affiliates); In re Specialty Prods. Holding Corp., No. 10-11780 (KJC), Adv. Pro. No. 10-51085 (KJC) (Bankr. D. Del. June 4, 2010) [Dkt. 13] at 3-5 (staying asbestos-related actions against non-debtor parent company and other affiliates); W.R. Grace, 386 B.R. at 34 (enjoining actions against a third party railroad that transported the debtor's asbestos-containing products); Quigley Stay Order (enjoining the continuation of asbestos lawsuits against the parent corporation of the debtor); In re Mid Valley, Inc., No. 03-35592 (JKF), Adv. Pro. No. 03-3296 (JKF) (Bankr. W.D. Pa. Dec. 17, 2003) [Dkt. 7]; In re Combustion Eng'g, Inc., No. 03-10495 (JKF), Adv. Pro. No. 03-50839 (JKF) (Bankr. D. Del. Mar. 7, 2003) [Dkt. 19] (order enjoining asbestos litigation against certain non-debtor affiliates); In re ACandS, Inc., No. 02-12687 (PJW), Adv Pro. No. 02-5581 (PJW) (Bankr. D. Del. Sept. 27, 2002)

debtor to equitably resolve all current and future talc claims against it under the Bankruptcy Code.

**B.      The Preliminary Injunction Factors All Support Enjoining the Pursuit of Debtor Talc Claims Against the Protected Parties.**

122.    To be entitled to a preliminary injunction, the moving party carries the burden of satisfying the following factors:  "(a) a substantial likelihood that the movant will prevail on the merits; (b) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (c) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (d) that the granting of the injunction will not disserve the public interest."  In re CDP Corp., Inc., 462 B.R.615, 629 (Bankr. S.D. Miss. 2011) (citing Zale, 62 F.3d at 765); see also Hoover v. Morales, 164 F.3d 221, 224 (5th Cir. 1998).  The Fifth Circuit employs a sliding scale when analyzing the degree of "success on the merits" a movant must demonstrate to justify injunctive relief.  In re Hunt, 93 B.R. 484, 492 (N.D. Tex. 1988).  This involves "balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits."  Id.  As discussed herein, each factor favors an injunction here—not only are the Debtor's prospects for a successful reorganization strong, but the requested injunction is necessary to achieve the confirmation of the Amended Plan in this Chapter 11 Case and the Debtor would be irreparably harmed without the injunction.

---

[Dkt. 16]; In re G-I Holdings, Inc., No. 01-30135 (RG), Adv. Pro. No. 01-3013 (RG) (Bankr. D.N.J. Feb. 22, 2002) [Dkt. 65]; In re Harbison-Walker Refractories Co., No. 02-21627 (JKF), Adv. Pro. No. 02-02080 (Bankr. W.D. Pa. Feb. 14, 2002) [Dkt. 9] (enjoining asbestos lawsuits against the former owner of the debtor); In re N. Am. Refractories Co., No. 02-20198 (JKF), Adv. Pro. No. 02-2004 (JKF) (Bankr. W.D. Pa. Jan. 4, 2002) [Dkt. 5] (the "N. Am. Refractories TRO Order") (TRO); In re W.R. Grace & Co., No. 01-01139 (KJC), Adv. Pro. No. 01-00771 (KJC) (Bankr. D. Del. May 3, 2001) [Dkt. 32] at 36 (order expanding preliminary injunction to enjoin asbestos suits against non-debtor subsidiaries); Babcock & Wilcox Injunction Order (staying asbestos-related actions against non-debtor affiliates and insurance carriers); and In re Pittsburgh Corning Corp., No. 00-22876 (JKF), Adv. Pro. No. 00-2161 (JKF) (Bankr. W.D. Pa. Apr. 16, 2000) [Dkt. 6].

***(i)      There is a Substantial Likelihood of Success on the Merits.***

123.     In the context of a section 105 preliminary injunction, the focus of the "likelihood of success" element is on the "purpose of the requested injunction." In re FiberTower Network Servs. Corp., 482 B.R. 169, 182 (Bankr. N.D. Tex. 2012) (quoting 2 Collier on Bankruptcy ¶ 105.03[1][a] (16th ed. 2012)).  As a result, "[b]ankruptcy courts have defined success on the merits as 'the probability of a successful plan of reorganization.'" In re Babcock & Wilcox Co., 2001 WL 536305, at *7 (E.D. La. 2001).  Courts need not find that success is certain and the crux of the inquiry is "whether this court is authorized and likely to grant the requested relief."  FiberTower, 482 B.R. at 183; see also Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086, 1097 (9th Cir. 2007) ("[I]t is not a high burden to show a reasonable likelihood of success in reorganization"); In re Eagle-Picher Indus., Inc., 963 F.2d 855, 860 (6th Cir. 1992) ("In view of the bankruptcy court's protection of [the debtor's] reorganization efforts, it is implicit in its decision that it believed [the debtor] had some realistic possibility of successfully reorganizing under Chapter 11.").

