United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 31, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 24-90505 |
| RED RIVER TALC LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |

### MEMORANDUM DECISION AND ORDER

Red River Talc LLC seeks approval of a disclosure statement and confirmation of a prepackaged chapter 11 plan. If confirmed, the plan would constitute one of the largest mass tort settlements in history. Red River and Johnson & Johnson—aka J&J—propose to pay about $9 billion to resolve ovarian and other gynecological cancer litigation claims based on talc-related products.[1] Red River claims the proposed payments are twice as much as claimants will ever receive in the tort system. The litigation claims are about whether talc-based products like Johnson's Baby Powder contained asbestos and, if so, whether that asbestos caused women to develop cancer. J&J parties maintain that there was never asbestos in their products and there is no proven causal link between claimants' cancers and the products. Plaintiffs suing J&J parties disagree.

J&J has been historically successful defending these litigation claims. There was one multibillion-dollar verdict, but J&J considers it an outlier. Most claimants have lost. Despite the winning streak, J&J and its affiliates want finality. J&J companies spend millions every year defending themselves and indemnifying certain third parties who are included as defendants in the talc litigation. There are over 90,000 claims, with the majority pending in multidistrict litigation, multicounty litigation, putative federal class actions, and state courts.

J&J companies want to use the bankruptcy system to resolve the talc litigation because it offers potential finality. If a debtor obtains 75% approval from a voting class of asbestos-related claimants, a chapter 11 plan and a related injunction could channel current and future litigation claims to a trust. A chapter 11 plan could also release and enjoin certain litigation claims against J&J and third parties.

---

[1] The prior LTL cases involved additional cancer claims like mesothelioma. This case was limited to ovarian and other gynecological cancers.

There is an incentive for plaintiffs' firms and their clients to participate in the bankruptcy process. Bankruptcy plans may offer a cash payment to clients sooner than waiting for a trial through the tort system. There are only about ten J&J talc-related trials a year. And with about 90,000 current claims, even if some cases are consolidated, one can do the math and see that claimants may die before ever having juries decide their cases. And litigating talc-related claims against J&J in the tort system comes with risk because the odds have not been historically in their favor. Even some favorable verdicts have been overturned on appeal. Yet some plaintiffs' lawyers remain confident in the tort system and want to continue litigating cases. They point out that mass tort cases historically settle too.[2]

So far, use of the bankruptcy system has been unsuccessful to resolve the J&J talc-based litigation. This is the third bankruptcy case for a J&J entity holding the talc liability (arguably 2.5 because the second case was short lived). But each case progressed further in the quest for plan confirmation and enjoyed more support than the previous one.

J&J first used Texas divisional merger statutes to form a company known as LTL and assigned it the talc-related liabilities. LTL filed for bankruptcy in North Carolina in 2021. LTL had no real business operations, but it had a $60 billion funding agreement from J&J. LTL's case was transferred to New Jersey where it was later dismissed for cause under a now-famous Third Circuit decision.

After dismissal, J&J and LTL kept working to build consensus with plaintiffs' firms. LTL filed a second chapter 11 case with the support of an ad hoc group of firms representing thousands of claimants. But LTL2 did not last long. The bankruptcy court was bound by the Third Circuit's decision in the first LTL case and dismissed the case. Despite dismissal, J&J, LTL, and supporting firms kept negotiating. They also hoped to garner the support of more plaintiffs' firms and their clients.

After months of negotiating, parties believed they had enough support to confirm a chapter 11 plan. The prior LTL cases tried to resolve all talc-related litigation. This new case would be limited to ovarian and other gynecological cancer claims. Third Circuit precedent likely prevented them from going back to New Jersey. So supporting parties agreed to solicit a plan and file a new bankruptcy case in Texas.

In June 2024, J&J and a Red River predecessor started soliciting votes on a prepackaged chapter 11 plan to over 90,000 claimants with ovarian and other gynecological cancer claims. The disclosure statement told voters that, upon reaching 75% voting support, J&J would form a Texas entity—which eventually becomes Red River—and start a chapter 11 case to seek confirmation of the plan. On the bankruptcy petition date, Red River said it had about 83% voting support.

---

[2] In this case, the preferred system (bankruptcy v. tort litigation) was in the eye of the party who supported or opposed plan confirmation.

The plan was supported by plaintiffs' firms representing the majority of current claimants suing J&J and Red River's predecessors (now Red River).

Despite strong support, the bankruptcy case was heavily contested right from the start. The Office of the United States Trustee (who opposed LTL1 and LTL2) and a small but well-organized coalition of plaintiffs' firms opposed the Red River bankruptcy case and the prepackaged plan. They argued, among other things, that the case was not filed in good faith and J&J's use of the Texas divisional merger statutes was an abuse of the bankruptcy system. They also argued Red River did not meet the requirements under the Bankruptcy Code to confirm the plan. A group of insurance companies led by Traveler's Insurance Company also opposed the plan and argued, among other things, that the plan improperly infringed on rights under existing insurance policies.

The Court conducted a two-week trial about whether to, among other things, approve the disclosure statement, confirm the plan, dismiss the case, and/or allow some claimants to switch their votes from a no to a yes. The Court heard testimony from, among others, Red River's Chief Legal Officer, a former head of the FDA, a leading oncologist, and well-respected financial experts modeling estimated payouts for current and future claimants. The Court also learned that unfortunately some women fighting ovarian and other gynecological cancers died during this case. The future claimants' representative also reminded the Court that if it confirms the plan, not to forget that there are women who may not even know they have cancer yet and would be bound by this Court's decisions on the allocation of funds between current and future claimants. The concern was that if current claimants are allocated a significant portion of the money, there will not be enough left for all future claimants. It has happened in cases before, and the future claimants' representative did not want it to happen here.

In the end, this case distilled to fundamental bankruptcy principles. The Court could either dismiss the case, confirm the plan, or deny confirmation but keep the case alive. Based on the record, Red River's chapter 11 plan cannot be confirmed as constructed. First, the prepetition vote cannot be certified. Plaintiffs' firms voted tens of thousands of claims without either hearing directly from their clients or having the requisite authority to do so. They did not do it in bad faith. One firm was put in a bad spot due to solicitation issues that were not its fault. Others improperly relied on general language in engagement letters in hopes of getting this plan over the 75% threshold. The plain language of the Bankruptcy Code, the Bankruptcy Rules, the Master Ballots, and related tabulation procedures confirm the Court's conclusions on voting.

Red River said that the purpose of soliciting votes pre-bankruptcy was to get the deal before claimants and have them vote. The Bankruptcy Code requires debtors to solicit votes from creditors and give them adequate information to make an informed decision. Votes are a quintessential part of plan confirmation. Votes are voices. But the Court did not get to hear from tens of thousands of them.

Thousands of claimants were given an unreasonably short time to vote even though there was no real deadline or contingency to start this case. There was also a controversial vote switch that did not follow the tabulation procedures in the Master Ballots and the disclosure statement.

The plan also cannot be confirmed because it contains impermissible nonconsensual third-party releases. Claimants could not opt out or opt in to these releases. The plan also includes broad language enjoining and channeling talc-related claims against hundreds of retailers and a former J&J-related company named Kenvue, including claims for potential liability wholly separate from Red River's acts or not dependent on Red River's liability.

Opponents want this case dismissed. Fifth Circuit case law requires the Court to make an on-the-spot evaluation about a bankruptcy filing, considering both pre- and post-petition acts. This case is different than LTL1 and LTL2. Red River solicited a chapter 11 plan offering billions. Red River has the support of plaintiffs' firms representing the majority of current ovarian and other gynecological cancer litigation claims. Some firms who opposed the plan at the start now support it. The plan would pay claimants soon, when there is no certainty of payment in the tort system.

But there are strong counter arguments. Opponents say that J&J is inappropriately using the bankruptcy system by filing a third case in Texas after having two cases dismissed in New Jersey. Voters were also told there would not be another divisional merger after LTL and that this case would not start without 75% voting support. It is questionable whether that happened in light of how the last key votes were obtained.

The Court could theoretically deny dismissal, require a new disclosure statement, require re-solicitation under court supervision with an opt-in/opt-out feature for the third-party releases, and require some changes to the plan— including language ensuring the plan is insurance neutral. But that will not work here.

The record is clear on a few points. The prepetition voting and solicitation history and related issues raised serious questions about whether this case should have started based on the 75% threshold requirement stated in the disclosure statement. The nonconsensual third-party releases and channeling injunction are also integral to J&J's willingness to put $9 billion on the table. Red River's expert witness and its Chief Legal Officer also confirmed that the plan is not feasible without including retailers in the channeling injunction. The plan was heavily negotiated, achieves potential finality, and enjoys significant support. But it cannot be confirmed.

Red River would face the prospect of having to construct a new chapter 11 plan from a post-*Harrington v. Purdue* perspective and consistent with Fifth Circuit law. The prepackaged plan estimated all claims at $1 for voting purposes, which would need to be changed in another plan. There is also a Court-ordered stay of

talc-related lawsuits against nondebtors (like retailers) that will soon expire and objections to retaining virtually every professional—including counsel to the Official Committee of Talc Claimants.

Creditors have been stayed from litigating in the tort system during the pendency of three bankruptcy cases. J&J and Red River will also not obtain finality through plan confirmation. And voters may unfortunately continue to die while all of this gets sorted out. J&J pays all the administrative costs and the legal fees of counsel supporting the plan. There is no guarantee J&J will fund material fights on the horizon. It does not have to fund. And that is understandable. But it is what also makes this divisional merger case so different from other mass tort bankruptcy cases. There is no real company or jobs to save here. This case is about whether voters will accept a deal. Obtaining 75% of the vote from the talc class was essential. It is never easy, but it is what Congress mandated. This case is different. It is not like *Boy Scouts*, *Purdue Pharma*, or *Imerys*.

In the end, based on the Court's on-the-spot evaluation, the prepetition voting and solicitation issues, the denial of plan confirmation, and the unique nature of this divisional merger case, there is cause to dismiss this case. There is not any one individual factor that requires this result. It is all of them together that require the Court to dismiss this case.

The latest version of the Red River plan contemplated an out-of-court deal if plan confirmation was overturned on appeal. While all required contingencies will not occur, the Court hopes that J&J, Red River, and some claimants obtain the closure they seek.

## JURISDICTION AND VENUE

The Court has jurisdiction under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b). The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

J&J started selling Johnson's Baby Powder in 1894.[3] Between 1978-79, J&J transferred assets and liabilities associated with its baby products business to a subsidiary named J&J Baby Products.[4] As part of this transfer, J&J Baby Products agreed to indemnify J&J for claims relating to talc-containing baby products.[5] Over

---

[3] All references to Joint Exhibits refer to exhibits listed on the Sixth Amended Joint Master Exhibit List at ECF No. 1350-1. Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶19, ECF No. 1130-10.

[4] Agreement for Transfer of Assets and Indemnity, Joint Exhibit 6, ECF No. 1157-2; Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶20, ECF No. 1130-10.

[5] Agreement for Transfer of Assets and Indemnity, Joint Exhibit 6, ECF No. 1157-2; Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶20, ECF No. 1130-10.

the next 20 years, J&J conducted a series of intercompany transfers involving the baby products business.[6] In 2015, the baby products business resided with Johnson and Johnson Consumer Inc. ("**Old JJCI**").[7] Old JJCI became responsible for claims based on allegations that Johnson's Baby Powder and other talc-containing products caused cancer.[8] Old JJCI also remained obligated to indemnify J&J for talc-related claims.[9]

### The 2021 Divisional Merger, LTL1, and LTL2

In 2021, Old JJCI implemented a corporate restructuring using divisional merger statutes in the Texas Business Organization Code ("**TBOC**").[10] The divisional merger statutes permit one entity to separate into two or more entities.[11]

Based on the divisional merger, Old JJCI ceased to exist and two new entities were created: J&J Consumer Inc. ("**New JJCI**") and LTL Management LLC ("**LTL**").[12] New JJCI assumed the majority of Old JJCI's assets, allowing it to continue manufacturing and selling consumer products.[13] LTL got some assets and assumed Old JJCI's talc-related liabilities, including Old JJCI's obligation to indemnify J&J for talc claims.[14] An integral part of this corporate restructuring was a funding agreement between LTL, J&J, and New JJCI.[15] The funding agreement required New JJCI and J&J to provide funding up to the value of New JJCI for the administrative costs of an LTL bankruptcy case and a trust to cover current and future talc claims.[16] The funding agreement had a potential pay-out value by J&J of approximately $60 billion.[17]

After the divisional merger was complete, LTL converted into a North Carolina limited liability company.[18] Then, in October 2021, LTL started a chapter 11 bankruptcy case in the Western District of North Carolina ("**LTL1**").[19] The North

---

[6] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶20–24, ECF No. 1130-10.

[7] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶20–24, ECF No. 1130-10.

[8] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶25, ECF No. 1130-10.

[9] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶25, ECF No. 1130-10.

[10] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶29, ECF No. 1130-10.

[11] TEX. BUS. ORGS. CODE § 1.002(55)(A). Texas is not the only that state that permits divisional mergers. Delaware, Arizona, and Pennsylvania also have divisional merger statutes. *See, e.g.*, 6 DE Code § 18-217(g); 29 Ariz. Rev. Stat. § 2601; 15 Pa. Cons. Stat. Subchapter F.

[12] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶29, ECF No. 1130-10.

[13] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶32, ECF No. 1130-10.

[14] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶29, ECF No. 1130-10; Kim Dec. in Support of LTL's First Day Pleadings, Joint Exhibit 478 ¶24, ECF No. 1168-15.

[15] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶30, ECF No. 1130-10.

[16] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶30, ECF No. 1130-10.

[17] Transcripts from the trial are referenced throughout this decision as: Tr.1 (ECF No. 1234); Tr.2 (ECF No. 1250); Tr.3 (ECF No. 1263); Tr.4 (ECF No. 1278); Tr.5 (ECF No. 1356); Tr.6 (ECF No. 1312); Tr.7 (ECF No. 1326); Tr.8 (ECF No. 1332); and Tr.9 (ECF No. 1340). Tr.2 85:25–86:18.

[18] Kim Dec. in Support of LTL's First Day Pleadings, Joint Exhibit 478 ¶16, ECF No. 1168-15.

[19] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶31, ECF No. 1130-10.

Carolina bankruptcy court transferred LTL's case to the District of New Jersey.[20] Shortly thereafter certain parties moved to dismiss the case.[21] In February 2022, the New Jersey bankruptcy court denied the dismissal motions.[22] The order denying dismissal was certified for direct appeal to the Third Circuit.[23]

In December 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc. ("**Holdco**").[24] In January 2023, the Third Circuit reversed and remanded the case to the bankruptcy court with instructions to dismiss LTL's bankruptcy case.[25] The Third Circuit held, among other things, that LTL was not in financial distress, which the court found was a threshold requirement to starting a chapter 11 case.[26]

J&J, LTL, and various plaintiffs' firms continued negotiating about a potential settlement using the bankruptcy process to resolve LTL's liability for talc-related claims.[27] Parties ultimately reached an agreement on terms for a chapter 11 plan.[28]

In January 2023, Holdco transferred its consumer business assets to its parent, Janssen Pharmaceuticals, Inc.[29] In May 2023, J&J agreed to separate the consumer business assets and put them in a new company named Kenvue Inc.[30] J&J initially retained a 9.5% interest in Kenvue.[31] J&J also agreed to indemnify Kenvue for talc-related liability allocated to LTL in the 2021 divisional merger.[32]

LTL1 was officially dismissed in April 2023.[33] That same day, LTL started a second chapter 11 case in New Jersey ("**LTL2**").[34] This time, LTL had the support of an ad hoc committee of supporting counsel.[35] Before filing the case, the 2021 funding agreement was terminated and parties entered into two new agreements.[36]

---

[20] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶31, ECF No. 1130-10.

[21] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶98, ECF No. 1130-10.

[22] *In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022), *rev'd and remanded*, 58 F.4th 738 (3d Cir. 2023), *amended and superseded by* 64 F.4th 84 (3d Cir. 2023).

[23] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶100, ECF No. 1130-10.

[24] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶34, ECF No. 1130-10.

[25] *In re LTL Mgmt., LLC*, 58 F.4th 738, *amended and superseded by* 64 F.4th at 111.

[26] *In re LTL Mgmt., LLC*, 64 F.4th at 93.

[27] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶108, ECF No. 1130-10.

[28] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶108, ECF No. 1130-10.

[29] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶34, ECF No. 1130-10.

[30] Separation Agreement by and between Johnson & Johnson and Kenvue Inc., Joint Exhibit 1422, ECF No. 1203-134; Lindenmayer Depo. 28:19–23, ECF No. 1351-3; Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶9, ECF No. 1203-66.

[31] Kenvue Form S-1 dated April 18, 2023, Joint Exhibit 514, ECF No. 1149-2, at 150/1108; Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶34, ECF No. 1130-10.

[32] Separation Agreement by and between Johnson and Kenvue Inc., Joint Exhibit 1422 § 6.03, ECF No. 1203-134; Tr.2 48:1–17.

[33] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 378/535.

[34] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶109, ECF No. 1130-10.

[35] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶109, ECF No. 1130-10.

[36] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶105, ECF No. 1130-10.