124.     Here, the Debtor's prospects for a successful reorganization are strong. Following months of good-faith negotiations with representatives for current and future claimants, the Debtor has commenced the Chapter 11 Case following the successful solicitation and with the support of the substantial majority of claimants.  While holdouts and objectors remain—including, principally, law firms whose vested interests in maintaining the status quo diverge from the best interests of their clients—the Debtor intends to address any objections in short order and proceed promptly to confirmation of the Amended Plan.

125.     Courts have consistently recognized that the bankruptcy court is the most logical and best positioned forum for the resolution of mass tort liability.  See In re Honx, Inc., 2022 WL 17984313, at *2 (Bankr. S.D. Tex. 2022) ("Congress wrote § 524(g) to codify what it

-64-

described as a 'creative solution to help protect future asbestos claimants.' . . . Congress

recognized that while an asbestos bankruptcy differs from a 'classic' bankruptcy with an

insolvent or near-insolvent debtor, it is still a forward-looking solution meant to treat fairly all

parties in interest.  That is the hallmark purpose of chapter 11.") (internal citation omitted);

Ex. 39 (Tr. of Apr. 29, 2022 Hr'g at 38:17-23, HONX, Inc. v. Those Parties Listed in

Appendix A (In re HONX, Inc.), Adv. Pro. No. 22-03129 (Bankr. S.D. Tex.) ("I think that [a

§ 524(g) trust] is a huge benefit to the mass of people who are out there."))[42]

126.    Before the Petition Date, the Company also successfully negotiated a

settlement (the "Imerys Settlement") with Imerys Talc America, Inc. and its affiliated debtors

and Cyprus Mines Corporation (collectively, the "Imerys Debtors"), as more fully discussed in

the First Day Declaration.  See First Day Decl. ¶¶ 90-92.  While approval of the Imerys

Settlement is pending, the Imerys Settlement further maximizes the Debtor's prospects for a

successful reorganization while also providing a pathway for the Imerys Debtors to exit their

chapter 11 cases, which have been pending for over five years.

127.    In short, the Debtor is likely to successfully confirm the Amended Plan in

accordance with the Bankruptcy Code.  Accordingly, the Debtor's prospects for successfully

reorganizing strongly weigh in favor of the requested injunction.

---

[42]    See also In re Federal-Mogul Glob., Inc., 684 F.3d 355, 359 (3d Cir. 2012) ("Bankruptcy has proven an attractive alternative to the tort system for corporations [facing mass tort claims] because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably."); S. Elizabeth Gibson, Judicial Management of Mass Tort Bankruptcy Cases, Federal Judicial Center, at 1 (2005), https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that "bankruptcy courts have become a forum for companies seeking the resolution of pending and threatened mass tort litigation" and that, as of the publication date, "over seventy companies, motivated primarily by their desire to reach a final resolution of their mass tort liabilities, have sought bankruptcy protection").

###### (ii)      *Failure to Enjoin Litigation of Debtor Talc Claims Would Irreparably Harm the Debtor.*

128.    In analyzing irreparable harm, the key question is "whether the litigation 'could interfere with the reorganization of the debtor' or 'would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization.'" W.R. Grace, 115 F. App'x at 570 (first quoting Robins, 828 F.2d at 1025, then quoting Johns-Manville, 26 B.R. at 436); Aldrich Pump, 2021 WL 3729335, at *33 ("[T]he critical, if not decisive, issue over whether injunctive relief should be granted is whether and to what extent the non-debtor litigation interferes with the debtors' reorganization efforts.") (quoting Brier Creek, 486 B.R. at 694).  For the same reasons that the "unusual circumstances" exist for application or extension of the automatic stay, "unusual circumstances" exist for an injunction pursuant to section 105 to effectuate the protections of the automatic stay and prevent irreparable harm to the Debtor.