Holdco and LTL entered into a new funding agreement and LTL, Holdco, and J&J entered into a support agreement.[37] These 2023 funding agreements required Holdco (not J&J) to provide funding necessary to fund a trust created under a plan to satisfy LTL's talc-related liabilities.[38] The 2023 plan provided for the establishment of a trust funded with about $8.9 billion on a net present value basis to settle and pay all current and future talc-related claims.[39]

LTL2 was opposed by the official committee of talc claimants and the Office of the United States Trustee, and the committee moved to dismiss the case.[40] Applying the recent Third Circuit precedent, the bankruptcy court dismissed LTL2 in July 2023, but urged parties to continue trying to achieve a global resolution of the claims.[41] The Third Circuit affirmed the dismissal in July 2024.[42]

### The 2024 Divisional Merger and Red River Bankruptcy Case

After LTL2 was dismissed, LTL and J&J continued negotiating for months with an ad hoc committee of supporting counsel.[43] These negotiations also included Randi Ellis, who was appointed the future claimants' representative ("**FCR**") in the LTL cases.[44]

In December 2023, LTL converted into a Texas limited liability company and changed its name to LLT.[45] In January 2024, law firms who represented thousands of talc claimants signed plan support agreements with LLT where the firms agreed to recommend that their clients support a prepackaged chapter 11 plan.[46] In turn, LLT agreed to, among other things, pay the firms' fees related to the case.[47]

In May 2024, J&J and LLT announced that they had reached a broad consensus on a global resolution of talc claims with a majority of claimants asserting ovarian and other gynecological cancer-related talc claims through a prepackaged chapter 11 plan of reorganization ("**Initial Plan**").[48] The proposal in the Initial Plan to only resolve talc-related ovarian and other gynecological cancer

---

[37] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶105, ECF No. 1130-10.

[38] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶106, ECF No. 1130-10.

[39] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶111, ECF No. 1130-10.

[40] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶113, ECF No. 1130-10.

[41] *In re LTL Mgmt., LLC*, 652 B.R. 433, 455 (Bankr. D.N.J. 2023), *aff'd sub nom. In re LTL Mgmt. LLC*, No. 23-2971, 2024 WL 3540467 (3d Cir. July 25, 2024); Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶114, ECF No. 1130-10.

[42] *In re LTL Mgmt. LLC*, 2024 WL 3540467.

[43] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶117, ECF No. 1130-10.

[44] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶101, 109, 117, ECF No. 1130-10. Ellis was also appointed as the FCR in this case. Order Appointing Randi S. Ellis as Legal Representative for Future Talc Claimants, ECF No. 529.

[45] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216, n.10, ECF No. 1130-10.

[46] *See, e.g.*, Andrews PSA, Joint Exhibit 324, ECF No. 1155-111, at 8/75. Attached to each plan support agreement was also a list of the participating firms' client base. *See, e.g.*, Andrews PSA, Joint Exhibit 324, ECF No. 1155-111, at 3/75.

[47] *See, e.g.*, Andrews PSA, Joint Exhibit 324, ECF No. 1155-111, at 69/75.

[48] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 383/535.

claims differed from the LTL2 plan, which sought to resolve all LTL talc-related claims.

The Initial Plan proposed to place holders of talc personal injury claims in Class 4 and entitled them to vote.[49] The plan defined such claims as an injury asserted by a claimant against Red River, LLT, Old JJCI, or any other Protected Party[50] resulting in ovarian cancer or other gynecological cancers ("**Talc Personal Injury Claims**").

A talc personal injury trust would also be established, and existing and future Talc Personal Injury Claims would be channeled to the trust ("**Talc Personal Injury Trust**" or "**Trust**") under § 524(g) of the Bankruptcy Code.[51] The Trust would be funded by a stream of payments over 25 years totaling about $8 billion, or about $6.45 billion on a net present value basis.[52] The Initial Plan provided for two trustees to then review, value, and potentially pay the individual's claim.[53] The Initial Plan also required talc personal injury claimants to release J&J, LTL, LLT, and a host of third parties, including certain litigation claims, without an opportunity to opt in or opt out of such releases.[54] Even voters who rejected the Initial Plan would be deemed to accept the releases and would also have to sign another release before being eligible to receive a payment from the Trust.[55]

The Initial Plan and related Disclosure Statement were published on June 3, 2024.[56] The Disclosure Statement explicitly stated several times that J&J would not undertake another divisional merger or start a third chapter 11 case unless the Initial Plan was approved by 75% of the voting holders of Talc Personal Injury Claims:

> [V]oting on the Plan will occur before and outside any bankruptcy proceeding and *a bankruptcy filing will only be considered if the Plan is approved by at least 75% of the claimants* holding Channeled Talc Personal Injury Claims. *Thus, the vote of the claimants will determine whether the Plan can proceed.* Discl. Stmt., at 344 (emphasis added).
>
> …

---

[49] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 343–46/535; Talc Personal Injury Claim, Def. 1.1.141, Initial Plan, Joint Exhibit 225, ECF No. 1167-10, at 28–29/535.

[50] Protected Party, Def. 1.1.112, Initial Plan, Joint Exhibit 225, ECF No. 1167-10, at 23/535.

[51] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 343–46/535.

[52] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 343/535.

[53] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 343–45, 436/535.

[54] Releases by Holders of Claims, § 11.2.2, Initial Plan, Joint Exhibit 225, ECF No. 1167-10, 76–78/535.

[55] Acceptance and Release, § 7.2.1(A), Trust Distribution Procedures, Joint Exhibit 225, ECF No. 1167-10, 284–85/535.

[56] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 484/535.

Through this Disclosure Statement, LLT will solicit votes on the Plan. ***If the Plan is approved by the requisite votes***, the Company ***may thereafter implement a corporate restructuring of LLT and Holdco*** … to effectuate the terms of the Plan. As a result of the Prepetition Corporate Restructuring, Red River Talc LLC, a Texas limited liability company (the "Debtor"), would be created. Discl. Stmt., at 344–45 (emphasis added).

…

The Plan differs materially from the plan proposed in the 2023 Chapter 11 Case … including with respect to the following factors … (iii) voting on the Plan will occur before and outside of any bankruptcy proceeding and ***a bankruptcy filing will be considered only if the Plan is approved by at least 75% of the claimants*** holding Channeled Talc Personal Injury Claims. Discl. Stmt., at 360 (emphasis added).

Between June 6, 2024 and July 25, 2024, LLT's solicitation agent, Epiq Corporate Restructuring, LLC, sent hundreds of Master Ballot Solicitation Packages to plaintiffs' law firms representing ovarian and other gynecological talc claimants.[57] Those solicitation packages included the Disclosure Statement, the Initial Plan, a letter from LLT, a Master Ballot and related spreadsheet, voting instructions and tabulation procedures, and a letter from an ad hoc committee of supporting counsel ("**AHC**").[58] Epiq also sent around 58,000 direct ballot packages to individuals.[59] For a talc claimant's vote to be counted as valid, it must have been received by Epiq by July 26, 2024 at 4:00 p.m. CT, unless the voting deadline was extended by LLT.[60]

LLT also spent $8 million on an all-out advertising campaign to inform potential unrepresented ovarian and other gynecological cancer claimants about the Initial Plan and how to vote.[61]

---

[57] Kjontvedt Dec. Regarding Voting and Tabulation, Joint Exhibit 229 ¶¶ 4, 9–10, ECF No. 1167-14.

[58] Kjontvedt Dec. Regarding Voting and Tabulation, Joint Exhibit 229 ¶8, ECF No. 1167-14.

[59] Kjontvedt Dec. Regarding Voting and Tabulation, Joint Exhibit 229 ¶11, ECF No. 1167-14. Around 26,000 of these packages contained ballots for individuals to submit their vote directly, and around 31,000 just contained documents like the Initial Plan and Disclosure Statement based on requests by the individual claimants' law firm to exclude a Direct Ballot so that the law firm could vote on the individual's behalf using a Master Ballot.

[60] Kjontvedt Dec. Regarding Voting and Tabulation, Joint Exhibit 229 ¶14, ECF No. 1167-14; Master Ballot, Joint Exhibit 24, ECF No. 1155-11, at 2.

[61] Wheatman Dec. in Support of Supplemental Notice Plan, Joint Exhibit 1458 ¶5, ECF No. 1203-172. LLT hired an expert to create and advise on the advertisement campaign. Objecting parties spent precious trial time contesting a robust $8 million campaign. Interestingly, neither Red River nor the objectors elected to examine other members of Red River's management live during the trial. Instead, the parties relied on deposition designations.

*The prepetition solicitation and the Master Ballot voting resulted in material uncurable problems that are detailed later in a section dedicated to this issue.* The Court will provide a few key facts here.

The Master Ballot included instructions informing law firms how to complete the ballot or authorize Epiq to send individual ballots to their clients.[62] Alternatively, claimants submitting a Direct Ballot could either mail in ballots or submit them through Epiq's web-based balloting portal.[63] Law firms submitting Master Ballots were required to certify voting under "Option A" or "Option B."[64] Option A required a certification that the firm (i) collected and recorded the vote of the client or obtained authority to procedurally cast the client's vote and (ii) received the client's informed consent for the vote.[65] Option B required a certification that the firm had authority under a power of attorney to vote on behalf of the client.[66]

On August 9, 2024, Epiq reported to LLT's counsel that about 70% of claimants voted—directly or through a Master Ballot from counsel—to accept the Initial Plan.[67] This vote was less than the desired 75% and it forced LLT and J&J to strategize. They focused primarily on a Master Ballot submitted by Andy Birchfield of Beasley Allen Crow Methvin Portis & Miles, PC ("**Beasley Allen**"). Beasley Allen submitted a Master Ballot with over 11,000 votes rejecting the Initial Plan.[68] The Beasley Allen Master Ballot prevented LLT from reaching the 75% voting threshold.[69] J&J and LLT believed, however, that there were "red flags" on the Beasley Allen Ballot, including votes for claims that they believed were barred by the statute of limitations.[70]

Negotiations continued past the voting deadline between James Murdica, who represented both J&J and LLT, and various lawyers representing talc claimants.[71] On August 19, 2024, while those negotiations were ongoing and before 75% of talc claimants accepted the Initial Plan as stated in the Disclosure Statement, LLT started a series of corporate restructurings using the TBOC divisional merger statutes that eventually led to the end of LLT and the creation of Red River.[72]

---

[62] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 8/876.

[63] Kjontvedt Dec. Regarding Voting and Tabulation, Joint Exhibit 229, ECF No. 1167-14, at 11/1062.

[64] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876.

[65] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876.

[66] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876.

[67] Emails between Epiq and Counsel, Joint Exhibit 355, ECF No. 1156-14, at 2/54.

[68] Beasley Allen Master Ballot, Joint Exhibit 353, ECF No. 1156-12, at 5/24.

[69] *See* Emails between Epiq and Red River's Counsel, Joint Exhibit 355, ECF No. 1156-14.

[70] Tr.3 220:10–221:24.

[71] Tr.3 237:1–13; Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶127–128, ECF 1130-10; James Murdica Dec., Joint Exhibit 1555 ¶1, ECF No. 789-2.

[72] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶35, ECF No. 1130-10.

LLT approved the divisional merger through written consent on August 19, 2024.[73] It appears, however, that the President of LLT (and later, Red River) was unaware the vote was below 75% at the time the divisional merger occurred.[74]

The 2024 corporate restructuring proceeded in the following steps. First, Holdco was converted from a New Jersey corporation to a new Texas LLC named J&J Holdco (NA) LLC ("**Holdco (Texas)**").[75] Next, LLT was merged into Holdco (Texas), with Holdco (Texas) being the surviving entity.[76] Lastly, there was a divisional merger of Holdco (Texas) where Holdco (Texas) ceased to exist and the assets and liabilities of Holdco (Texas) were allocated to three new Texas LLCs.

Those LLCs are:
1. Red River, which was allocated the talc-related ovarian and other gynecological cancer liabilities;
2. Pecos River Talc LLC, which was allocated liabilities arising from other talc-related claims, including mesothelioma; and
3. New Holdco (Texas) LLC, which was allocated any remaining liabilities and assets.[77]

One of the liabilities Red River received as part of the divisional merger was the indemnity obligation that Old JJCI, and previously LTL/LLT, owed to J&J for ovarian and other gynecological talc claims.[78]

After the divisional merger, J&J Intermediate Holding Corp., a New Jersey corporation, merged with New Holdco (Texas).[79] The surviving entity, J&J Intermediate Holding Corp., was later renamed Johnson & Johnson Holdco (NA) Inc. ("**New Holdco**").[80] The following charts depict the steps of the corporate restructuring:[81]

---

[73] LLT Management LLC Unanimous Written Consent in lieu of BOM Meeting, Joint Exhibit 85, ECF No. 1164-24; Dickinson Depo. 101:14–23, ECF No. 1351-2.
[74] Wuesthoff Depo. 37:5–9, ECF No. 1351-1.
[75] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶36, ECF No. 1130-10.
[76] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶36, ECF No. 1130-10.
[77] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶37, ECF No. 1130-10.
[78] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶9, ECF No. 1203-66.
[79] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶38, ECF No. 1130-10.
[80] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶38, ECF No. 1130-10.
[81] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 393–94/535.



Red River's allocated assets included a wholly owned subsidiary named Royalty A&M LLC, which owns a portfolio of royalty revenue streams.[82] The 2023 funding agreements were terminated and the parties entered into two new ones: the Indemnity Cost Funding Agreement and the Expense Funding Agreement

---

[82] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶39, ECF No. 1130-10.

(together, "**Funding Agreements**").[83] The Indemnity Cost Funding Agreement obligates New Holdco to fund a talc personal injury trust if a plan is confirmed.[84] The Expense Funding Agreement pays the costs and expenses Red River incurs during the pendency of the bankruptcy case.[85] The estimated size of the Funding Agreements total now around $9 billion.

## Prepetition Talc-Related Litigation

Before discussing the Red River case, it is important to take a step back and understand the scope of pending litigation involving J&J-related parties.

J&J's talc-containing products were not the subject of much litigation until 2013.[86] In 2013, and later in 2016, two lawsuits alleged that Old JJCI's talc-containing products caused ovarian cancer.[87] These lawsuits, in part, triggered a wave of lawsuits against Old JJCI for its talc-containing products.[88] Before LTL1, Old JJCI was spending $10 to $20 million per month defending talc cases and paid $3.5 billion in indemnity costs.[89] By the 2024 divisional merger, there were thousands of lawsuits involving J&J and Red River's predecessors. At the time of trial, the only case where plaintiffs had reached a verdict for money damages that was upheld on appeal was the *Ingham* case, which resulted in about a $2 billion verdict.[90]

### *MDL*

In October 2016, the U.S. Judicial Panel on Multidistrict Litigation ordered that pending and future litigation in federal courts concerning ovarian cancer allegedly caused by Johnson's Baby Powder and Shower to Shower be transferred and centralized in the United States District Court for the District of New Jersey, Trenton Division (the "**MDL**").[91] The MDL includes individual lawsuits and two consumer class actions alleging that the J&J products were marketed for use without disclosure about their carcinogenic properties.[92] As of Red River's petition

---

[83] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶45–47, ECF No. 1130-10.

[84] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶45, ECF No. 1130-10.

[85] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶45, ECF No. 1130-10.

[86] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶57, ECF No. 1130-10.

[87] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶57–58, ECF No. 1130-10.

[88] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶57–58, ECF No. 1130-10; Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶6, ECF No. 1203-60.

[89] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶62, ECF No. 1130-10.

[90] Tr.2 15:12–22; Tr.2 302:24–303:15. This is not to say that all other trials resulted in defense verdicts; rather, many trials and appellate cases have been stayed since LTL1 filed in 2021.

[91] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶65, ECF No. 1130-10.

[92] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶9, ECF No. 1203-60.

date, there were more than 57,000 plaintiffs asserting claims in the MDL and the parties were still involved in pre-trial motion practice and discovery.[93] The New Jersey District Court was also considering six separate "Daubert" motions about the plaintiff steering committee's experts.[94]

### MCL

In October 2015, the Supreme Court of New Jersey entered an order designating 103 pending cases in New Jersey involving talc related claims against J&J and certain related defendants to be combined as part of a multicounty litigation (the "**MCL**").[95] As of the petition date, there were more than 2,800 plaintiffs asserting claims in the MCL and the parties were still involved in pre-trial motion practice and discovery.[96] Kenvue was later added as a defendant in a second amended complaint, and an appeal about adding Kenvue is pending.[97]

### Individual Ovarian/Other Gynecological Cancer Actions

Aside from the MDL and MCL, there are over 2,000 claimants asserting claims in actions around the United States against retailers who sold J&J talc products and other J&J-related parties.[98]

### Love Action

In May 2024, plaintiffs, both individually and on behalf of a proposed class, started a putative class action, styled *Love, D.D.S. v. LLT Mgmt. LLC*, No. 3:24-cv-06320-MAS-RLS (D.N.J. May 22, 2024).[99] The lawsuit asserts fraudulent transfer claims related to the 2021 divisional merger and the separation of Kenvue against LLT, J&J, Holdco, certain of their officers and directors, among others.[100] As of the petition date, the New Jersey court was considering a motion to dismiss filed by the J&J defendants.[101] Liability associated with the Love litigation was allocated to Red

---

[93] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶52, ECF No. 1130-10.

[94] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶11, ECF No. 1203-60.

[95] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶12, ECF No. 1203-60.

[96] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶12, ECF No. 1203-60.

[97] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶11, ECF No. 1203-66.

[98] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶13, ECF No. 1203-60.

[99] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶14, ECF No. 1203-60.

[100] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶14, ECF No. 1203-60.

[101] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶15, ECF No. 1203-60.