129.    The Debtor will not burden the Court with extensive repetition of the various means discussed above by which continued litigation of Debtor Talc Claims in the tort system would effectively thwart this Chapter 11 Case.  See supra §§ I.C, II.A, II.B, II.C, II.D.[43] These numerous impacts on and risks to the Debtor's restructuring and confirmation efforts include, among others:  the liquidation of claims outside the Chapter 11 Case for which the Debtor is liable, whether directly or via actual or alleged indemnification obligations; the impact of ongoing litigation on the Debtor's efforts to confirm the Amended Plan; the likelihood of preclusion or other prejudice through res judicata, collateral estoppel and record taint; the

---

[43]      See also, e.g., Aldrich Pump, 2021 WL 3729335, at *36 ("[P]rosecution of those same claims outside of this case would almost certainly end the Debtors' reorganization efforts"); DBMP, 2021 WL 3552350, at *41 ("[T]he litigation of DBMP Asbestos Claims in the tort system while the Chapter 11 Case remains pending would undermine the purposes of chapter 11 and section 524(g) to resolve all such current and future claims in a fair and equitable manner though a chapter 11.").

potential depletion of available insurance coverage under shared policies; the disruption that continued litigation against non-debtor affiliates could cause to the funding of the Debtor's trust; and the constant drain on the Debtor's resources of monitoring fragmented litigation around the United States while seeking to preserve its rights.  See id.  Continued litigation of the Debtor Talc Claims against the Protected Parties clearly presents an imminent and substantial risk of irreparable harm to the Debtor's estate.

### (iii) *The Irreparable Harm that the Debtor Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to the Defendants.*

130.    In contrast to the risk of the Debtor's ability to confirm the Amended Plan and successfully establish a section 524(g) trust, any prejudice caused to the Defendants by an injunction would be minimal, to the extent it would exist at all.[44]  The issuance of an injunction would toll Debtor Talc Claims for the majority of claimants who support the Amended Plan and objectors alike to the extent not already tolled.  And the Debtor's Amended Plan promises a far faster path to recovery for all claimants than the piecemeal litigation of claims in the tort system. Even if this Court assumes that an injunction might cause delay for some Defendants, "it is well established that mere delay is insufficient to prevent the issuance of an injunction."  Bestwall, 606 B.R. at 257; see also In re United Health Care Org., 210 B.R. 228, 234 (S.D.N.Y. 1997) (finding that delay to the enjoined party from pursuing remedies was heavily outweighed by potential harm to reorganization efforts).[45]  Otherwise, no injunction could ever be issued

---

[44]    As explained above, litigation of the Debtor Talc Claims should already be stayed pursuant to sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code.  Because of this, the requested injunction does not affect, much less harm, the Defendants asserting such claims, except as contemplated by the Bankruptcy Code.

[45]    See also W.R. Grace, 386 B.R. at 35 (finding that delay of compensation for asbestos claimants and potential loss of witness testimony did not outweigh potential harm to reorganization efforts); In re Lazarus Burman Assocs., 161 B.R. at 901 (concluding that delay was not sufficient harm to justify denial of injunction because "[t]he preliminary injunction will not invalidate the rights of [the creditor]" but rather "will merely delay the enforcement of those rights"; Am. Film Techs., 175 B.R. at 849 (defendants are "not being asked to forego [their] prosecution against the individual defendants, only to delay it"); In re PTI

because an injunction by definition involves delay.  Further, "the harm from any delay to some Defendants is far outweighed by the greater harm that failure to issue the injunction would cause the Debtor's reorganization efforts.  The entire purpose of this proceeding would be defeated absent the requested injunction."  Bestwall, 606 B.R. at 257

131.    Rather than the issuance of an injunction, it is continued litigation of the Debtor Talc Claims that is likely to harm claimants.  Outside of this Chapter 11 Case, the chance is small that a particular claimant will receive any recovery at all.  Further, mass-tort litigation generally requires extensive discovery, involves numerous parties and presents complicated questions of causation.  Such litigation is rarely efficient and often goes on for many years—including trials and appellate practice.  By contrast, a trust established by the Debtor in the Chapter 11 Case would "provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims." Bestwall, 606 B.R. at 257; HONX, Inc. v. Those Parties Listed in Appendix A (In re HONX, Inc.), Adv. Pro. No. 22-03129, Docket No. 24 (Apr. 29, 2022 Hr'g Tr.) at 38:17-23 (Bankr. S.D. Tex. Apr. 28, 2022) ("I think that [a § 524(g) trust] is a huge benefit to the mass of people who are out there.").[46]  Continued prosecution of claims against the Protected Parties would jeopardize the Debtor's ability to resolve Channeled Talc Personal Injury Claims through a

Holding Corp., 346 B.R. 820, 831-32 (Bankr. D. Nev. 2006) (holding that delay of pursuit of guaranty did not constitute sufficient harm to justify denial of injunction).