River in the 2024 divisional merger.[102] The Love litigation is included in the third-party releases in the plan.[103]

### Bynum Action

In June, plaintiffs, both individually and on behalf of a proposed class, commenced a putative class action, styled *Bynum v. LLT Mgmt. LLC*, Case No. 3:24-cv-07065-MAS-RLS (D.N.J. June 17, 2024).[104] The lawsuit is against LLT, J&J, Holdco and certain of their affiliates and other entities.[105] Plaintiffs seek damages on behalf of a subclass of future claimants who used cosmetic talc products but have not been diagnosed with cancer.[106] Plaintiffs seek costs of medical monitoring for potential future claimants.[107] As of the petition date, the New Jersey court was considering a motion to dismiss filed by the J&J defendants.[108] Liability associated with the Bynum litigation was allocated to Red River in the 2024 divisional merger.[109] The Bynum litigation is included in the third-party releases in the plan.[110]

### Red River Chapter 11 Case and the Trial

Around the time of the 2024 divisional merger, negotiations between J&J, LLT, and the firms representing talc claimants continued in an effort to get the vote to 75%.[111] In August 2024, Erik Haas, Vice President of Worldwide Litigation at J&J, released a statement announcing that the vote's certification was paused while negotiations continued.[112]

One of the firms who became involved in the negotiations was the Smith Law Firm, PLLC. Allen Smith of the Smith Law Firm was a party to a joint venture agreement with Beasley Allen and, thus, co-represented holders of the alleged 11,000 no votes in the Beasley Allen Master Ballot.[113] Smith also did not support

---

[102] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶73, ECF No. 1130-10.

[103] *See* Releases by Holders of Claims, § 11.2.2, Third Amended Plan, ECF No. 1171.

[104] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶16, ECF No. 1203-60.

[105] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶16, ECF No. 1203-60.

[106] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶16, ECF No. 1203-60.

[107] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶16, ECF No. 1203-60.

[108] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶16, ECF No. 1203-60.

[109] Kim Dec. in Support of Red River's Complaint for Injunctive Relief, Joint Exhibit 1363 ¶16, ECF No. 1203-60.

[110] *See* Releases by Holders of Claims, § 11.2.2, Third Amended Plan, ECF No. 1171.

[111] Tr.3 237:1–13; Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶128, ECF No. 1130-10.

[112] Erik Haas Press Release, Joint Exhibit 1310, ECF No. 1203-12.

[113] *See* Joint Venture Agreement, Joint Exhibit 137, ECF No. 1155-24.

the Initial Plan.[114] But Red River and J&J (primarily through their joint counsel—Murdica) worked on getting Smith from a no to a yes.[115] Smith, Red River, and J&J eventually reached an agreement memorialized in a document referred to as the Smith Memorandum of Understanding ("**Smith MOU**").[116]

The Smith MOU proposed an additional $1 billion to the proposed Trust, $650 million funded to a proposed Common Benefit Qualified Settlement Fund, creation of an Individual Review Fund, early review by the claims administrator of talc claims, and quicker funding of the Trust by J&J.[117] J&J's obligation to fulfill the terms in the Smith MOU depended on Smith requesting that Epiq change at least 95% of the Beasley Allen submitted votes by September 16, 2024.[118] The Smith MOU also provided that if a plan did not go effective because the Fifth Circuit vacated a confirmation order, resolution of the Talc Personal Injury Claims could be converted to a private, non-bankruptcy mass tort resolution program.[119] If that happened, rather than funding a trust, a qualified settlement fund would be created and funded with $4.975 billion plus an additional $880 million in individual review funds.[120]

On Wednesday, September 11, 2024, Smith communicated to clients that he now supported the Initial Plan and informed them that he would be voting to accept the Initial Plan on their behalf unless they voted through an internal ballot system to reject the Initial Plan.[121] On Monday, September 16, Smith submitted a Master Ballot casting over 11,000 yes votes, relying primarily on Option B (power of attorney).[122] The Smith Master Ballot purported to vote the same claims that the Beasley Allen Master Ballot voted.[123] Following the submission of the Smith Master Ballot, on or around September 19, Epiq—under the direction of counsel for Red River—accepted the Smith Master Ballot as a "superseding" ballot.[124] Epiq then tabulated and certified that about 83% of voting claimants voted to accept the Initial Plan.[125]

Red River started this case and filed an Amended Chapter 11 Plan on September 20, 2024 with the support of a majority of firms representing ovarian

---

[114] Tr.4 233:13–21; Tr.4 234:10–21.

[115] *See, e.g.*, Tr.4 251:21–252:19.

[116] Smith Memorandum of Understanding, Joint Exhibit 34, ECF No. 1155-18.

[117] Smith Memorandum of Understanding, Joint Exhibit 34, ECF No. 1155-18, at 4–7.

[118] Smith Memorandum of Understanding, Joint Exhibit 34, No. 1155-18, at 3.

[119] Smith Memorandum of Understanding, Joint Exhibit 34, No. 1155-18, at 8–10.

[120] Smith Memorandum of Understanding, Joint Exhibit 34, No. 1155-18, at 9.

[121] SLF September 11, 2024 Letter, Joint Exhibit 139, ECF No. 1155-26; Tr.4 264:9–20.

[122] Smith Master Ballot, Joint Exhibit 140, ECF No. 1155-27.

[123] Smith Master Ballot, Joint Exhibit 140, ECF No. 1155-27.

[124] Emails between Epiq and Debtor's Counsel September 17, 2024, Joint Exhibit 1212, ECF No. 1200-67; Tr.6 105:16–22; Tr.6 107:3–108:23.

[125] Kjontvedt Dec. Regarding Voting and Tabulation, Joint Exhibit 229, ECF No. 1167-14, at 1060/1063.

and other gynecological cancer claimants.[126] The Smith MOU was partially incorporated into the Amended Plan.[127] Under the Amended Plan, the Trust would be funded by an additional $1 billion, bringing the total amount funded to approximately $9 billion.[128]

The day after the petition date, the Coalition of Counsel for Justice for Talc Claimants ("**Coalition**"), which includes Beasley Allen and Golomb Legal, PC, moved to dismiss the case.[129] The same day, the Coalition and the Office of the United States Trustee also moved to transfer the case back to New Jersey.[130] This Court denied the motions to transfer venue.[131] Shortly thereafter, the U.S. Trustee filed its own motion to dismiss the case.[132]

In October, the U.S. Trustee formed an Official Committee of Talc Claimants ("**TCC**"). The TCC reached an agreement among its members that it would try and work to reach a settlement with Red River and J&J to improve the Amended Plan. The TCC later reached an agreement in principle with Red River and J&J memorialized in the TCC Memorandum of Understanding ("**TCC MOU**").[133] The TCC MOU provides for funding to the Trust upon occurrence of the "Effective Date," which would occur on the earlier of the Fifth Circuit affirming the order confirming the Plan or the date 95% of claimants submitted releases to the Trust under the TCC MOU.[134] Red River filed a Second Amended Plan on December 9, 2024.[135] The TCC MOU was partially incorporated into the Second Amended Plan.

Many parties objected to confirmation of the Second Amended Plan.[136]

---

[126] Chapter 11 Petition, ECF No. 1; Amended Plan, ECF No. 24.

[127] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶130, ECF No. 1130-10.

[128] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶132, ECF No. 1130-10.

[129] Coalition's Motion to Dismiss Chapter 11 Case, ECF No. 44.

[130] Coalition's Motion to Transfer, ECF No. 43; U.S. Trustee's Motion to Transfer, ECF No. 35.

[131] Order Denying Motions To Transfer Venue, ECF No. 245. This Order is currently on appeal to the District Court.

[132] U.S. Trustee's Motion to Dismiss, ECF No. 299.

[133] TCC Notice of Plan Support and Memorandum of Understanding, Joint Exhibit 1401, ECF No. 1203-102.

[134] TCC Notice of Plan Support and Memorandum of Understanding, Joint Exhibit 1401, ECF No. 1203-102, at 6.

[135] Second Amended Plan, ECF No. 722.

[136] Kevin Nesko's Objection to Plan Confirmation, ECF No. 972; Allstate Ins. Co.'s Objection to Plan Confirmation, ECF No. 973; Century Indem. Co.'s Objection to Plan Confirmation, ECF No. 975; U.S. Trustee's Objection to Plan Confirmation, ECF No. 980; Travelers Indem. Co.'s Objection to Plan Confirmation, ECF No. 981; Employers Ins. of Wasau's Objection to Plan Confirmation, ECF No. 982; Truck Ins. Exchange's Objection to Plan Confirmation, ECF No. 983; United States of America's Objection to Plan Confirmation, ECF No. 984; Everest Reinsurance Co.'s Objection to Plan Confirmation, ECF No. 985; Barnes Law Group Claimants' Objection to Plan Confirmation, ECF No. 987; Coalition's Objection to Plan Confirmation, ECF No. 988; Elizabeth Ashley Prather's Objection to Plan Confirmation, ECF No. 991; Beasley Allen's Objection to Plan Confirmation and Joinder to

Attempting to resolve some of the confirmation objections, Red River filed a Third Amended Plan ("**Plan**") the day before trial.[137]

Throughout the amendments, Red River's plan has kept the same general structure. The Plan proposes to pay the claims of ovarian and other gynecological cancer claimants through the Trust. In turn, claimants would be bound by a variety of releases: a nonconsensual third-party release ("**Third-Party Releases**"),[138] a release of Talc Personal Injury Claims by channeling them to the Trust and enjoining litigation against Red River and other third parties ("**§ 524(g) Releases**"),[139] and an additional release that claimants seeking payment from the Trust must sign ("**TDP Releases**").[140] Additionally, based on a settlement involving J&J in the *Imerys* bankruptcy case pending in Delaware, claimants could receive a potential additional payment under a trust that may be established in that case.[141]

In this case, ovarian cancer claimants may elect review under any of the three review processes (Individual Review Process, Expedited Review Process, or Quickpay Review Process).[142] LLT/Red River estimates that ovarian cancer claimants would receive approximately $75,000 to $150,000 on their claims, which it believes is more than they would receive in the tort system and results in a faster payment.[143] Gynecological cancer claimants would receive a $1,500 payment through a proposed Quickpay Review Process.[144] Finally, claimants seeking payment for the 'other disease' category, should they qualify, are eligible for a $1,000 payment at most.[145] For voting purposes, all claims were estimated at $1.[146]

Throughout the case, the vote has been heavily contested. The Coalition and the U.S. Trustee have consistently challenged the vote and maintained that the vote

---

Coalition's Objection, ECF No. 993; Brandi Carl's Objection to Plan Confirmation, ECF No. 994; Sue Sommer-Kresse's Objection to Plan Confirmation, ECF No. 998; FCR's Objection to Plan Confirmation, ECF No. 1014.

[137] Third Amended Plan, ECF No. 1171.

[138] Releases by Holders of Claims, § 11.2.2, Third Amended Plan, ECF No. 1171.

[139] Channeling Injunction, § 11.3.1, Third Amended Plan, ECF No. 1171.

[140] Acceptance and Release, § 7.2.1(A), Trust Distribution Procedures, Third Amended Plan, ECF No. 1171-3.

[141] Tr.3 201:21–202:8; Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 360/535.

[142] Preliminary Evaluation, § 4.6.2, Trust Distribution Procedures, Third Amended Plan, ECF No. 1171-3.

[143] LLT Letter in Support of the Plan, ECF No. 1155-32; Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 361/535.

[144] Gynecological Claims, § 5.5.2, Trust Distribution Procedures, Third Amended Plan, ECF No. 1171-3. The $1,500 offer is an economic decision. Though J&J and Red River firmly believe that no J&J talc-based product caused cancer, the science supporting other gynecological cancer claims is weaker than ovarian cancer, and that they would win in the tort system, it costs more to litigate these cases. The Coalition opposes the Plan, but seemed to agree that the science supporting other gynecological cancer claims is weaker, despite its member firms having filed such claims in the tort system.

[145] Procedures for Other Disease, § 3.6, Trust Distribution Procedures, Third Amended Plan, ECF No. 1171-3.

[146] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 489/535.

never reached the necessary 75%. Red River has a pending motion to confirm the results of the vote.[147] The Coalition has a pending motion to designate all votes to accept the plan as rejecting the plan under § 1126(e) of the Bankruptcy Code and a motion to reinstate the Beasley Allen Master Ballot.[148] Red River has also filed two motions to change the votes of claimants who were initially listed as rejecting the Initial Plan on Master Ballots submitted by two different law firms.[149] Each of these motions is contested.

Trial began on February 18, 2025, and continued through February 28, 2025. Over 1,800 exhibits were admitted in the record.[150] At the time of trial, the Plan was supported by the TCC, the AHC (which was made up of 18 law firms representing talc claimants),[151] the FCR, subject to one remaining limited objection, and the Smith Law Firm. On the first day of trial, there was discussion about a Fourth Amended Plan, but it was not filed.

The Plan, and all prior versions, were opposed by the U.S. Trustee, the Coalition, certain insurers, including Travelers Casualty and Surety Company and the Travelers Indemnity Company (collectively, "**Travelers**"), among others. The matters before the Court during trial included:

- Red River's Disclosure Statement Motion[152]
- Confirmation of the Plan[153]
- Coalition's Motion to Dismiss[154]
- U.S. Trustee's Motion to Dismiss[155]
- Coalition's Motion to Vacate Retention Order of Epiq[156]
- U.S. Trustee's Motion to Reconsider Retention Order of Epiq[157]
- Coalition's Motion to Designate Votes[158]

---

[147] Red River Motion to Confirm Results of the Voting on Prepackaged Plan, ECF No. 305.

[148] Coalition's Motion to Designate Votes, ECF No. 265; Coalition's Motion to Reinstate Votes Improperly Modified by Smith Law Firm, ECF No. 266. The Coalition also has a motion to estimate claims for voting purposes and a motion to set a bar date for claims. Coalition's Motion to Establish Deadline for Filing Proofs of Claim, ECF No. 264; Coalition's Motion to Estimate Current Talc Claims for Voting Purposes, ECF No. 267.

[149] Red River's Motion to Permit Clients of Morelli Law Firm to Change Votes, ECF No. 328; Red River's Motion to Permit Clients of Summers & Johnson to Change Votes, ECF No. 731. Additionally, on the last day of trial, Achcraft & Gerel submitted a motion to change the votes of their clients from rejecting to accepting the plan. Motion for an Order Permitting Ashcraft & Gerel to Change their Votes, ECF No. 1322.

[150] *See* Sixth Amended Joint Master Exhibit List, ECF No. 1350-1.

[151] Tr.1 44:8–12.

[152] Red River's Motion for Approval of Disclosure Statement and Solicitation Packages and Procedures, ECF No. 46.

[153] Second Amended Plan, ECF No. 722; Third Amended Plan, ECF No. 1171.

[154] Coalition's Motion to Dismiss Chapter 11 Case, ECF No. 44.

[155] U.S. Trustee's Motion to Dismiss, ECF No. 299.

[156] Coalition's Motion to Reconsider and Vacate the Employment and Retention of Epiq, ECF No. 257.

[157] U.S. Trustee's Motion to Reconsider the Employment and Retention of Epiq, ECF No. 300.

[158] Coalition's Motion to Designate Votes, ECF No. 265.

- Coalition's Motion to Reinstate Votes[159]
- Red River's Motion to Confirm Votes[160]
- Red River's Motion to Change Morelli's Votes[161]
- Red River's Motion to Change Summers & Johnson's Votes[162]
- Coalition's Bar Date Motion[163]
- Coalition's Motion to Estimate Claims for Voting Purposes[164]
- AHC's Motion to Authorize OnderLaw to Submit a Supplemental Master Ballot[165]

In its Plan confirmation objection, the Coalition argues that the § 524(g) Releases impermissibly include claims against hundreds of nondebtors, like retailers and Kenvue.[166] And that the 75% voting threshold required by § 524(g) was never achieved.[167] The Coalition also argues that the chapter 11 plans were not filed in good faith, many of the votes should be disregarded, that Red River put on no evidence to support many requirements under § 1129, and that the Third-Party Releases are improper.[168]

The U.S. Trustee raises similar arguments about voting and solicitation and argues that the Plan does not comply with many parts of § 1129(a).[169] The Trustee also argues that the Third-Party Releases are nonconsensual, thereby violating *Purdue* and Fifth Circuit precedent.[170]

Travelers argues that the Plan is not insurance neutral and does not satisfy § 1129(a)(3) because it violates both state and bankruptcy law by abridging insurers' rights.[171] Travelers also argues that the § 524(g) Releases exceed what is authorized under the Bankruptcy Code.[172]

The Coalition argues in its motion to dismiss that this case was filed in bad faith because Red River has no going concern to preserve or reorganize, the case does not maximize value for creditors, and because Red River seeks to obtain a discharge of its solvent parent, J&J.[173] The Coalition also asserts that the sole path to reorganization that Red River seeks, using § 524(g), is not possible and therefore

---

[159] Coalition's Motion to Reinstate Votes Improperly Modified by Smith Law Firm, ECF No. 266.
[160] Red River's Motion to Confirm Results of the Voting on Prepackaged Plan, ECF No. 305.
[161] Red River's Motion to Permit Clients of Morelli Law Firm to Change Votes, ECF No. 328.
[162] Red River's Motion to Permit Clients of Summers & Johnson to Change Votes, ECF No. 731.
[163] Coalition's Motion to Establish Deadline for Filing Proofs of Claim, ECF No. 264.
[164] Coalition's Motion to Estimate Current Talc Claims for Voting Purposes, ECF No. 267.
[165] AHC's Motion to Authorize OnderLaw to Submit a Supplemental Master Ballot, ECF No. 1182.
[166] Coalition's Objection to Plan Confirmation, ECF No. 988, at 38–45.
[167] Coalition's Objection to Plan Confirmation, ECF No. 988, at 72.
[168] Coalition's Objection to Plan Confirmation, ECF No. 988, at 46–61, 72–73; Tr.9 264:20–265:22.
[169] U.S. Trustee's Objection to Plan Confirmation, ECF No. 980, at 7–11, 30–50.
[170] U.S. Trustee's Objection to Plan Confirmation, ECF No. 980, at 8, 12–13, 19–22.
[171] Travelers Indem. Co.'s Objection to Plan Confirmation, ECF No. 981, at 3–11.
[172] Travelers Indem. Co.'s Objection to Plan Confirmation, ECF No. 981, at 29–30.
[173] Coalition's Motion to Dismiss ¶¶100, 102, 120, ECF No. 44.

warrants dismissal.[174] The Coalition also argues that the prior dismissals of the LTL bankruptcies for lack of financial distress under Third Circuit precedent support dismissal of this case.[175]

The U.S. Trustee argues in its motion to dismiss that Red River has not demonstrated changed circumstances sufficient to justify another chapter 11 filing after the dismissals in the LTL cases.[176] The U.S. Trustee also asserts that the Third Circuit's findings of bad faith are issue preclusive as to Red River.[177] Alternatively, the U.S. Trustee argues that Red River's petition was filed in bad faith because Red River lacks a valid restructuring purpose.[178] Lastly, the U.S. Trustee argues that this case should be dismissed because the Plan is unconfirmable as a matter of law.[179]

After trial, the Court took all matters under advisement. The Court now gives its ruling.