[46]    See Federal-Mogul, 684 F.3d at 362 ("Furthermore, the trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability. In particular, observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution. Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.") (citing studies).

bankruptcy trust, eliminating any possibility of a more efficient means of recovery to current and future talc claimants.

> ### (iv)    Injunctive Relief Will Further the Public Interest by Ensuring the Debtor's Successful Reorganization and Equitable Treatment of Defendants.

132.    Courts consistently have recognized the public interest in a successful reorganization.  See, e.g., United States v. Whiting Pools, Inc., 462 U.S. 198, 204 (1983); Sudbury, 140 B.R. at 465.  As one bankruptcy judge observed:  "[P]romoting a successful reorganization is one of the most important public interests."  In re Gander Partners LLC, 432 B.R 781, 789 (Bankr. N.D. Ill. 2010) (quoting In re Integrated Health Servs., Inc., 281 B.R. 231, 239 (Bankr. D. Del. 2002)); see also Johns-Manville, 26 B.R. at 428 ("[T]he goal of removing all obstacles to plan formulation [is] eminently praiseworthy and [this court] supports every lawful effort to foster this goal while protecting the due process rights of all constituencies."); In re Caesers Ent. Operating Co., Inc., 561 B.R. 441, 451 (Bankr. N.D. Ill. 2016) ("the relevant public interest is the interest in successful reorganizations, since reorganizations preserve value for creditors and ultimately the public.").

133.    A successful reorganization particularly serves the public interest in the mass tort context, where "completing the reorganization process . . . [will] resolv[e] thousands of claims in a uniform and equitable manner."  W.R. Grace & Co., 386 B.R. at 36 (extending injunction to cover a non-debtor affiliate railroad that transported products of the debtor).  It is in the public interest that "the bankruptcy process [is] utilized to the fullest extent" to resolve claims against the Debtor—a result made possible by a comprehensive injunction.  Id.

134.    It also is in the public interest to promote justice in the court system through the equitable treatment of all holders of current and future Debtor Talc Claims. Inconsistent judgments are not a desirable means of resolving a dispute with nationwide

implications.  In re Dow Corning Corp., 211 B.R. 545, 588 (Bankr. E.D. Mich. 1997) ("[I]t is

anything but just when presenting the identical proofs, one plaintiff suffering nearly identical

injuries or illness[] wins a multimillion dollar verdict against a defendant while another takes

nothing.").  The Debtor respectfully submits that an equitable outcome can only be achieved in

this Court, by utilizing bankruptcy-specific tools geared towards encouraging efficient and fair

resolution of liabilities.  See In re Honx, Inc., 2022 WL 17984313, at *2 (Bankr. S.D. Tex. 2022)

("Congress wrote § 524(g) to codify what it described as a 'creative solution to help protect

future asbestos claimants.' . . . Congress recognized that while an asbestos bankruptcy differs

from a 'classic' bankruptcy with an insolvent or near-insolvent debtor, it is still a forward-

looking solution meant to treat fairly all parties in interest.").

    135. Permitting Debtor Talc Claims to continue against the Protected Parties

would jeopardize the very purpose of the Debtor's Chapter 11 Case and undermine public

interest.  Without the requested relief, the Debtor would not benefit from a reprieve of litigation

to focus on confirmation of the Amended Plan.  The Debtor and the Protected Parties are not

seeking to "escape" any talc liabilities through the injunctive relief requested herein or through

the Chapter 11 Case.  Rather, the Debtor requests an injunction to allow it to pursue confirmation

of the Amended Plan that requires the Debtor and J&J to contribute approximately $8.0 billion

over the next 25 years to fund a trust to resolve all current and future Channeled Talc Personal

Injury Claims.  The Debtor recognizes that all liability arising from the Channeled Talc Personal

Injury Claims will be "resolved and channeled only if [the Debtor] succeeds in confirming a plan

of reorganization that contains a channeling injunction that extends to the Protected Parties."

Bestwall, 606 B.R. at 258.  Without the requested preliminary injunctive relief, however, it will

be difficult or impossible for the Debtor and its supporting claimants and other parties in interest
to comprehensively and equitably resolve such claims.