## DISCLOSURE STATEMENT

Interpreting the Bankruptcy Code begins with analyzing the text. *See Whitlock v. Lowe* (*In re DeBerry*), 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

A disclosure statement must contain adequate information to allow creditors to make an informed decision about voting to accept or reject a chapter 11 plan. *See* 11 U.S.C. § 1125. The Coalition objected to approval of the Disclosure Statement, stating that the Disclosure Statement contained false and misleading information about the relationship between talc and asbestos.[180] The Coalition targeted statements in the Disclosure Statement saying that LLT and J&J believed no studies proved there was asbestos in the talc or that J&J products caused cancer.[181] The Coalition's experts said these statements were false and that J&J knew so.[182] The Coalition's experts also said voters were not provided necessary counter arguments.[183] Red River vigorously challenged these expert opinions and argued

---

[174] Coalition's Motion to Dismiss ¶¶142–143, ECF No. 44.
[175] Coalition's Motion to Dismiss ¶173, ECF No. 44.
[176] U.S. Trustee's Motion to Dismiss ¶42, ECF No. 299.
[177] U.S. Trustee's Motion to Dismiss ¶46, ECF No. 299.
[178] U.S. Trustee's Motion to Dismiss ¶58, ECF No. 299.
[179] U.S. Trustee's Motion to Dismiss ¶64, ECF No. 299.
[180] Coalition's Objection to Adequacy of Disclosure Statement, ECF No. 268.
[181] Coalition's Objection to Adequacy of Disclosure Statement ¶¶ 209–218, ECF No. 268.
[182] Tr.7 273:4–8; Tr.7 297:14–300:20; Tr.7 306:14–307:1; Tr.8 52:20–55:22.
[183] Tr.7 354:9–20; Tr.7 356:7–10.

that such statements were prefaced with a statement that they were LLT's beliefs.[184]

The statements in the Disclosure Statement are consistent with what J&J and Red River's predecessors have argued in tort cases. Whether J&J talc products contained asbestos or caused cancer are highly litigated matters. This Court is not tasked with resolving those questions. Most voters who received the Disclosure Statement are also suing J&J and Red River. Considering the entirety of the Disclosure Statement and the prefatory language, the Disclosure Statement contained adequate information within the meaning of § 1125.

The Disclosure Statement does, however, say that LLT would not engage in another divisional merger and that another bankruptcy case would not start without 75% voting approval.[185] These statements do not weigh against the adequacy of the Disclosure Statement, but they do go to whether LLT/Red River acted in good faith by not strictly abiding by its own statements. That issue is more appropriately weighed in considering dismissal of the case. The Court now turns to confirmation related issues.

## PLAN CONFIRMATION

Section 1129(a) of the Bankruptcy Code says that the bankruptcy court shall confirm a plan only if all the requirements under subsection (a) are met. 11 U.S.C. § 1129(a). Red River bears the burden of proving that the Plan satisfies each part of § 1129 by a preponderance of the evidence. *See Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Idearc Inc.*, 423 B.R. 138, 159 (Bankr. N.D. Tex. 2009).

The Plan cannot be confirmed for several reasons. First, there were significant voting and solicitation irregularities that make it impossible to certify the vote. Second, the Plan includes impermissible nonconsensual third-party releases. Third, the proposed § 524(g) channeling injunction improperly includes claims against hundreds of retailers and Kenvue.

### Solicitation and Voting

On the petition date, Red River touted that it had about 83% talc claimant support for the Initial Plan.[186] Red River has since filed a motion asking the Court to confirm the voting results under §§ 1126 and 105(a) of the Bankruptcy Code.[187] The Coalition, Travelers, and the U.S. Trustee, however, challenged the voting results.[188] Based on the record, over 90,000 votes were cast, but at least half of them cannot count. There were numerous prepetition voting irregularities and

---

[184] *See* Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 369/535.

[185] Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 344–45/535.

[186] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶8, ECF No. 1130-10.

[187] Red River's Motion to Confirm Results of the Voting on Prepackaged Plan, ECF No. 305.

[188] *See, e.g.,* Coalition's Motion to Designate Votes, ECF No. 265.

solicitation hiccups that make it impossible certify the vote. And that means the requisite 75% claimant support has not been met for plan confirmation purposes.

Epiq started serving solicitations packages for the Initial Plan on June 6, 2024.[189] Epiq sent "Master Ballot Packages" to law firms representing talc clients and "Direct Ballot Packages" to individual claimants.[190] The Master Ballot Packages included Master Ballots that allowed attorneys to vote on behalf of their clients if the attorney could certify, under penalty of perjury: that the attorney had authority to vote for the client, that the client had been provided a Solicitation Package, and that the attorney had a reasonable belief that the client had a qualifying disease type.[191] If an attorney was unable to vote on behalf of a client using a Master Ballot, the attorney could ask Epiq to send the client a Direct Ballot.[192]

Attorneys could certify their authority to vote on behalf of a client under Option A or Option B.[193] Option A allowed an attorney to certify authority to vote if the attorney recorded a vote after the client indicated her informed consent:

> With respect to each Client identified on the Master Ballot Spreadsheet for whom "Option A Certification" is selected, if any, such Client is represented by me, and I have ***collected and recorded the vote*** of such Client through customary and accepted practices, or have obtained authority to procedurally cast such Client's vote. I have complied with all terms, instructions, and conditions set forth in this Master Ballot and the Disclosure Statement. ***Each such Client has indicated his or her informed consent with respect to such vote under applicable law***.[194]

Option B allowed attorneys to certify authority to vote under a power of attorney to vote to accept or reject the Initial Plan:

> With respect to each Client identified on the Master Ballot Spreadsheet for whom "Option B Certification" is selected, if any, such Client is represented by me, and ***I have the authority under a power of attorney to vote to accept or reject the Plan on behalf of such Client's Channeled Talc Personal Injury Claim for which a***

---

[189] Kjontvedt Dec. Regarding Voting and Tabulation, Joint Exhibit 229 ¶¶9–10, ECF No. 1167-14. LLT solicited votes on the Initial Plan. Red River was not formed until August 19, 2024.
[190] Tr.6 84:1–10; Tr.6 86:1–20.
[191] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876. The Solicitation Package was defined to include the Disclosure Statement and the Initial Plan.
[192] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 13/876.
[193] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876.
[194] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876 (emphasis added).

*vote is cast on the Master Ballot Spreadsheet*. I have completed this Master Ballot and the Master Ballot Spreadsheet in accordance with the power granted to me/my law firm, and I have complied with all terms, instructions and conditions set forth in this Master Ballot and the Disclosure Statement.[195]

The Master Ballot Packages also included a spreadsheet where attorneys indicated whether the attorney had authority under Option A or Option B for each client included on the ballot.[196] Additionally, the Master Ballot instructions included "Tabulation Procedures" that mirrored the solicitation and tabulation procedures described in the Disclosure Statement.[197]

### Option B Certification Issues

A significant problem with the vote in this case centered on attorneys' reliance on Option B, which required attorneys to have a "power of attorney to vote to accept or reject the Plan" on behalf of their clients.[198] Over half of the total votes cast in this case were certified under Option B.[199] But the evidence showed that the majority of these votes were not supported by a power of attorney. Here are a few examples:

### I.   Watts Master Ballot

Mikal Watts submitted a Master Ballot purporting to vote on behalf of over 17,000 talc claimants, with the overwhelming majority voting to accept the Initial Plan.[200] Watts testified that he asked Epiq to send ballots to his clients so they could vote directly.[201] Unfortunately, things did not go as planned.

Watts's staff received calls from clients saying they did not know how to vote on the Initial Plan and that they had not received a ballot.[202] Around July 8, Watts directed a member of his staff to contact Epiq and inquire about the status of the solicitation materials.[203] By July 15, with only 11 days left before the July 26 voting deadline, Epiq confirmed that because of an internal mistake, it did not send ballots

---

[195] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876 (emphasis added).

[196] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 10/876. Attorneys were also required to list each client's disease type ("Ovarian Cancer," "Gynecological Cancer," or "Other Disease") on the spreadsheet.

[197] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 25/876; Discl. Stmt., Joint Exhibit 225, ECF No. 1167-10, at 484–92/535.

[198] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876.

[199] Epiq Voting Results Spreadsheet, Joint Exhibit 1220, ECF No. 1200-75.

[200] Watts Master Ballot, Joint Exhibit 184, ECF No. 1157-47; Tr.3 61:25–62:4. Watts voted 17,599 clients as rejecting the Initial Plan and 12 clients as accepting the Initial Plan.

[201] Tr.3 55:1–4; Tr.3 57:12–24; Watts Email to Epiq, Joint Exhibit 1054, ECF No. 1336-7.

[202] Tr.3 140:8–10; Emails to Epiq Re: Ballot Issue, Joint Exhibit 1456, ECF No. 1203-170.

[203] Tr.3 140:23–141:6.

to Watts's clients.[204] It appears a massive express mailing was sent to try to salvage the situation.[205]

Watts then started researching if he could vote on behalf of his clients with a Master Ballot.[206] Watts testified that there was a discussion with Murdica (counsel who represented J&J and LLT) about possibly extending the voting deadline.[207] He did not get an extension.[208] Instead, Watts testified that: "What was suggested back to me is vote Option B."[209]

So, after July 15, Watts started sending out mass communications to his clients explaining the ballot issue and how clients could vote.[210] By July 22, Watts's communications said that if clients failed to vote on the Initial Plan, he would vote to accept the Initial Plan on their behalf.[211] Watts ultimately submitted a Master Ballot certifying he was authorized to vote under Option A to reject the Initial Plan for clients who communicated their vote to him, and under Option B to accept the Initial Plan for the remainder of his clients.[212]

Watts testified that his engagement letter granted him the authority to vote under Option B unless the client said that he or she did not support the Initial Plan.[213] Watts relied on language in his engagement letter allowing him to "manage and handle … claims as [Watts] deem[s] proper and to investigate and prosecute them, with or without filing a lawsuit, in any manner [Watts] deem[s] advisable" as giving Watts authority to vote under Option B.[214] Watts's engagement letter also said, however, in bold letters, that "[n]o settlement will be made without the Client's Consent."[215]

There is nothing in the record justifying why Watts's clients were not afforded more time to vote, especially considering they did nothing wrong. Watts's effort to communicate with clients under an incredibly tight deadline was valiant, but it should not have been required. Watts's clients were given an unreasonably short time to vote.

---

[204] Tr.3 55:6–9; Tr.3 55:22–25; Tr.3 141:7–21.
[205] Tr.3 141:7–21.
[206] Tr.3 57:2–4; Tr.3 58:6–14.
[207] Tr.3 133:5–9.
[208] Tr.3 133:5–13.
[209] Tr.3 133:5–19.
[210] Tr.3 58:23–59:8.
[211] Tr.3 143:17–144:7.
[212] Tr.3 61:18–24.
[213] Tr.3 61:18–24; Tr.3 106:12–23; Tr.3 126:9–127:8; Tr.3 128:1–129:15.
[214] Tr.3 129:11–131:2; Watts Form Engagement Letter, Joint Exhibit 687, ECF No. 1153-59. Watts also testified that this was the form engagement letter used for substantially all of his clients. Tr.3 41:4–13.
[215] Watts Form Engagement Letter, Joint Exhibit 687, ECF No. 1153-59.

## II.    Pulaski Master Ballot

Adam Pulaski submitted a Master Ballot purporting to vote on behalf of more than 7,000 talc claimants with the overwhelming majority being votes to accept the Initial Plan.[216] Pulaski's communications with his clients included a link to a separate internal ballot system where the client could indicate his or her vote to accept or reject the Initial Plan.[217]

For clients that responded affirmatively indicating their vote, he voted under Option A.[218] For his remaining 5,000 talc clients, he voted under Option B, relying on his engagement letter and negative notice communications informing clients that if they failed to respond Pulaski would vote to accept the Initial Plan on their behalf.[219]

Pulaski relied on language in his engagement letter where the client "fully empower[s], authorize[s] and direct[s] [Pulaski] to manage and handle, as [Pulaski] deem[s] necessary, best and proper [the client's] claim ... and to prosecute said [claim] with or without suit in any manner [Pulaski] deem[s] advisable" as giving him authority to vote under Option B.[220] Pulaski's engagement letter also said, however, that "[n]o settlement will be made without the Client's consent."[221]

## III.    Andrews Master Ballot

Anne Andrews founded Andrews & Thornton, AAL, ALC.[222] A partner at Andrews & Thornton purported to vote on behalf of over 10,000 talc claimants with the overwhelming majority voting to accept the Initial Plan.[223] Around half of these votes were submitted under Option A and half were submitted under Option B.[224]

Andrews opted to send her clients the solicitation materials directly along with other communications, including emails, texts, phone calls, and invitations to town hall meetings that encouraged clients to vote to accept the Initial Plan.[225] Andrews also used an "eBallot" system where clients could submit their votes.[226]

---

[216] Pulaski Master Ballot, Joint Exhibit 204, ECF No. 1157-65; Tr.6 30:14–19. Pulaski voted 7,355 clients as accepting the Initial Plan and 32 clients as rejecting the Initial Plan. Pulaski testified that in his original Master Ballot Spreadsheet, he accidentally marked all of his clients as having ovarian cancer. Tr.6 52:7–19. Pulaski realized the error when he was questioned about his Master Ballot at his December 2024. Tr.6 52:7–53:7. Pulaski testified that the error was inadvertent and later corrected. Tr.6 52:7–19.

[217] Tr.6 34:1–18.

[218] Tr.6 34:1–18.

[219] Tr.6 49:6–14; Tr.6 37:2–38:19; Pulaski Negative Notice Email, Joint Exhibit 378, ECF No. 1156-37.

[220] Pulaski Contract of Employment, Joint Exhibit 399, ECF No. 1156-57, at 2/3.

[221] Pulaski Contract of Employment, Joint Exhibit 399, ECF No. 1156-57, at 3/3.

[222] Tr.5 274:23–275:8.

[223] The master ballot listed 10,664 as accepting the Initial Plan and 19 clients as rejecting the Initial Plan. Tr.5 298:16–299:1.

[224] Tr.5 299:2–5.

[225] Tr.5 298:12–15; Tr.5 299:6–23.

[226] Tr.5 299:24–300:11.

Andrews received around 5,000 affirmative responses through the eBallot system, and the firm recorded those votes under Option A.[227]

Andrews testified that her engagement letters gave the firm authority to vote under Option B for the remaining clients that did not submit an eBallot.[228] Andrews pointed to provisions in her engagement letter with talc claimants that gave her firm the right to "bring qualified claims against Imerys, Cyprus and LTL within their respective Chapter 11 bankruptcies" and the right to sign documents on behalf of clients to "protect Client's rights from a deadline" as the provisions giving her firm authority to vote on behalf of clients.[229] Andrews believed the reference to LTL in her engagement letter also meant Red River, and therefore gave her power to vote in this bankruptcy case.[230] Andrews's engagement letter also said, however, "[n]o settlement will be made without the Client's consent."[231]

## Analysis of Option B Voting

The Bankruptcy Code "offers procedural and substantive protections for creditors who are impaired by a plan." *In re PG&E Corp.*, 46 F.4th 1047, 1060 (9th Cir. 2022) (discussing section 1126(a) of the Bankruptcy Code). The most fundamental of those protections is an impaired creditor's right to vote on a plan. *See, e.g.*, *In re Heritage Org., L.L.C.*, 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007) (citing *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006)).

In mass tort bankruptcies "master ballots" are frequently used to facilitate voting on a chapter 11 plan. *See, e.g.*, *In re Imerys Talc Am., Inc.,* No. 19-10289, 2021 WL 4786093, at *9–12 (Bankr. D. Del. Oct. 13, 2021). When a debtor uses master ballots to obtain creditors' votes on a plan, it must adhere to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

We start with the text of the Bankruptcy Code. Section 1126(a) says that the holder of a claim is the party who may accept or reject a plan. Section 1126(c) says it is the vote of the claimholder that determines whether a class of claims accepts a plan. Section 1129(a)(8) requires a debtor to prove in connection with plan confirmation that a class has voted to accept the plan. Section 1126(b)(2) says that a creditor is only deemed to have accepted or rejected the plan prepetition if the plan was "solicited after disclosure to such holder [of a claim or interest] of adequate information, as defined in section 1125(a)."

---

[227] Tr.5 299:24–300:11; Tr.5 355:6–13.

[228] Tr.5 301:3–25; Tr.5 302:1–303:4.

[229] Tr.5 356:4–11; Andrews Attorney Client Retainer Agreement, Joint Exhibit 198, ECF No. 1155-41, at 1, 5.

[230] Tr.5 356:11–25.

[231] Andrews Attorney Client Retainer Agreement, Joint Exhibit 198, ECF No. 1155-41, at 2. Andrews & Thornton also did not have medical records for half of the over 10,000 claimants that it voted for that would confirm that the claimants actually had the diseases that would make them holders of a talc personal injury claim and entitled to vote. Tr.5 313:15–315:9.