136.    As described above, each of the four factors clearly weighs in favor of this
Court issuing a preliminary injunction prohibiting the Defendants from commencing or
prosecuting Debtor Talc Claims against the Protected Parties.

## IV.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER TO EFFECTUATE THE RELIEF SOUGHT BY THE DEBTOR PENDING A FINAL HEARING.

137.    The Debtor requests that this Court enter a temporary restraining order,
with limited notice, to preserve the effectiveness of the automatic stay until this Court has the
opportunity to hold a final hearing on the merits.  The Court has authority to issue a temporary
restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure (the "Civil
Rules"), which is made applicable to this adversary proceeding by Bankruptcy Rule 7065.  Civil
Rule 65(b) provides:

> The court may issue a temporary restraining order without written
> or oral notice to the adverse party or its attorney only if:  (A) specific
> facts in an affidavit or a verified complaint clearly show that
> immediate and irreparable injury, loss, or damage will result to the
> movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to
> give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b).[47]  A temporary restraining order is properly granted where it is necessary
to prevent immediate and irreparable injury pending a hearing upon a motion for an injunction.
13 Moore's Federal Practice § 65.36 (2019).

---

[47]    Although Civil Rule 65(c) requires the posting of a bond as a prerequisite to a preliminary injunction,
Bankruptcy Rule 7065 exempts an application made by a debtor, trustee or debtor in possession from
the bond requirement.  Fed. R. Bankr. P. 7065.

138.    Permitting plaintiffs to pursue the Protected Parties at the same time the Debtor seeks to confirm the Amended Plan threatens to harm the Debtor's interest by potentially fixing claims against the estate or otherwise binding the Debtor with respect to talc claims against it.  Without immediate injunctive relief, the Debtor will be compelled to pull key estate resources away from its efforts to confirm the Amended Plan to focus on that ongoing litigation, delaying the Debtor's reorganization from the outset.  A denial of the Debtor's request for a temporary restraining order pending a final hearing on the Debtor's request for declaratory and/or injunctive relief would cause the very harm that the Debtor seeks to prevent by the Motion and the Complaint.

139.    As described above, the commencement or continued prosecution of Debtor Talc Claims against the Protected Parties risks significant, immediate and irreversible harm to the Debtor and its estate.  The Debtor will be compelled to actively monitor, participate in and defend the Pending Actions and threatened additional actions, notwithstanding the automatic stay, to limit the risks they pose to the estate.  On a daily basis, obligations arise and deadlines are imposed in those cases that already have been filed, including in connection with depositions, court appearances and discovery requests.  Addressing these matters will require the time and attention of key Debtor personnel, diverting estate resources away from reorganization efforts.  These negative effects on the Debtor's estate will only compound as new Debtor Talc Claims are filed against the Protected Parties.

140.    It is appropriate for the Court to grant the relief requested by this Motion with limited notice to the Defendants.  The Debtor cannot realistically provide effective notice to the many named plaintiffs who have sued or may sue the Protected Parties in the short period of time in which this Court's action is needed.  Moreover, notice of this Motion and the Complaint

may further exacerbate the very rush to the courthouse created by the notice of the bankruptcy filing, which a temporary restraining order is necessary to further prevent.  In re Vuitton et fils S.A., 606 F.2d 1, 5 (2d Cir. 1979) (notice of temporary restraining order action not required when notice would defeat purposes of the action); see also Am. Can Co. v. Mansukhani, 742 F.2d 314, 322 (7th Cir. 1984) (citing with approval Vuitton, 606 F.2d at 5).  Further, Defendants John and Jane Does 1-1000 are putative plaintiffs for future Debtor Talc Claims against the Protected Parties and are unknown at this time.  The Debtor's sole means of notifying these plaintiffs is through publication.  First Tech. Safety Sys., Inc. v. Depinet, 11 F.3d 641, 650 (6th Cir. 1993) ("The normal circumstance for which the district court would be justified in proceeding *ex parte* is where notice to the adverse party is impossible, as in the cases where the adverse party is unknown or is unable to be found.").

141.    Bankruptcy courts in similar mass tort chapter 11 cases have issued temporary restraining orders enjoining litigation as to third parties to avoid any immediate and irreparable harm to the debtor or its estate.  See, e.g., In re Aldrich Pump LLC, No. 20-30608 (JCW), Adv. Pro.No. 20-3041 (JCW) (Bankr. W.D.N.C. June 25, 2020) [Dkt. 26]; In re DBMP LLC, No. 20-30080 (JCW), Adv. Pro. No. 20-3004 (JCW) (Bankr. W.D.N.C. Jan. 29, 2020) [Dkt. 21]; In re Bestwall LLC, No. 17-31795 (LTB), Adv. Pro. No. 17-03105 (LTB) (Bankr. W.D.N.C. Nov. 8, 2017) [Dkt. 18].[48]  Under the circumstances here, as in these other cases, immediate injunctive relief is required to safeguard the Debtor's prospects for a successful reorganization.