Thus, the Bankruptcy Code places the voting power with creditors. Creditors are not only granted the substantive right to decide *how* to vote on a plan, but also *whether* to vote at all. *See* 11 U.S.C. § 1126(a) ("The holder of a claim . . . *may* accept or reject a plan.") (emphasis added).[232]

Congress also increased the amount of creditor support required to confirm a plan with a § 524(g) channeling injunction:

> [A] separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan …

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). Thus, when it comes to § 524(g) the emphasis on creditors' actual votes is heightened.

Bankruptcy Rule 3018(b) provides procedural requirements that must be met for a creditor to be deemed as accepting or rejecting a plan based on a vote obtained prepetition. Bankruptcy Rule 3018(b) does not give a specific amount of time required for prepetition plan solicitation. But it does require notice to all creditors in the same class and sufficient time for creditors to vote:

> A holder of a claim or interest who accepted or rejected a plan before the petition was filed will not be considered to have accepted or rejected the plan if the court finds, after notice and a hearing, that:
> > (A) the plan was not sent to substantially all creditors and equity security holders of the same class;
> > (B) an unreasonably short time was prescribed for those creditors and equity security holders to accept or reject the plan; or
> > (C) the solicitation did not comply with § 1126(b).

Bankruptcy Rule 3018(c) requires that the form of an acceptance or rejection of a plan be a writing that is signed by the "creditor … or an authorized agent" and "conform to Form 314."[233]

---

[232] An attorney voting on behalf of a client without hearing from the client is much different than the choices an actual creditor makes to vote to accept or reject a plan or opt in or out of consensual releases.

[233] *See* Official Form 314 (https://www.uscourts.gov/forms-rules/forms/ballot-accepting-or-rejecting-plan-0).

Bankruptcy Rule 9010(c) gives guidance concerning authority to act on a creditor's behalf at times that do not apply to this case:

> The authority of an agent, attorney-in-fact, or proxy to represent a creditor—for any purpose other than executing and filing a proof of claim or accepting or rejecting a plan——must be evidenced by a power of attorney that substantially conforms to the appropriate version of Form 411.

Official Forms 411A (General Power of Attorney) and 411B (Special Power of Attorney) describe the power of attorney required by Rule 9010(c) for purposes other than accepting or rejecting a plan.[234] A debtor, however, may still require a power of attorney to vote on a client's behalf using a master ballot. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2004), *as amended* (Feb. 23, 2005) (holding that Rule 9010(c) does not mandate a power of attorney evidenced by a specific Official Form for an attorney to vote on a creditor's behalf, but it also does not prohibit a debtor from requiring that an attorney have a power of attorney to vote for a creditor using a master ballot).

The authority in the engagement letters that Andrews, Watts, and Pulaski relied on to vote under Option B does not pass muster.[235] These firms collectively purported to vote on behalf of more than 25,000 claimants under Option B. Option B required that the certifying attorney have a "power of attorney *to vote*" on behalf of a client.[236]

A "power of attorney" by definition must be evidenced by a legal instrument authorizing an attorney to act on a client's behalf.[237] And here, a specific power of attorney granting authority to vote is required.[238] Words matter in a master ballot and so does a creditor's substantive right to vote under the Bankruptcy Code. If an attorney did not have a specific power of attorney to vote on behalf of a client evidenced in writing, that attorney did not have the power to vote for that client under Option B. The general power under the engagement letters that Andrews, Watts, and Pulaski relied on do not give them express authority to vote on behalf of their clients in this bankruptcy.

Another reason these votes cannot be certified is that the lawyers, without realizing it, were likely settling claims without client approval. The Court expressly finds that Andrews, Watts, and Pulaski submitted their Master Ballots in good

---

[234] Official Form 411A; 411B (https://www.uscourts.gov/forms rules/forms/bankruptcy-forms).

[235] The Court will discuss the Smith Master Ballot in detail in a later section. The engagement letters Smith had with his clients share the same issues that the Court points out in the Andrews, Watts, and Pulaski engagement letters.

[236] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876 (emphasis added).

[237] *Power of Attorney*, Merriam-Webster Online Dictionary (https://www.merriam webster.com/dictionary/power of attorney) (last visited March 30, 2025); *Power of Attorney*, Black's Law Dictionary (12th ed. 2024).

[238] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876.

faith, believing that they had the authority to vote on behalf of their clients. That said, believing one is right does not make it so.

Red River argued, and the attorneys testified at trial, that the Initial Plan was not a settlement.[239] And, instead, that the Initial Plan just offered a mechanism where the claimant can later receive and choose whether or not to accept an individual settlement offer.[240] The language of the solicited Initial Plan, however, says something different.

Typically, a chapter 11 plan is not itself a settlement. A debtor may include a settlement of a claim belonging to the estate in a chapter 11 plan. *See* 11 U.S.C. § 1123(b)(3)(A). But it need not so do. The Disclosure Statement and the Initial Plan that were used to solicit votes, and the Amended Plan and the Second Amended Plan filed during the case, all say that the plan itself constituted a settlement of all claims:

> Good Faith Compromise and Settlement Provision . . . [t]he Plan, the other Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of claims and controversies.[241]

This language was removed from the Third Amended Plan filed the day before trial.[242] Removing this language on the back end does not change the fact that the version used to solicit votes said that the Initial Plan was a settlement. It also does not change the fact that all versions of the plan include nonconsensual third-party releases. And that the recovery for claimants with gynecological cancer or an "other disease" is capped at $1,500 and $1,000 respectively.[243] The contemporaneous evidence during the voting period also shows that attorneys described the Initial Plan as a settlement to their clients, who are the actual voters.[244]

Attorneys also testified that they may have had an ethical or fiduciary duty to vote for their clients that did not respond indicating their vote.[245] The Court does not doubt their testimony. But the Bankruptcy Code says creditors *may* vote. 11

---

[239] *See, e.g.*, Tr.6 38:23–39:19.

[240] *See, e.g.*, Tr.6 38:23–39:19.

[241] Redline of Third Amended Plan, ECF No. 1175-1, at 52/76.

[242] Redline of Third Amended Plan, ECF No. 1175-1, at 52/76.

[243] Gynecological Claims, § 5.5.2, Trust Distribution Procedures, Third Amended Plan, ECF No. 1171-3; Procedures for Other Disease, § 3.6, Trust Distribution Procedures, Third Amended Plan, ECF No. 1171-3.

[244] *See, e.g.*, Watts Talc Settlement Reminder Video 7-12-24, Joint Exhibit 703, ECF No. 1153-75; Tr.3 108:14–20; Pulaski Negative Notice Email, Joint Exhibit 378, ECF No. 1156-37; SLF September 11, 2024 Letter, Joint Exhibit 139, ECF No. 1155-26; Andrews Solicitation Email, Joint Exhibit 347, ECF No. 1156-6. Watts even referred to the Initial Plan as a settlement in his direct testimony: "It had everything to do with what I stated was my willingness to stay involved in this effort to *settle* via a plan of reorganization. It's the reason I remained involved as a plan supporter from LTL II to Red River Talc." Tr.3 44:16–22 (emphasis added).

[245] Tr.6 36:21–37:1.

U.S.C. § 1126(a). Often in bankruptcy cases, the actual vote is lower than the eligible voting pool.

Thus, the Court finds that Option B votes cast by Watts, Pulaski, and Andrews were not authorized by the required power of attorney. The Court did not hear testimony from every attorney who submitted a Master Ballot and purported to vote for the thousands of remaining claimants whose votes were cast under Option B.[246] With one or two exceptions, the majority of the engagement letters for the law firms that submitted these Option B votes—including the engagement letters for the Smith Law Firm that are detailed below—have some of the same issues present in the Pulaski, Watts, and Andrews engagement letters.[247]

One exception was James Onder, who submitted a Master Ballot voting on behalf of over 12,000 talc claimants.[248] Onder received approximately 11,000 affirmative responses using an internal ballot process.[249] He voted those individuals under Option A.[250] For the remainder of the clients he voted for in his Master Ballot, Onder voted under Option B relying on a power of attorney granted to him by his form engagement letter with his talc clients.[251] Onder's engagement letter gave him a "specific durable power of attorney to…prepare a ballot and vote on [a client's] behalf to accept or reject any bankruptcy plan applicable to [a client's] claim, and/or to include [a client] as part of a master ballot."[252] Onder testified that his goal was to adhere to a "gold standard" of Master Ballot voting after his experience with the *Imerys* bankruptcy, by only voting under Option B on behalf of clients whose engagement letter contained this power of attorney provision.[253] Onder did it right. This is not a gold standard. In bankruptcy, it is the standard.

Master ballots are incredibly useful in bankruptcy cases. The Master Ballot used in this case adheres to the Bankruptcy Code and it could have worked here. But the terms of the Master Ballot were not followed. Again, the Court does not find that the plaintiffs' law firms acted in bad faith. But these invalid votes cannot be counted. The Court will also not disenfranchise claimants by disregarding thousands of votes. A debtor need not be the power of attorney police in every case. But when votes are challenged, courts must enforce the Bankruptcy Code, the Bankruptcy Rules, and the terms of the applicable master ballot.

---

[246] Epiq Voting Results Spreadsheet, Joint Exhibit 1220, ECF No. 1200-75.

[247] *See, e.g.*, Napoli Shkolnik Talcum Powder Retainer Agreement, Joint Exhibit 397, ECF No. 1156-55.

[248] Onder Master Ballot, Joint Exhibit 404, ECF No. 1156-62. Onder voted 12,038 clients as accepting the Initial Plan and 107 clients as rejecting the Initial Plan.

[249] Tr.1 170:16–23; Tr.1 214:21–24.

[250] Tr.1 170:16–23; Tr.1 214:21–24.

[251] Onder Professional Employment Agreement, Joint Exhibit 398, ECF No. 1156-56; Tr.1 170:16–171:2.

[252] Onder Professional Employment Agreement, Joint Exhibit 398, ECF No. 1156-56.

[253] Tr.1 170:16–171:2; Tr.1 182:24–183:14; Tr.1 214:14–20; Tr.1 219:2–8.

**Beasley Allen/Smith Voting Issues**

Andy Birchfield of Beasley Allen purported to vote on behalf of over 11,000 talc claimants, with the overwhelming majority of votes being to reject the Initial Plan.[254] Red River asserts that the Beasley Allen Master Ballot was superseded by a Master Ballot submitted by Beasley Allen's co-counsel, Allen Smith of the Smith Law Firm. Without the Smith Master Ballot overcoming the Beasley Allen Master Ballot, Red River would not have the requisite 75% claimant support for the Initial Plan. The Coalition has a pending motion to reinstate the Beasley Allen Master Ballot over the Smith Master Ballot.[255] As described below, both Master Ballots have serious problems that would render them invalid.

## I.   Beasley Allen Master Ballot

Birchfield serves on the leadership committee of the MDL.[256] Beasley Allen has been a vocal opponent of a third filing of a J&J subsidiary bankruptcy and has publicly criticized the plaintiffs' law firms that supported the bankruptcy.[257]

Birchfield certified each of his 11,000 votes under Option A.[258] But the evidence confirmed that he received only 3,000 affirmative responses from clients communicating how the client wanted to vote.[259] The firm did not receive a response from the remaining 8,000.[260]

Birchfield testified that his communications with clients about the third bankruptcy included emails, texts, letters, invitations to town hall meetings, and phone calls.[261] His communications with clients also included negative notice provisions informing clients that Beasley Allen intended to "vote on [the client's] behalf to REJECT J&J's bankruptcy plan unless [the client] let[s] us know that [the client] prefer[s] to vote to ACCEPT."[262]

Birchfield believed such communications gave him authority to vote on behalf of his clients under Option A even if the client did not respond affirmatively indicating how she wanted to vote.[263] Birchfield did not interpret Option A as requiring an affirmative response from clients and he testified that he collected his

---

[254] Beasley Allen Master Ballot, Joint Exhibit 353, ECF No. 1156-12.

[255] Coalition's Motion to Reinstate Votes Improperly Modified by Smith Law Firm, ECF No. 266.

[256] Tr.3 342:16–19.

[257] *See, e.g.*, Mass Torts Made Perfect Communication from Papantonio and Birchfield, Joint Exhibit 1312, ECF No. 1203-14 (stating that plaintiffs' law firms' justifications for supporting J&J's third bankruptcy "lead[s] one to believe that perhaps [the attorneys'] chosen profession should involve selling used cars or penny stocks" and listing plaintiffs' firms that have "come to the aid of J&J's bankruptcy").

[258] Tr.4 37:14–17; Beasley Allen Master Ballot, Joint Exhibit 353, ECF No. 1156-12. Beasley Allen voted 11,434 clients as rejecting the Initial Plan and 69 clients as accepting the initial plan.

[259] Tr.4 40:7–10.

[260] Tr.4 43:1–3.

[261] Tr.4 43:4–44:15; Tr.4 192:14–193:1.

[262] Beasley Allen Example Solicitation materials, Joint Exhibit 447, 1156-96, at 14/22.

[263] Tr.4 43:4–44:15.

clients' "silence as a response."[264] The Court disagrees with silence equaling acceptance based on the required certification language for Option A.

Option A required a certification that "[e]ach such Client has *indicated* his or her informed consent with respect to such vote."[265] "Indicated" used here is a transitive verb, which means that a person receives the action of the verb. Indicated means to "point out" or "state or express briefly."[266] Thus, authority under Option A cannot be obtained by silence. All the votes without affirmative client consent were not valid under Option A and the Bankruptcy Code.

Birchfield also certified that over 5,000 voting clients had gynecological cancer on his Master Ballot Spreadsheet.[267] And thousands of these clients were voted to reject the Initial Plan without any direction from those clients.[268] At the same time, Birchfield believes gynecological cancer claims are non-compensable in the tort system based on a lack of scientific support.[269] Birchfield voted on behalf of clients, without their consent, to reject payment under the Initial Plan even though he believes those clients will not and cannot be paid in the tort system.[270]

The Beasley Allen votes also stood out because they were the subject of another controversy. The Beasley Allen Master Ballot votes were switched and superseded by the votes of Beasley Allen's co-counsel. The Court now turns to the Smith votes.

## II.   Beasley Allen's Joint Venture with the Smith Law Firm

Beasley Allen represented all of the clients that were included on its Master Ballot with the Smith Law Firm under a joint venture agreement.[271] The joint venture agreement states that each law firm will be responsible for 50% of the work related to their shared talc clients.[272] In practice, Beasley Allen took the lead on general communications with clients—including communications soliciting votes on the plan—with Smith being copied on those communications.[273] Smith testified that while client communication was not his  primary responsibility, he still communicated with clients on an event or case related basis.[274]

---

[264] Tr.4 43:4–21.

[265] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, at 11/876 (emphasis added).

[266] *Indicated*, Merriam-Webster Online Dictionary (https://www.merriam webster.com/dictionary/indicated) (last visited March 31, 2025).

[267] Tr.4 27:7–28:4.

[268] Tr.4 46:18–47:18.

[269] Tr.4 47:1–48:13; Tr.4 81:2–9.

[270] Tr.4 46:18–47:18.

[271] Tr.4 90:14–91:23; Tr.4 220:1–22; Joint Venture Agreement, Joint Exhibit 137, ECF No. 1155-24.

[272] Joint Venture Agreement, Joint Exhibit 137, ECF No. 1155-24.

[273] Tr.4 120:6–15; Tr.4 196:10–16; Tr.4 226:9–11.

[274] Tr.4 223:2–225:7.

### III.    Smith's Involvement in Plan Negotiations

Smith discussed LTL1 and LTL2 with Birchfield and agreed not to support the bankruptcy cases and recommended the same to their clients.[275] Smith also initially agreed with Birchfield not to support the third bankruptcy filing of a J&J-related company.[276] Smith did not play any role in compiling the Beasley Allen Master Ballot.[277]

At the same time, Smith had a good working relationship with Murdica.[278] In discussions with Murdica about the third bankruptcy filing, Smith was informed that acrimony had developed between Birchfield and Murdica that severely affected settlement discussions.[279] Smith learned that negotiations between Birchfield and Murdica had deteriorated so significantly that "both sides couldn't even get into the room to determine whether there were terms to agree upon."[280]

Smith eventually involved himself in mediation efforts before the July 2024 voting deadline, but ultimately a deal was not reached at that time.[281]

### IV.    The Smith MOU

After the voting deadline, Smith was told by Murdica that J&J believed it had the requisite 75% claimant support for confirmation.[282] Smith testified that "[i]t would have been devastating. In my opinion, for that plan to go through without trying to build a consensus" on more beneficial terms for his clients.[283] So Smith got involved with mediation discussions after the July 2024 voting deadline with Birchfield and J&J representatives.[284] Smith believed Birchfield was taking positions that were effectively "deal killer[s]."[285] In August 2024 Smith began negotiating more often with Murdica.[286] These negotiations led to terms that were eventually memorialized in the Smith MOU.[287]

The Smith MOU resolved Smith's opposition to the Initial Plan through "J&J's agreement to supplemental terms, beyond those currently contemplated by the plan."[288] Those terms included J&J adding $1 billion to the Trust, the creation of the $650 million Common Benefit Qualified Settlement Fund, early review by the

---

[275] Tr.4 233:13–25.

[276] Tr.4 233:13–21.

[277] Tr.4 233:22–25.

[278] Tr.4 234:10–235:19.

[279] Tr.4 234:10–236:7.

[280] Tr.4 234:10–236:7.

[281] Tr.4 238:4–239:10.

[282] Tr.4 252:1–19.

[283] Tr.4 251:21–252:19.

[284] Tr.4 239:11–241:22.

[285] Tr.4 241:1–25.

[286] Tr.4 241:23–242:16.

[287] Tr.4 242:14–19; *see* Smith Memorandum of Understanding, Joint Exhibit 34, ECF No. 1155-18.