---

[48]     See also In re Leslie Controls, Inc., No. 10-12199, Adv. Pro. No. 10-51394 (Bankr. D. Del. July 14, 2010) [Dkt. 46]; In re Specialty Prods. Holding Corp., No. 10-11780, Adv. Pro. No. 10-51085 (Bankr. D. Del. June 4, 2010) [Dkt. 13]; N. Am. Refractories TRO Order; In re G-I Holdings Inc., No. 01-30135, Adv. Pro. No. 01-03013 (Bankr. D.N.J. Jan. 19, 2001) [Dkt. 15].

142.     Although temporary restraining orders issued without notice generally are limited to 14 days, before that period expires and for good cause, this Court may extend its order for an additional 14 days.  Fed. R. Civ. P. 65(b)(2).  The Debtor requests that the Court:  (a) for good cause, enter a temporary restraining order extending for the maximum period allowed under Civil Rule 65—i.e., 28 days from the date of the hearing on the Debtor's request; and (b) set a hearing on this Motion on or before that date.  That measure will allow more parties in interest to participate in the final hearing on the requested relief.  Granting such relief also will conserve time and resources for the Court and the Debtor's estate.

## CONCLUSION

143.     For the reasons discussed above, the Debtor requests that the Court enter the Proposed Order (a) declaring that the filing or continued prosecution of the Debtor Talc Claims against any of the Protected Parties while the Chapter 11 Case remains pending violates the automatic stay, and (b) preliminarily enjoining the filing or continued prosecution of Debtor Talc Claims (on any theory of liability) against any of the Protected Parties while the Debtor's Chapter 11 Case remains pending.[49]

144.     Further, the Debtor respectfully requests that the Court enter the Temporary Restraining Order, temporarily restraining the Defendants from filing or continuing to prosecute any Debtor Talc Claims against any of the Protected Parties until the Court has had an opportunity to hold a final hearing on the merits.

---

[49]     This injunction would include, without limitation:  (a) the pursuit of discovery from the Protected Parties or their officers, directors, employees or agents; (b) the enforcement of any discovery order against the Protected Parties; (c) further motions practice related to the foregoing; and (d) any collection activity on account of a Debtor Talc Claim against any Protected Party or its officers, directors, employees or agents or its respective assets.

## <u>NOTICE</u>

145.    Notice of this Motion has been provided to:  (a) the U.S. Trustee; (b) counsel to the Debtor's non-debtor affiliates, Johnson & Johnson Holdco (NA) Inc. and Johnson & Johnson; (c) the FCR and her counsel; (d) counsel to the Ad Hoc Committee of Supporting Counsel; (e) the Defendants in this adversary proceeding, as identified on Appendix A to the Complaint, or their counsel, if known; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor respectfully submits that no other or further notice need be provided.


*[Remainder of Page Intentionally Left Blank]*

Dated:  September 21, 2024
Houston, Texas

Respectfully submitted,

/s/ John F. Higgins
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

- and –

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
(Admission pro hac vice pending)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
bberens@jonesday.com
ccahow@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

## **Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Local Rule 9013-1(i).

*/s/ John K. Kim*
John K. Kim

## **Certificate of Service**

I certify that on September 21, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing, and solicitation agent.

*/s/ John F. Higgins*
John F. Higgins

**CERTIFICATE OF MOVANT'S ATTORNEY PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 65(b)(1)(B)
<u>AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 7065</u>**

Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B) and Federal Rule of

Bankruptcy Procedure 7065, I hereby certify as counsel for movant herein that, for the reasons

stated in this Motion and the Kim Declaration, notice should not be required.  However, the

Debtor will cause copies of this Motion and other papers filed in this adversary proceeding

concurrently herewith, except as otherwise set forth in an order entered by this Court, to be sent

via e-mail, facsimile, hand delivery or overnight carrier as soon as practicable to known, existing

counsel for the Defendants in their respective underlying talc lawsuits, as set forth on

<u>Appendix A</u> to the Complaint.

*/s/ John F. Higgins*
John F. Higgins