[288] Smith Memorandum of Understanding, Joint Exhibit 34, ECF No. 1155-18, at 2.

claims administrator of talc claims, and quicker funding of the Trust by J&J due to limitations on J&J's walk-away rights.[289]

The effective date of the Smith MOU was August 30, 2024, but the terms of the Smith MOU were not incorporated into an amended plan at that time.[290] There were also conditions precedent to the Smith MOU going into effect that included Smith's requesting that Epiq change at least 95% of the approximate 11,000 votes voted by Beasley Allen from "reject" to "accept" by September 16, 2024.[291]

Smith initially hoped that Birchfield would agree to the Smith MOU.[292] Smith sent Birchfield a letter in August communicating that he was worried about the Initial Plan being confirmed without the addition of the more beneficial terms in the Smith MOU.[293] Smith hoped that even if he could not reach agreement with Birchfield, they could work together to send a joint communication to the clients communicating their respective views about a bankruptcy case.[294] Birchfield was not receptive to those requests.[295]

Smith asked Birchfield for a list of their clients' contact information, and Birchfield refused.[296] Smith testified that Beasley Allen threatened him with a lawsuit if he communicated with the clients about the bankruptcy.[297] On September 10, Beasley Allen sued Smith in the District Court for the Middle District of Alabama, alleging that Smith breached the joint venture agreement and requesting compensatory and punitive damages.[298]

Smith and his staff cross referenced previous communications to compile contact information for the clients.[299] Then, on September 11 (five days before the deadline) Smith sent a letter via email to his clients informing them of his position on the bankruptcy now that the Smith MOU had been signed and giving them another opportunity to vote.[300] The letter was sent by physical overnight mail to a small percentage of clients for which he did not have an email address.[301]

The letter describes the terms of the Smith MOU, states Smith's disagreement with Beasley Allen, and explains why Smith now supports and

---

[289] *See* Smith Memorandum of Understanding, Joint Exhibit 34, ECF No. 1155-18.
[290] Tr.5 6:22–8:16; Smith Memorandum of Understanding, Joint Exhibit 34, ECF No. 1155-18, at 2. Some of the terms of the terms of the Smith MOU were eventually incorporated into the Amended Plan that was filed on the petition date. *See* Amended Plan, ECF No. 24.
[291] Smith Memorandum of Understanding, Joint Exhibit 34, ECF No. 1155-18, at 3.
[292] Tr.4 252:23–25.
[293] Tr.4 253:4–254:18.
[294] Tr.4 254:24–255:24; Tr.4 193:2–12.
[295] Tr.4 254:24–255:24; Tr.4 193:2–12.
[296] Tr.4 72:22–73:17; Tr.4 74:24–75:12; Tr.4 255:25–256:9.
[297] Tr.4 256:10–23.
[298] Beasley Allen v. Smith Law Firm Complaint Case No. 2:2400582, Joint Exhibit 1306, ECF No. 1203-9.
[299] Tr.4 255:25–256:9.
[300] SLF September 11, 2024 Letter, Joint Exhibit 139, ECF No. 1155-26.
[301] Tr.4 264:9–20.

recommends clients to vote to accept the "new Plan."[302] The letter closes by stating "[p]lease vote by September 13, 2024. If you choose not to vote, I will submit your vote for approval of the new Plan in my power as attorney authorized to prosecute your case."[303]

The letter also included a link that directed clients to an online portal set up by Smith where claimants could vote.[304] Smith later extended the internal deadline to vote to September 15 (still within the September 16 deadline to change his clients votes under the Smith MOU) due to a hurricane that had displaced some of his clients.[305] Smith testified that he did not ask J&J or Red River for an extension.[306] Smith also testified that while the time given to his clients to vote was "not ideal" he still "believed it was sufficient."[307]

## V.   Smith Master Ballot

On September 17, Smith submitted a Master Ballot purporting to change the votes of over 11,000 claimants whose votes had previously been submitted on the Beasley Allen Master Ballot.[308] The Smith Master Ballot lists the overwhelming majority of votes as accepting the Initial Plan, even for clients who communicated to Beasley Allen that they wanted to reject the Initial Plan.[309]

Smith voted under Option A for about 800 clients who affirmatively indicated their vote to the Smith Law Firm within the two business day voting period.[310] For the rest, he voted under Option B relying on his joint venture agreement with Beasley Allen and engagement letters that he had with his clients.[311]

A representative sample engagement letter offered by Smith contained language authorizing Smith Law Firm to "do any and all acts which in [its] judgment may be reasonable and necessary in the handling of [the client's] cause of action."[312]

Smith testified at trial that he believed the Initial Plan, that was to be supplemented under the Smith MOU, was not a specific settlement offer to

---

[302] SLF September 11, 2024 Letter, Joint Exhibit 139, ECF No. 1155-26.

[303] SLF September 11, 2024 Letter, Joint Exhibit 139, ECF No. 1155-26.

[304] Tr.4 264:9–20; SLF Website Voting Page, Joint Exhibit 143, ECF No. 1155-30.

[305] Tr.4 264:21–265:1; Tr.4 279:5–10; Tr.4 290:4–19; Tr.5 22:1–6.

[306] Tr.5 77:24–79:11.

[307] Tr.5 78:6–9.

[308] Kjontvedt Dec. Regarding Voting and Tabulation, Joint Exhibit 229, ECF No. 1167-14, at n.4; Smith Master Ballot, Joint Exhibit 140, ECF No. 1155-27. Specifically, the Smith Master Ballot reflected votes on behalf of 11,480 of the 11,503 claimants identified on the Beasley Allen Master Ballot. Kjontvedt Supplemental Dec. Regarding Voting and Tabulation, Joint Exhibit 1334 ¶16, ECF No. 1203-33.

[309] Smith Master Ballot, Joint Exhibit 140, ECF No. 1155-27. Smith voted 11,886 clients as accepting the Initial Plan and 169 clients as rejecting.

[310] Tr.4 274:10–276:20; Tr.5 113:4–9.

[311] Tr.4 280:6–281:13; Tr.5 113:4–12.

[312] Example Fee Contract, Joint Exhibit 150, ECF No. 1169-8; Tr.4 281:17–283:14.

individuals and instead that the Initial Plan was "a settlement structure with an overall offer of $9.1 billion."[313] And, that "under [his] powers of attorney generally" he had the power to accept and put his clients in the "settlement structure" contemplated by the Initial Plan.[314]

Smith also testified that his Master Ballot was not changing the vote of his clients and instead was merely casting their votes on a new plan that included more favorable terms than the Initial Plan.[315]

## VI. The Tabulation Process for the Beasley Allen and Smith Ballots

On the initial voting deadline, Epiq emailed Red River's counsel that Beasley Allen had submitted a Master Ballot casting more than 11,000 votes to reject the Initial Plan.[316]

Murdica testified that there were certain "red flags" that immediately stood out about the Beasley Allen Master Ballot.[317] One of the red flags was that it included votes for almost double the number of claims that Beasley Allen had disclosed to the bankruptcy court in LTL2.[318] Murdica was also concerned that Beasley Allen voted claims that were barred by the statute of limitations.[319]

An Epiq witness testified that each running count of the vote that Epiq sent out after the voting deadline only showed between 70-71% acceptance of the Initial Plan, until the Smith Master Ballot was received and accepted on September 17.[320]

On August 23, Epiq received an email from Red River's counsel informing Epiq that a law firm would submit a revised master ballot changing votes on the Initial Plan and instructing Epiq to pause tabulation until further instruction.[321]

On August 28, a Beasley Allen attorney emailed Epiq with a letter signed by Birchfield that stated:

> Attached please find a copy of the [Beasley Allen Master Ballot] that was submitted on July 26, 2024, on behalf of Beasley Allen clients. Any attempt by any firm or party other than Beasley Allen to change the votes of any of these clients is unauthorized and submitted without proper authority.

---

[313] Tr.4 287:4–25.

[314] Tr.5 123:2–7.

[315] Tr.4 245:22–246:11; Tr.4 257:18–258:13.

[316] Emails between Epiq and Red River's Counsel July 26, 2024, Joint Exhibit 348, ECF No. 1156-7.

[317] Tr.3 220:10–221:24.

[318] Tr.3 221:3–24.

[319] Tr.3 221:3–16.

[320] Tr.6 165:12–167:3; *see, e.g.*, Emails between Epiq and Red River's Counsel, Joint Exhibit 355, ECF No. 1156-14, at 42/54.

[321] Email asking Epiq to Pause Tabulation, Joint Exhibit 1532, ECF No. 1204-62; Tr.6 98:4–18.

> Please be advised that if Epiq changes the votes of any of
> these clients, you will be proceeding at your peril.[322]

The email was sent to a general inbox Epiq provided for inquiries about the
solicitation of the Initial Plan.[323] An Epiq employee forwarded the email to an Epiq
consultant on the Red River solicitation team.[324] The consultant received the email
but it appears she never read the email or the Beasley Allen letter until her
deposition in November 2024.[325]

On September 12, Red River's counsel informed Epiq that Smith would be
submitting a Master Ballot for substantially all of the claims reflected in the
Beasley Allen Master Ballot.[326] Epiq then sent Smith a form Master Ballot.[327]

On September 13, Red River's counsel emailed Epiq and cited to section 4(b)
of the Tabulation Procedures as authority to switch the Beasley Allen votes.[328] On
September 17, after the Smith Master Ballot was submitted, Red River's counsel
confirmed instructions to Epiq to accept the change of votes under section 4(b).[329]
Epiq also believed section 4(c) of the Tabulation Procedures gave it authority to
switch the votes.[330]

On September 19, Beasley Allen sent another email inquiring about the
status of the Beasley Allen Master Ballot.[331] Epiq did not respond to this email or
forward it to Red River's counsel.[332]

After Epiq switched the votes that previously rejected the Initial Plan to
accepting the Initial Plan under the Smith Master Ballot, Red River's acceptance
rate of the Initial Plan went from 71% to 83%.[333] This triggered the bankruptcy
filing and was the acceptance rate represented to the Court on the petition date.[334]

---

[322] Email and Forward of Email from Achtemeier, Joint Exhibit 942, ECF No. 1199-39; Letter from
Beasley Allen, Joint Exhibit 943, ECF No. 1199-40; Tr.6 113:22–115:25.

[323] Email and Forward of Email from Achtemeier, Joint Exhibit 942, ECF No. 1199-39; Tr.6 113:22–
115:25.

[324] Email and Forward of Email from Achtemeier, Joint Exhibit 942, ECF No. 1199-39; Tr.6 113:22–
115:25.

[325] Tr.6 115:8–116:20.

[326] Emails Between Epiq and Red River's Counsel about Creation of SLF Ballot, Joint Exhibit 362,
ECF No. 1156-21.

[327] Kjontvedt Supplemental Dec. in Support of Tabulation, Joint Exhibit 1334 ¶15, ECF No. 1203-33.

[328] Emails Between Epiq and Red River's Counsel about Creation of SLF Ballot, Joint Exhibit 362,
ECF No. 1156-21.

[329] Emails between Epiq and Red River's Counsel September 17, 2024, Joint Exhibit 1212, ECF No.
1200-67; Tr.6 107:7–19.

[330] Tr.6 109:13–110:9.

[331] Achtemeier Email September 19, 2024, Joint Exhibit 936, ECF No. 1191-63.

[332] Tr.6 118:21–119:9; Tr.6 176:22–177:19.

[333] Tr.6 166:21–25.

[334] Tr.6 166:21–25; Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶8,
ECF No. 1130-10.

### Analysis of Beasley Allen and Smith Issues

The Smith ballot has several problems.

First, Smith did not have a power of attorney to vote on the Initial Plan on behalf of his clients. For the reasons stated above, his general reliance on the engagement letter terms and negative notice is not sufficient.

Smith also acknowledged that he could not settle an individual claim without client consent.[335] Smith believed he did not need client consent to vote on the Initial Plan because he was not agreeing to an individual settlement on behalf of a client.[336] Instead, he testified that he was accepting a "settlement matrix" by voting to accept the Initial Plan.[337] Some of the engagement letters Smith had with his clients do consider a type settlement matrix, but it would not apply in this case.[338] Additionally, Smith himself acknowledged there was no settlement structure or "matrix" that could apply to claimants that would only receive $1,500 or $1,000 under the Initial Plan.[339] Based on his testimony, Smith also believed he was soliciting a new plan, which he would not be permitted to do under the Bankruptcy Code.[340]

Next, the Tabulation Procedures were not properly followed. Red River relied on section 4(b) of the Tabulation Procedures as giving authority to switch the votes.[341] Section 4(b) states:

> The holder of a Channeled Talc Personal Injury Claim for whom a vote is submitted on a valid ballot may withdraw their vote; provided, however, that neither LLT nor the Debtor is obligated to recognize any withdrawal, revocation, or change of any vote received after the Voting Deadline; provided, further, that counsel to a claimant may withdraw valid votes of Clients submitted on a Master Ballot only if (i) such Master Ballot was submitted by such counsel pursuant to a power of attorney or (ii) counsel obtains such claimant's consent to withdraw their vote.[342]

This section is about withdrawing votes, not changing votes. Counsel may withdraw votes if the Master Ballot was submitted by "such counsel pursuant to a

---

[335] Tr.5 44:4–7.

[336] Tr.5 44:4–13; Tr.5 122:18–123:7; Tr.5 161:2–162:23.

[337] Tr.5 44:4–13; Tr.5 122:18–123:7; Tr.5 161:2–162:23.

[338] Example of Smith Engagement Letter, Joint Exhibit 1182, ECF No. 1200-46; Tr.5 161:13–162:18; Tr.5 170:15–173:17,

[339] Tr.5 169:8–170:5.

[340] Tr.4 245:22–246:11; Tr.4 257:18–258:13.

[341] Emails between Epiq and Red River's Counsel September 17, 2024, Joint Exhibit 1212, ECF No. 1200-67; Tr.6 107:7–19.

[342] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 26–27/876.

power of attorney."[343] The Beasley Allen Master Ballot was not submitted pursuant to a power of attorney. It was submitted under Option A. Moreover, the purported "withdrawing" counsel here would have to be Smith because Beasley Allen did not submit an additional Master Ballot or supplement its original Master Ballot. And Smith is not "such counsel" that originally submitted the first Master Ballot that was being "withdrawn." Thus, section 4(b) does not support the switch of the Beasley Allen votes.

Epiq also points to section 4(c) as supporting the switch of the Beasley Allen votes. Section 4(c) states:

> Any holder of a Channeled Talc Personal Injury Claim who submits a properly completed superseding ballot or withdrawal of a ballot on or before the Voting Deadline will be presumed to have sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's or interest holder's acceptance or rejection of the Plan.[344]

This section likewise does not support switching the votes. This section is concerned with a holder of a claim submitting a superseding ballot or withdrawing a ballot, not the holder's counsel. The difference between actions taken by a holder of a claim versus counsel is one highlighted in other sections of the Tabulation Procedures. In fact, section 4(b)—the section cited by Red River—illustrates the distinction. That section specifically authorizes the "holder" of a claim and "counsel to a claimant" to do different things.[345] Thus, section 4(c) does not address the ability of counsel to change the vote on a previously submitted Master Ballot.

The section that addresses the situation is section 4(g). Section 4(g) states:

> If the same holder of a Channeled Talc Personal Injury Claim appears on more than one Master Ballot, the Solicitation Agent will exercise reasonable efforts to coordinate with the respective firms to cure the discrepancy. If the discrepancy is not cured, the vote for the holder appearing on more than one Master Ballot will be counted only once and only if such votes are consistent with respect to acceptance or rejection of the Plan. In the event that such votes are not consistent, none of the votes will be counted.[346]

Here we had the same holders of claims appearing on two different Master Ballots. So Epiq was required to "exercise reasonable effort to coordinate" with the firms to

---

[343] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 26–27/876.

[344] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 27/876.

[345] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 26–27/876.

[346] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 27/876.

resolve the discrepancy.[347] This effort was not optional.[348] But that did not happen. The Court recognizes that Epiq was acting according to directions from Red River's counsel who drafted the procedures.

Red River believes that even under section 4(g), if the discrepancy was not cured and the votes remained inconsistent, the result is that none of the votes should be counted.[349] And if the Beasley Allen and Smith Master Ballots are not counted, Red River meets the requisite 75% acceptance.[350] But these claimants should not have to pay for the lack of agreement between their counsel or solicitation issues that have nothing to do with them.

During trial, section 4(d) was also cited as potential authority for the switch. But it too does not authorize the switch. Section 4(d) only allows for a later voted ballot to be counted over an earlier voted ballot if the later in time ballot is received "from the same authorized representative representing the same holder of a Channeled Talc Personal Injury Claim."[351] Smith and the Smith Law Firm are co-counsel with Birchfield and Beasley Allen, but they are not the same authorized representatives. They were opposed representatives in connection with voting.

Finally, the notice employed by Smith is especially troubling. Smith sent a negative notice email to his clients on Wednesday, September 11, 2024, with the initial deadline to respond being Friday, September 13.[352] He then extended the deadline to Sunday, September 15.[353] At best, women with cancer had two business days and a weekend to respond and indicate their votes. This is an "unreasonably" short time for a creditor vote under Bankruptcy Rule 3018(b), and therefore, regardless of the other issues the Court has discussed, these votes cannot be counted. FED. R. BANKR. P. 3018(b); *see also In re Southland Corp.*, 124 B.R. 211,

---

[347] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 27/876.

[348] The language in section 4(g) states that Epiq "*will* exercise reasonable efforts to coordinate" with the law firms who submitted the Master Ballots, while other sections of the tabulation procedures state that Epiq "*may*, at its discretion" contact counsel concerning defective ballots. Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 26–27/876 (emphasis added). Thus, the procedures themselves distinguish between actions Epiq may take, and actions Epiq is required to take.

[349] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 26/876.

[350] Many of the alternative scenarios of the vote count that Red River offered in testimony and argument were premised on the expert report of Andrew Evans. In Evans's report, he notes that almost all of his calculations utilize a base set of data that includes the assumption that the Court will allow three law firms to change their Master Ballots voting on behalf of 1,700 total talc claimants from rejecting to accepting the plan. *See* Evans Expert Report, Joint Exhibit 1566, ECF No. 1264-1, at 14–15; Tr.6 202:6–204:12. Most of these votes are the subject of Red River's two vote change motions. *See* Red River's Motion to Permit Clients of Morelli Law Firm to Change Votes, ECF No. 328; Red River's Motion to Permit Clients of Summers & Johnson to Change Votes, ECF No. 731. It appears that Evans also assumes the Court will allow Carlson Law Firm to amend its Master Ballot even though there is no filed request to do so.

[351] Master Ballot Package, Joint Exhibit 23, ECF No. 1155-10, Annex C at 27/876.

[352] SLF September 11, 2024 Letter, Joint Exhibit 139, ECF No. 1155-26.

[353] Tr.4 264:21–265:1; Tr.4 279:5–10; Tr.4 290:4–19; Tr.5 22:1–6.

227 (Bankr. N.D. Tex. 1991) (holding that an 8 business day period between the day of mailing of the solicitation materials and the last day for voting was an unreasonably short period of time under Rule 3018(b)).

In conclusion, the entire vote cannot be certified. The Court cannot find that the class of talc claimants voted to accept the Plan under § 1129(a)(8), which prevents confirmation of the Plan. Red River's Motion to Confirm the Pre-Petition Voting Results is denied. This ruling renders the other pending motions concerning voting moot. Many of those motions were also plagued by the same problems discussed above. For example, Red River filed a motion to permit the Morelli Law Firm, PLLC to change about 1,500 votes under Option A, even though Morelli stated at his deposition that he has not even contacted his clients about the change.[354] This request highlights the problems that were present throughout the solicitation and voting process in this case. Again, the Master Ballot would have worked, but it was not carefully followed. The Court cannot certify these results.

### Nonconsensual Third-Party Releases

The Plan contains improper nonconsensual third-party releases. The Third-Party Releases in § 11.2.2 of the Plan release claims against hundreds of nondebtor third parties related to J&J, including claims asserted in the *Love* and *Bynum* lawsuits.[355] There is no dispute that voters had no opportunity to opt in or opt out of these releases. Thus, voters who affirmatively voted to reject the Plan would still be bound by the Third-Party Releases.

The Supreme Court held in *Harrington v. Purdue Pharma* that the Bankruptcy Code does not "authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 207 (2024).

Red River argues, however, that *Purdue* does not apply because its Plan is "full pay"[356] and relies on the following language in the decision:[357]

> As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. *See, e.g., In re Specialty Equipment Cos.*, 3 F.3d 1043, 1047 (CA7 1993). **Nor do we have occasion today**

---

[354] Red River's Motion to Permit Clients of Morelli Law Firm to Change Votes, ECF No. 328; Morelli Depo. 87:15–23, ECF No. 1351-6.

[355] Releases by Holders of Claims, § 11.2.2, Third Amended Plan, ECF No. 1171.

[356] Tr.9 179:14–180:12.

[357] Tr.9 178:1–8.

> *to express a view on what qualifies as a consensual*
> *release or pass upon a plan that provides for the full*
> *satisfaction of claims against a third-party*
> *nondebtor* . . . Confining ourselves to the question
> presented, we hold only that the bankruptcy code does not
> authorize a release and injunction that, as part of a plan of
> reorganization under Chapter 11, effectively seeks to
> discharge claims against a nondebtor without the consent
> of affected claimants.

*Purdue Pharma*, 603 U.S. at 226–27 (emphasis added).

Thus, according to Red River, a "full pay" plan may contain nonconsensual third-party releases. This argument theoretically extends to chapter 11 plans with classes of claims that are unimpaired, do not vote, and are deemed under § 1126(e) to accept a plan. Red River argues claimants historically lost at trial leading up to LTL1, so its "full pay" analysis is based prior estimated payouts for settlements J&J has made with claimants.[358] Red River believes the Plan will pay claimants twice as much as this historical average, giving them "full pay."[359]

The Supreme Court provided no guidance on the "full satisfaction of claims" language. This Court, however, does not read *Purdue* as implicitly endorsing the third-party releases in this case because this is not a "full pay" case. While it is material that Red River based its analysis on prior estimated payouts for settlements that J&J has made with claimants, there has been a verdict against J&J exceeding the proposed payout under the Plan.[360] There is also a difference between a claim for liquidated damages under a contract, where the damages may be calculated from the contract alone, and estimated damages based on previous settlements.

In any case, the Fifth Circuit has stated many times that nonconsensual third-party releases are not permissible. *See In re Highland Cap. Mgmt., L.P.*, No. 23-10534, 2025 WL 841189, at *4 (5th Cir. Mar. 18, 2025) ("Notably, any bankruptcy court action must square with the Bankruptcy Code's edict that 'discharge of a debt of the debtor does not affect the liability of any other entity on…such debt'") (citations omitted); *In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) ("this court has held that Section 524(e) only releases the debtor, not co-liable third parties."); *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 760 (5th Cir. 1995) ("Section 524 prohibits the discharge of debts of nondebtors"); *In re Coho Res., Inc.,* 345 F.3d 338, 342 (5th Cir. 2003) ("The discharge and injunction, however, are expressly designed to protect only the *debtor,* and do 'not affect the liability of any other entity' for the debt"); *Matter of Edgeworth,* 993 F.2d 51, 53–54

---

[358] Expert Report of Dr. Mullin, Joint Exhibit 1837, ECF No. 1247-1, at 35/187; Tr.7 68:4–13.
[359] Tr.6 327:9–22.
[360] Tr.2 302:22–303:19 (discussing the $2.562 billion *Ingham* verdict).

(5th Cir. 1993) ("Section 524(e) specifies that the debt still exists and can be collected from any other entity that might be liable").

Red River believes the All Writs Act serves as additional authority for which the Court has the power to approve the Third-Party Releases. The Court disagrees. The All Writs Act says "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

This argument conflicts with *Purdue*, which prohibited nonconsensual third-party releases after finding there was no express section in the Bankruptcy Code allowing them. Section 105 of the Bankruptcy Code grants bankruptcy courts broader authority than the All Writs Act,[361] and it cannot justify granting nonconsensual third-party releases either. *Purdue Pharma*, 603 U.S. at 217, n.2; *Brown v. Viegelahn* (*In re Brown*), 960 F.3d 711, 719–20 (5th Cir. 2020) (citing *Law v. Siegel*. 571 U.S. 415, 421 (2014)); *see also Highland Cap. Mgmt., L.P.*, 2025 WL 841189, at *4 (recognizing that bankruptcy courts are not "roving commission[s] to do equity") (citations omitted). If a debtor cannot use § 105 as a basis to seek approval of nonconsensual releases, the All Writs Act—which has a limited usage to aiding jurisdiction—fails too.

### Section 524(g) Injunction

The Plan proposes to channel all Channeled Talc Personal Injury Claims against Protected Parties to the Talc Personal Injury Trust.[362] Channeled Talc Personal Injury Claims include all Talc Personal Injury Claims, defined as:

> [A]ny claim or [demand for payment] against the Debtor, LLT, Old JJCI, or any other Protected Party, whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtor, LLT, Old JJCI, or any other Person, but, in the case of such acts or omissions of LLT, Old JJCI or any other Person (other than the Debtor) only to the extent the Debtor has, or is alleged to have, liability for LLT's, Old JJCI's, or such other Person's conduct, whether by operation of the law, by assumption of such liability from LLT, Old JJCI, or such other Person, by

---

[361] *See Haynes v. Chase Bank USA, N.A.* (*In re Haynes*), No. 11-23212 (RDD), 2014 WL 3608891, at *8 (Bankr. S.D.N.Y. July 22, 2014).

[362] Channeling Injunction, § 11.3.1, Third Amended Plan, ECF No. 1171.

> agreement to indemnify, defend, or hold harmless LLT, Old
> JJCI, or such other Person from and against such liability,
> or otherwise…[363]

The definition of Protected Parties contains over 700 entities, including several hundred retailers and Kenvue.[364] On the effective date of the Plan, all claims against the Protected Parties by current and future talc claimants will be channeled to the Talc Personal Injury Trust.[365] After the effective date, claimants are enjoined from taking any action against any of the Protected Parties and must look to the Trust.[366] The Court finds that § 524(g) does not permit enjoining actions against certain Protected Parties.

If a chapter 11 plan is confirmed and the debtor is entitled to receive a discharge of its debts, § 524(a)(2) provides that the discharge operates as an injunction against acts to collect such debts as a personal liability of the debtor. This provision does not mean that the debt simply disappears. Instead, the debt will be satisfied under the confirmed plan. Section 524(e) says that a discharge given to the debtor does not affect the liability of a third party who is liable for that same debt. Section 524(g), however, provides a limited exception to § 524(e) and allows a supplemental injunction to extend to third parties in certain asbestos-related cases.

Section 524(g) allows for the creation of a trust and authorizes bankruptcy courts to issue a supplemental injunction to enjoin and channel present and future asbestos-related claims against a debtor to the trust in connection with confirmation of a chapter 11 plan. 11 U.S.C. § 524(g)(l)(A). Besides releasing the claim against the debtor, notwithstanding § 524(e), the supplemental injunction may also "bar any action based on such claims against the debtor that are directed at a third party." 4 Collier on Bankruptcy ¶ 524.07 (16th Ed. 2025); *see also* 11 U.S.C. 524(g)(4)(A)(ii) (allowing third-party claims to be enjoined and channeled to the trust).

Before a court may issue the channeling injunction, a debtor must satisfy several statutory prerequisites. For actions against nondebtor third parties to be channeled, a debtor must demonstrate that those actions properly fall within § 524(g)(4)(A)(ii)'s scope. Whether Red River has done so is heavily contested.

> Section 524(g)(4)(A)(ii) says that a supplemental injunction:
> may bar any action directed against a third party who is
> identifiable from the terms of such injunction (by name or as part
> of an identifiable group) ***and is alleged to be directly or
> indirectly liable for the conduct of, claims against, or***

---

[363] Channeled Talc Personal Injury Claims, Def. 1.1.26, Third Amended Plan, ECF No. 1171; Talc Personal Injury Claim, Def. 1.1.159, Third Amended Plan, ECF No. 1171.
[364] Protected Party, Def. 1.1.124, Third Amended Plan, ECF No. 1171; *see* Schedule 3 to the Plan, ECF No. 24-15.
[365] Channeling Injunction, § 11.3.1, Third Amended Plan, ECF No. 1171.
[366] Channeling Injunction, § 11.3.1, Third Amended Plan, ECF No. 1171.

> ***demands on the debtor to the extent such alleged liability of
> such third party arises by reason of—***
>
> (I)    the third party's ownership of a financial interest in the
>        debtor, a past or present affiliate of the debtor, or a
>        predecessor in interest of the debtor;
> (II)   the third party's involvement in the management of the
>        debtor or a predecessor in interest of the debtor, or service
>        as an officer, director or employee of the debtor or a related
>        party;
> (III)  the third party's provision of insurance to the debtor or a
>        related party;  or
> (IV)   the third party's involvement in a transaction changing the
>        corporate structure, or in a loan or other financial
>        transaction affecting the financial condition, of the debtor
>        or a related party, including but not limited to:
>        aa.  involvement in providing financing (debt or equity), or
>             advice to an entity involved with such a transaction or
>        bb.  acquiring or selling a financial interest on an entity as
>             part of such transaction.

11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added).

Courts interpreting this language have recognized two statutory
prerequisites for determining whether a claim against a third party is properly
channeled to a trust: how the third party shares liability with the debtor (the
liability requirement) and how that liability arose (the statutory relationship
requirement). *In re W.R. Grace & Co.*, 900 F.3d 126, 135 (3d Cir. 2018); *In re
Quigley Co.*, 676 F.3d 45, 59–62 (2d Cir. 2012); *Combustion Eng'g,* 391 F.3d at 234–
35.

Second and Third Circuit cases hold that § 524(g)(4)(A)(ii) only enjoins
actions against third parties that are derivative of claims against the debtor. *See,
e.g.*, *W.R. Grace & Co.*, 900 F.3d at 136; *Quigley Co.*, 676 F.3d at 60; *Combustion
Eng'g*, 391 F.3d at 234. In *W.R. Grace*, the Third Circuit said that bankruptcy courts
should review applicable law about the claims alleged against the third party to
determine whether the liability is "wholly separate from the debtor's liability or
depends on it." *W.R. Grace & Co.*, 900 F.3d at 137. In *Quigley*, the Second Circuit
explained that the "four relationships enumerated in subsections (I) through (IV),
[constitute] a relationship between one party and another that, in appropriate
circumstances, has commonly given rise to the liability of the one party for the
conduct of or claims or demands against the other." *Quigley Co.*, 676 F.3d at 61.
Third-party liability subject to subsection (IV) could arise, for example, on "an
aiding and abetting theory, as when one party induces another to commit a tort …
or on a successor liability theory." *Id.* at 60.

The word "derivative" is not used in § 524(g), but this Court agrees that the text supports such a reading. Section 524(g)(4)(A)(ii) operates as an exception to § 524(e). But the exception only extends to where the third party is alleged to be liable for "the conduct of, claims against, or demands on the debtor," indicating that liability of the third party must essentially be a claim against the debtor. Further, that liability must arise because of a statutory relationship enumerated in subsections (I)-(IV). These subsections all refer to instances when a claim against a debtor is directed at a third party based on a meaningful connection. Section 524(g)(4)(A)(ii) does not, however, enjoin claimants from seeking to recover against nondebtors based on liability wholly separate from the debtor's liability or not dependent on it.

## I.   Retailers

There are several hundred retailers included as "Protected Parties."[367] Retailers are allegedly included in hundreds of talc-based product lawsuits involving J&J and its affiliates.[368] Retailers argue they did not mine or manufacture talc-containing products.[369] They claim that their alleged liability is based on their participation in the stream of commerce, and "the fact that they (or their affiliates) allegedly sold talc-containing products created by others, such as J&J."[370] According to the retailers, a talc claim nominally asserted against them is essentially a talc claim against J&J, "given its absolute obligations to indemnify and defend the retailers."[371]

Red River also states that retailers are being sued because they distributed its predecessor's talc-containing products.[372] According to Red River, retailers entered into financial transactions to distribute these products, by sale or distribution contract, and, in turn, there are contractual indemnity or common law indemnity obligations that are owed to the retailers.[373] Red River claims these transactions fall within § 524(g)(4)(A)(ii)(IV) because retailers entered into transactions that affected the financial condition of Red River's predecessors.[374] Old JJCI and LTL—Red River's predecessors—signed indemnification agreements with

---

[367] Protected Party, Def. 1.1.124, Third Amended Plan, ECF No. 1171; Schedule 3 to the Plan, ECF No. 24-15.
[368] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364, ECF No. 1203-66, at 12–33/775.
[369] Retailers' Reservation of Rights, ECF No. 1067, at 2.
[370] Retailers' Reservation of Rights, ECF No. 1067, at 2.
[371] Retailers' Reservation of Rights, ECF No. 1067, at 2–3.
[372] Tr.9 173:1–5.
[373] Tr.9 172:19–173:19; Tr.9 176:10–20.
[374] Tr.9 172:19–173:19.

retailers.[375] These indemnification obligations were allocated to Red River as part of the 2024 divisional merger.[376]

The plain text of the statute coupled with the lack of evidence in the record requires the Court to deny including retailers in the channeling injunction. For a claim against a retailer to be enjoined and channeled to the Trust under § 524(g), the retailer must be alleged to be directly or indirectly liable for:

- The conduct of the debtor;

- claims against the debtor; or

- demands on the debtor.

And the retailer's alleged liability must arise by reason of:

- The retailer's involvement in a financial transaction affecting the financial condition of the debtor or a related party.

Red River's expert witness and its Chief Legal Officer separately confirmed that the Plan is not feasible if the retailers are not included in the channeling injunction because, in part, of the magnitude of the indemnity obligations.[377] But there is nothing in the record establishing that retailers are being sued based on "the conduct of," "claims against," or "demands on" Red River. The record does not include material evidence of the allegations against retailers in lawsuits. The record does include references to contractual and common law indemnity obligations that Red River's predecessors owed to retailers, and that such obligations were later allocated to Red River via the divisional merger.[378] But that is not enough to satisfy § 524(g)'s requirements. A contractual indemnity that Red River may owe a retailer based on inherited indemnities for talc liability does not create liability for the retailer that it could assert as within the scope of § 524(g).

Red River's interpretation of § 524(g) forecloses any possibility that retailers are being sued for their own independent acts. For example, retailers could be sued under theories of liability that are wholly separate from causes of action based on the acts of a talc manufacturer or distributor. If a retailer is alleged to have committed an independent act, and state or federal law gives claimants a right to pursue a separate claim against a retailer, § 524(g) may not enjoin the claim. Such

---

[375] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶77, ECF No. 1130-10.

[376] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶77, ECF No. 1130-10; Tr.2 251:4–13. Red River's predecessor Old JJCI, and later LTL, entered into these indemnity contracts. Red River inherited these liabilities in the divisional merger. And under the TBOC, it appears that Red River would be the counterparty to these indemnity agreements now. *See* TEX. BUS. ORGS. CODE § 10.008(a)(4)–(5).

[377] Tr.2 41:11–17; Tr.7 92:8–93:24; Tr.9 177:8–15.

[378] Tr.2 25:13–20; Tr.2 41:1–12; Tr.2 42:16–20; Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶7, ECF No. 1203-66.

litigation may not be based on "the conduct of," "claims against," or "demands on" Red River.

Further, claims against retailers may fail the statutory relationship requirement. Red River's argument that the transactions between the retailers and J&J-related entities qualify as an "other financial transaction affecting the financial condition, of the debtor or a related party" under subsection (IV) suggests that the subsection should be broadly construed to include financial transactions in the ordinary course of business. Subsection (IV) lists examples of these types of financial transactions: (aa) involvement in providing financing or advice to an entity in the financial transaction or (bb) acquiring or selling a financial interest in an entity as part of the financial transaction. Red River's interpretation of subsection (IV) does not align with the examples Congress provided. And while such examples are not exhaustive, Red River's reading makes the exception swallow the rule.

Perhaps some liability against retailers could be appropriately channeled under § 524(g), but perhaps some liability would not. The Plan, however, would improperly channel both. Because the testimony and argument at trial highlighted that the Plan does not work without the inclusion of the retailers as Protected Parties, the Plan is not feasible.

## II. Kenvue

To evaluate whether claims against Kenvue can be appropriately released and channeled to the Trust, it helps to again review the corporate history and transactions preceding the existence of Red River.

- In 1978-79, J&J transferred all assets and liabilities associated with its baby products division, including talc-based J&J Baby Powder, to a wholly owned subsidiary, and that subsidiary eventually became known as Old JJCI.[379] As part of the transfer, Old JJCI agreed to indemnify J&J for all claims related to the baby products.[380]

- From 1978 to 2020, Old JJCI continued to produce talc-containing J&J Baby Powder.[381] In May 2020, Old JJCI announced that it would discontinue the line of talc-based J&J Baby Powder in the U.S. and Canada.[382]

---

[379] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶20, ECF No. 1130-10.
[380] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶20, ECF No. 1130-10.
[381] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶59, ECF No. 1130-10; Tr.2 46:24–47:3.
[382] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶59, ECF No. 1130-10; Tr.2 46:24–47:3.

- In 2021, Old JJCI underwent a divisional merger using the TBOC and ceased to exist.[383]

- From the divisional merger emerged New JJCI, which held most of Old JJCI's assets—including the consumer products division—and LTL, which was allocated Old JJCI's talc-related liabilities.[384] In December 2022, New JJCI changed its name to Holdco.[385]

- In January 2023, Holdco transferred the consumer product assets to its parent, Janssen Pharmaceuticals, Inc.[386]

- In August 2023, J&J announced that the consumer product assets of Janssen had been separated into Kenvue, a new public company.[387] J&J initially retained a 9.5% interest in Kenvue.[388]

- In May 2024, J&J divested all shares of Kenvue common stock as part of a debt-for-equity exchange.[389] The actual separation occurred under a 2023 separation agreement.[390] As part of the separation, J&J agreed to indemnify Kenvue for derivative and other liabilities of LTL (i.e., the talc liability).[391]

- In 2024, Holdco and LTL converted to Texas limited liability companies and were renamed Holdco (Texas) and LLT.[392]

---

[383] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶29, ECF No. 1130-10.
[384] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶29, 32, ECF No. 1130-10.
[385] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶34, ECF No. 1130-10.
[386] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶34, ECF No. 1130-10.
[387] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶34, ECF No. 1130-10.
[388] Kenvue Form S-1 dated April 18, 2023, Joint Exhibit 514, ECF No. 1149-2, at 150/1108; Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶34, ECF No. 1130-10. At the time of trial, Kenvue was no longer an affiliate of J&J; J&J had sold all of its shares in Kenvue. Tr.2 322:24–323:3.
[389] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶8, ECF No. 1203-66.
[390] Separation Agreement by and between Johnson & Johnson and Kenvue Inc., Joint Exhibit 1422, ECF No. 1203-134
[391] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶9, ECF No. 1203-66.
[392] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶36, ECF No. 1130-10.

- LLT ceased to exist in August 2024, when it merged with Holdco (Texas).[393] Holdco (Texas) then underwent a divisional merger, ceased to exist, and three new entities were created: Red River, Pecos River, and New Holdco (Texas).[394]

- New Holdco (Texas) then merged with a J&J-related New Jersey corporation, ceased to exist, and the surviving entity was named New Holdco.[395]

In sum, under the 2024 divisional merger, ovarian and other gynecological talc-related liabilities held by Old JJCI, LTL, and LLT were allocated to Red River. Included in the allocation of liabilities is the indemnity obligation that Old JJCI, and then LTL/LLT, owed to J&J for those claims.[396] J&J also owes Kenvue an indemnity for any ovarian and other gynecological talc-related claims.[397]

According to Red River, neither Kenvue, its subsidiary J&J Inc., New JJCI, nor any other entity that held the consumer business after the 2021 divisional merger ever distributed, marketed, or sold talc products of any kind in the United States.[398]

Yet, as of the petition date, Kenvue is named in around 21,000 actions asserting ovarian and other gynecological talc-related claims.[399] Additionally, in August 2023, MDL plaintiffs moved to amend their master complaint to include claims against Kenvue.[400] The special master granted the motion to amend and the matter is on appeal.[401] Some plaintiffs allege that Kenvue is liable for products sold by Old JJCI.[402] But they also allege that New JJCI continued to manufacture J&J Baby Powder after Old JJCI's divisional merger, that Kenvue sold Johnson's Baby Powder products in the United States, and that Kenvue said in SEC filings that it was responsible for liabilities related to talc-based products sold outside the United States or Canada.[403] The second amended long form complaint in the MDL includes similar allegations and adds that Kenvue produced talc-based Johnson's Baby

---

[393] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶¶3, 36, ECF No. 1130-10

[394] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶37, ECF No. 1130-10.

[395] Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶38, ECF No. 1130-10.

[396] Tr.2 48:14–17; Kim Dec. in Support of Red River's First Day Pleadings, Joint Exhibit 216 ¶29, ECF No. 1130-10; Kim Dec. in Support of LTL's First Day Pleadings, Joint Exhibit 478 ¶24, ECF No. 1168-15.

[397] Tr.2 48:1–17; Tr.2 174:2–7; Separation Agreement by and between Johnson & Johnson and Kenvue Inc., Joint Exhibit 1422 § 6.03, ECF No. 1203-134.

[398] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶10, ECF No. 1203-66.

[399] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶10, ECF No. 1203-66.

[400] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶10, ECF No. 1203-66.

[401] Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶11, ECF No. 1203-66.

[402] *See, e.g.,* Nesko v. Johnson & Johnson Complaint, Joint Exhibit 579, ECF No. 1165-1.

[403] Nesko v. Johnson & Johnson Complaint, Joint Exhibit 579 ¶¶13, 34, 45–48, ECF No. 1165-1.

Powder outside the United States and allowed U.S. citizens to buy it through third-party retailers.[404] The MCL litigation makes similar allegations against Kenvue.[405] Kenvue, J&J, and Red River strongly oppose these allegations against Kenvue.[406] This Court makes no finding about the merits of any allegations or claims against Kenvue. Such matters are not before this Court.

Red River argues that claims against Kenvue should be enjoined and channeled to the Trust because claims against it fall under § 524(g)(4)(A)(ii)(IV) as a claim against Red River.[407] Red River argues these claims arise because of Kenvue's involvement in a transaction changing the corporate structure of a "related party" (the spinoff of consumer assets from New JJCI to, ultimately, Kenvue) or a financial transaction affecting the financial condition of such "related party" (Red River's indemnification of J&J and J&J's indemnification of Kenvue).[408]

It could be that claims against Kenvue relating to Old JJCI could be channeled to the Trust. The divisional merger of Old JJCI resulted in the existing talc liabilities in 2021 being allocated to LTL, and then eventually to Red River. Thus, an action against Kenvue based on a talc liability that arose before the 2021 divisional merger could be considered an action against Red River and fall under § 524(g)(4)(A)(ii)(IV).

But claims against Kenvue individually, for acts occurring post-2021 divisional merger and post-2023 separation from J&J, would fail the liability requirement of § 524(g). Such liability, if any, would not have been allocated to LTL, LLT, or Red River by Old JJCI and cannot arise because of "conduct of, claims against, or demands on the debtor." 11 U.S.C. 524(g)(4)(A)(ii). Just as with retailers, the indemnity obligations do not bring Kenvue's liability under § 524(g)'s scope either. Red River agreed to indemnify J&J for talc-related liabilities. There is no indemnity agreement between Red River and Kenvue.

Red River's proposed channeling injunction improperly attempts to channel and release wholly separate claims against Kenvue and claims based on a series of indemnity obligations.[409] Because Red River has represented the Trust would not work without enjoining claims against Kenvue, the Plan is not feasible.[410]

---

[404] Second Amended Master Long Form Complaint, Joint Exhibit 1238 ¶¶61–67, ECF No. 1191-120.
[405] Amended Complaint, Joint Exhibit 1412 ¶¶49–55, ECF No. 1207-1.
[406] *See, e.g.,* Second Kim Dec. in Support of Injunctive Relief, Joint Exhibit 1364 ¶10, ECF No. 1203-66; Lindenmayer Depo. 55:10–21, ECF No. 1351-3.
[407] Tr.9 171:2–172:16.
[408] Tr.9 171:16–172:16.
[409] *See* Channeling Injunction, § 11.3.1, Third Amended Plan, ECF No. 1171.
[410] Tr.9 171:16–18.

## DISMISSAL

Section 1112(b)(1) requires a bankruptcy court to dismiss a case—if in the best interests of creditors and the estate—for "cause," unless a court determines that appointment of a trustee or examiner under § 1104(a) is in the best interests of creditors and the estate. The Bankruptcy Code provides a non-exclusive list of 16 examples that constitute "cause" in § 1112(b)(4).[411] The Fifth Circuit recognizes that a lack of good faith in filing a chapter 11 is cause to dismiss the case. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986); *In re Humble Place Joint Venture*, 936 F.2d 814, 817 (5th Cir. 1991).

The Fifth Circuit has also observed that "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Little Creek Dev. Co.*, 779 F.2d at 1071. The standard for dismissal for lack of good faith requires an "on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Little Creek Dev. Co.*, 779 F.2d at 1072. Therefore, there is not any one factor that must be present for a chapter 11 case to be filed in good faith. *See id.*

The Third Circuit dismissed LTL's first bankruptcy case, holding that a chapter 11 debtor must show that it "suffer[s] from financial distress" for the filing to be in good faith. *In re LTL Mgmt., LLC*, 64 F.4th 84, 101 (3d Cir. 2023). The Third Circuit stated that a showing of financial distress does not require the debtor to prove that it is insolvent. *Id.* at 102. Instead, the financial distress standard requires an analysis of various factors that together show that the debtor suffers "financial difficulties" sufficient to "justify chapter 11 relief." *Id.* Because LTL had, among other things, a $60 billion funding agreement with J&J, there was no financial distress and the case was dismissed. *Id.* at 108–09. The *LTL* decision is not binding on this Court. But, under Fifth Circuit precedent, a debtor's financial condition is a factor a court can consider in its analysis.[412]

Heeding that guidance, this Court conducted an on-the-spot analysis to determine whether Red River filed for bankruptcy to pursue a valid bankruptcy purpose. The Court uses the phrase "bankruptcy purpose" and not the phrase "reorganization purpose" intentionally because not every chapter 11 debtor rehabilitates. In fact, some debtors liquidate and create trusts to benefit creditors. *See, e.g.*, 11 U.S.C. § 1123(b)(4) (providing a plan may provide for the sale of all or

---

[411] Section 102 of the Bankruptcy Code confirms that the word "includes" in § 1112(b)(4) is not to be construed as limiting. 11 U.S.C. § 102(3).

[412] The Court notes that the difference in these legal standards by itself—in addition to the countless factual differences between this case and the LTL cases—prevents the Third Circuit's holding in LTL1 from being issue preclusive as to Red River under the doctrine of collateral estoppel. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 284 (5th Cir. 2006) (holding that collateral estoppel does not apply "unless the facts and legal standards used to assess those facts are the same in both proceedings.") (citation omitted).

substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims and interests).

The Court also understands arguments that this case is an LTL 3.0 and that J&J is filing in a new jurisdiction after having two cases dismissed in New Jersey. This could be seen as an abuse of the bankruptcy process. And it could be seen as permitting companies to reincorporate in new jurisdictions if they do not get the answer they want in a case.

But one also cannot overlook that this case is different. The Plan is supported by plaintiffs' firms—including firms that previously did not support the LTL bankruptcies—that represent the majority of talc claimants in this case. These parties negotiated for months to reach a multibillion-dollar deal. Conditions changed between the LTL cases and the filing of Red River, which was over 1 year after the dismissal of LTL2.

There was also a prepetition solicitation and a vote on a plan. That never occurred in the LTL cases. Resolving mass tort claims in bankruptcy is a valid bankruptcy purpose. And seeking to enjoin future asbestos-related claims is authorized by Congress under § 524(g). Red River currently holds the liability for over 90,000 personal injury claims alleging talc-based products cause ovarian and other gynecological cancers, which requires millions per year to defend. And there is always the threat of a multibillion-dollar verdict. Finally, Red River and its professionals have also acted in good faith during this case. Red River has complied with its requirements under the Bankruptcy Code and the Bankruptcy Rules.

The Court also believes some of the issues with the voting process were inadvertent mistakes. The motions to reconsider and vacate the order authorizing the retention of Epiq are denied.[413] Epiq acted in good faith during solicitation and after the petition date. Any mistakes were not intentional. There was no evidence of collusion or other improper behavior.

But the substantive prepetition solicitation and voting issues are troubling. The Court must weigh that LLT and J&J started the divisional merger and corporate restructuring to create Red River before it reached 75% voter support as they promised claimants in the Disclosure Statement. And that it appears the President of Red River did not know that the vote was below 75% when the board approved the divisional merger. The Court did not hear testimony from management but has deposition designations indicating it.[414] There are other material issues with the solicitation and voting processes that were caused by J&J

---

[413] *See* Coalition's Motion to Reconsider and Vacate the Employment and Retention of Epiq, ECF No. 257; U.S. Trustee's Motion to Reconsider the Employment and Retention of Epiq, ECF No. 300.
[414] Wuesthoff Depo. 37:5–9, ECF No. 1351-1.

and Red River. J&J and Red River unnecessarily rushed the solicitation process at the cost of obtaining actual votes from creditors. J&J and Red River knew that Watts only had a week to obtain the votes of his 17,000 clients and they did not grant him an extension when asked. Smith then had two weeks to change 95% of the 11,000 votes from the Beasley Allen Master Ballot based on terms that were only disclosed to Smith and Beasley Allen's shared clients. Red River also misapplied its own tabulation procedures to get over the 75% threshold. Some claimants could have voted relying on the fact that J&J and LLT would only file a third bankruptcy if they had enough support to confirm a plan, not wanting to go through the motions of another bankruptcy case. These factors weigh against Red River.

A debtor pursuing a prepackaged plan and proposing a settlement to voters is not bad faith. That is a valid bankruptcy purpose. But a debtor rushing into bankruptcy after expressly stating in a disclosure statement that it would not file without 75% approval cuts against it, especially when the switch did not adhere to its own tabulation procedures. The Plan itself also has improper nonconsensual third-party releases that violate Fifth Circuit precedent.

Red River filed a settlement-driven divisional merger bankruptcy case. That makes this case different from other mass tort bankruptcy cases. The need for unanimity between this debtor and its funder is crucial. There is no real business to operate or save, no hard assets to sell, no employees to consider, and the debtor must rely on funding exclusively from J&J. This case is exclusively about settling all the ovarian and other gynecological cancer litigation under the Plan.

J&J and Red River want finality. But that requires the Third-Party Releases and requires the retailers to be part of the channeling injunction. The Plan is not feasible if the retailers are not included in the channeling injunction. There is no way to force J&J to fund this case or keep $9 billion on the table.[415]

Normally, a court could deny dismissal, require a new disclosure statement, require re-solicitation of a plan under court supervision with an opt-in/opt-out feature for third-party releases, and require some changes to the plan, including language to ensure a plan is insurance neutral. But that will not work here. There is no way to confirm the solicited plan or the amended versions. The entire construct of the Plan requires re-thinking from a post-*Purdue* perspective.

J&J-related entities are paying the administrative costs, including paying fees of supporting plaintiffs' firms. J&J can easily stop funding at any point because the Plan cannot be confirmed.[416] There are also plenty of immediate fights ahead,

---

[415] *See* Indemnity Cost Funding Agreement, Joint Exhibit 18, ECF No. 1168-7.
[416] *See* Indemnity Cost Funding Agreement, Joint Exhibit 18, ECF No. 1168-7.

including extending exclusivity, continuing a stay over litigation involving nondebtors (which will expire soon), estimation of claims for voting purposes, establishing a bar date for filing proofs of claim, and litigating objections to retention applications for almost all of the professionals in this case—including TCC counsel. At the same time, some voters have died during the case. To be clear, this would happen in the tort system too. There is no guarantee of a court date in the foreseeable future for most of these claimants. But the tort litigation should not be stayed in a divisional merger, settlement-driven case while all of this gets sorted out. Red River and J&J wanted to get a vote on their Plan, and that happened. It is just not a confirmable one and the vote was unnecessarily rushed.

Based on the record, the Court finds it is in the best interest of Red River, its estate, its primary plan proponent J&J, and creditors to dismiss this case for cause. The prepetition voting and solicitation irregularities, including the unreasonably short voting time for thousands of creditors, was all done to get to 75% at any cost. There is also not any present likelihood of rehabilitation of Red River and creditors have been stayed from litigating in the tort system during the pendency of three bankruptcy cases. Appointment of a trustee or conversion does not make sense in this case. And there are no unusual circumstances establishing that dismissal is not in the best interests of creditors and the estate. There is not any one individual factor that requires this result. It is all of them together that require the Court to dismiss this case. While the Court's decision is not an easy one, it is the right one. The Plan references a potential out-of-court deal if the Fifth Circuit would have overturned plan confirmation. The Court hopes something gets done for J&J, Red River, and claimants who also want finality on their cases.

For reasons stated above, it is hereby Ordered that this case and related Adversary Case No. 24-03194 are dismissed.

Signed: March 31, 2025

Christopher M. Lopez
United States Bankruptcy Judge